# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| LISA M. MURPHY,<br><br>Plaintiff,<br><br>v.<br><br>CAMBRIDGE INTEGRATED<br>SERVICES GROUP, INC.<br><br>Defendant | Case No. 08-cv-3224 (AW) |

**EXPERT REPORT OF
JOSEPH M. MARTORELLI, CPA**

I have been retained by the law firm of Campbell Miller Zimmerman, P.C. on behalf of their Plaintiff Lisa Murphy regarding the payment of sales commissions received versus the actual commissions earned during her employment at Cambridge Integrated Service Group Inc. (CISGI). I have been asked to review accounting data and other information so as to offer opinions as to what monies if any, are due to the plaintiff in this matter. In forming my opinions I have relied upon the following documents or summaries of deposition testimony reported by counsel for Plaintiff (when transcripts were not yet available) all of which were provided to me:

Bates Documents      DEF #001 - 1540

Bates Documents      Plaintiff #001-525

Bates Documents      PL Documents #001-1314

Expert Report of Bruce G. Dubinsky

Plaintiff's Answers and Amended Answers to Defendant's Amended First Set of Interrogatories

2006 Business Development Commission Plan for Lisa Murphy

2007 Business Development Commission Plan for Lisa Murphy

Services Agreement between CISGI and Coventry/Concentra

Agreement for Investigative Services between CISGI and MJM

Deposition of Paula Sorgeloos

Depositions of Kevin Turner

Deposition of Wesley O'Brien

Deposition of Michael Grodus

Deposition of David Pearson of Coventry/Concentra (summary)

Deposition of Pam Morrow (summary)

Deposition of Dave Faggert of MJM (summary)

Coventry/Concentra FCM/IME Summaries

Spreadsheet for Billings/Revenue for Surveillance by MJM

The issue of significant disagreement pertains to the sales commissions earned by Ms. Murphy relative to one major customer, Brickstreet Mutual Insurance which will be referred to as "Brickstreet" throughout the balance of this report, pursuant to the Brickstreet's contract with the West Virginia Office of the Insurance Commissioner.

A review of the materials provided has directed me to address four items which appear to be the focus of the disagreement between the parties.

1.) How much revenue was invoiced for services and products provided to Brickstreet?
2.) Should revenues for services "outsourced" to third party vendors be excluded from the calculation of commissions?
3.) Is the $150,000 commission limit per "account" (as referenced in the Business Development Commission Plan) based on per customer or per line of business, as listed on CISGI's commission reconciliation spreadsheets?
4.) What commissions if any are due to the Plaintiff?

## OPINION 1

### Issue 1 - Revenue Invoiced to Brickstreet

Attached are several exhibits which evidence the revenue invoiced by CISGI or third party vendors for services that CISGI provided to Brickstreet. Exhibit 1 summarizes Brickstreet billings by "Program" or "line of business" and the value of each line of business to CISGI. The amounts reflected on Exhibit 1 coincide with documents produced by the plaintiff, defendant and amounts recorded in the expert report of Bruce Dubinsky.

Exhibit 2 is a Summary of FCM revenue prepared by Coventry/Concentra which summary reflects that the revenue invoiced for FCM services to Brickstreet totaled $396,093.

Exhibit 3 is a Summary of IME revenue prepared by Coventry/Concentra which summary reflects that the revenue invoiced for IME services to Brickstreet totaled $2,236,523.

Exhibit 4 is a Spreadsheet for Billings/Revenue for Surveillance prepared by MJM/G4S which summary reflects that the revenue invoiced for SIU services to Brickstreet totaled $277,593.

Exhibit 5 is a Commission Payable Calculation for October 1, 2006 – September 30, 2008.

The revenue invoiced to Brickstreet for services provided between October 1, 2006 and February 4, 2008 totaled $10,373,918 which includes $127,657 of miscellaneous revenues not subject to commission.

The following is a summary of the revenue invoiced to Brickstreet.

| | |
|---|---:|
| Exhibit 1 Invoiced by CISGI | $ 7,463,709 |
| Exhibit 2 Invoiced by Concentra for FCM | 396,093 |
| Exhibit 3 Invoiced by Concentra for IME | 2,236,523 |
| Exhibit 4 Invoiced MJM for SIU | 277,593 |
| | $ 10,373,918 |

**Issue 2 – Are the Independent Medical Exams (IME), Field Case Management (FCM), and Surveillance and Investigation Unit (SIU) Lines of Business and the revenue invoiced thereon exempt from commissions as a result of the invoicing for such services being done by an outsource provider?**

Observations

CISGI entered into an agreement with Concentra, whereby Concentra would provide certain services on behalf of CISGI to Brickstreet. CISGI entered into an agreement with MJM, whereby MJM would perform certain services on behalf of CISGI. The agreements were renewed each year.

The CISGI/Concentra agreement goes beyond conventional customer/vendor relationships as the following were noted:

Reference

DEF 58     A.) CISGI agrees to "indemnify defend and hold harmless Concentra and its officers, employees, agents, stockholder" etc.

DEF 73-76 B.) FCM and other services are being provided to what are referred to as "CISGI clients".

DEF 77     C.) CISGI leased its employees to Concentra which had approval authority over all CISGI salary or benefit increases.

DEF 77     D.) CISGI subleased space to Concentra.

DEF 89     E.) Accounts receivable and follow up billing were coordinated through CISGI's office.

DEF 89     F.) Concentra sends non-EDI bills to CISGI branch offices

DEF 70   G.) CISGI "assigned" their clients to Concentra.

According to the depositions of Paula Sorgeloos and Wes O'Brien the Services Agreement to provide IME and FCM services was between Brickstreet and CISGI. Ms. Sorgeloos also stated there was no contract between Concentra and Brickstreet. Kevin Turner called FCM and IME "bundled services". He further testified that the contract for these services was between CISGI and Brickstreet.

The decision to utilize Concentra for these services was based in part upon Concentra's ability to deliver their services at a lower per unit cost (See PL 475). CISGI's decision to outsource the IME and FCM business was prudent providing a higher rate of return or profit margins could be achieved then if CISGI had undertaken these services internally.

In a memo to West Virginia insurance personnel, Kevin Turner (Executive Vice President Field Claim Sales) explains that the FCM and IME services are included under CISGI's CAMEO (Cambridge Authorized Medical Examination Organization). He goes on to clarify that **"Concentra is the service partner behind CAMEO"** and discloses the financial costs associated with these programs.

CISGI opted to outsource FCM and IME business to Concentra. As a result, it is CISGI's position that all revenue invoiced for these services provided to Brickstreet was done by Concentra and not eligible for sales commissions. The agreement between CISGI and Concentra does not appear to be a traditional vendor/customer relationship. In fact it appears that Concentra is a "<u>mere extension</u>" of CISGI. Both FCM and IME are repeatedly stated as separate accounts on the commission reconciliations which are business records of CISGI and, at one point, commissions were awarded to Plaintiff on these accounts, then reversed.

The profit margin on the FCM line of business is equal to over 23% ($22 divided by $94), so it is sufficient to support a commission payment. The gross profit on the IME business is 4.5% ($42 divided by $930), rendering this line of business as unprofitable, when applying what would be a 9% commission on gross sales, as was done by CISGI on other accounts.

Likewise, the contract between MJM/G4S and CISGI provides that services will be provided by MJM/G4S to Cambridge, for Cambridge's customers, such as Brickstreet. Further, I understand that from the recent deposition of Mr. Faggert that there was no contractual relationship between Brickstreet and MJM/G4S with respect to the services identified on Exhibit 4.

<u>OPINION 2</u>

Based upon the preceding, it is my opinion that the gross revenues of the IME, FCM and SIU lines of business should be included in the calculation of revenue for the purpose of calculating sales commissions due to Lisa Murphy. By all appearances Concentra was contracted by CISGI and is a mere extension of CISGI's CAMEO Program. Both companies were deeply intertwined as were CISGI and MJM. The outsourcing of the performance of these services to what was still

5

considered CISGI's customer, Brickstreet should not render this income commission ineligible. As Paula Sorgeloos affirmed in her deposition, Ms. Murphy was the sales person responsible for bringing in this income stream. These accounts, similar to the others that Ms. Murphy brought in should be commission eligible. If CISGI did not leave sufficient gross margin (specifically in their IME business) to support the related sales commissions due, this is a pricing problem.

This conclusion is supported the deposition testimony of Pam Morrow, a current CISGI employee. My conclusion is also supported by the provisions of the 2006 and 2007 Business Development Commission Plans which mandate that each plan "applies to all business produced."

### Issue 3 - Is the $150,000 per account commission "circuit breaker" based upon each customer or individual program or line of business?

### Observation

My reviews of numerous sales personnel commission reconciliations indicate separate sales billings and resulting commission compensation by "account". The plaintiff's largest customer, Brickstreet has eight separate accounts or lines of business listed for various services that were to be rendered (See DEF 363) to Brickstreet. Below is an example of other CISGI sales employee's who had multiple accounts separately listed and commissioned within the same customer.

| Reference | Sales Person | Customer | Separate Accounts |
|---|---|---|---|
| DEF 014 | John McKernan | Nationwide | 2 |
| DEF 014 | John McKernan | Walmart | 2 |
| DEF 323 | Tim Over | Ryob Technologies | 3 |
| DEF 302 | Unknown | Pillar Sp | 4 |
| DEF 302 | Unknown | Polaris | 3 |
| DEF 307 | Mark Gibbons | Royal & Sun Alliance | 2 |
| DEF 314 | Vernon Sutherland | LUA – Minneapolis | 2 |

In an effort to determine the defendants claim that the $150,000 circuit breaker was to be applied on a per customer basis, rather than per account, as listed on the commissions reconciliations, I reviewed their reconciliations searching for another large account whereby the maximum commission would have exceeded the $150,000 limit. Other than Brickstreet, the only example located was on DEF 334 whereby Vernon Southerland's commission associated with one customer (LUA Minneapolis), for 2004 was $184,035. Mr. Southerland earned $127,829 from the LUA Minneapolis customer for Phase III Claim Operations and $56,206 from the same customer for Phase I Change to Life account, for a total of $184,035 from this single customer. According to Paula Sorgeloos' deposition, Mr. Southerland had a $300,000 per account limit thus his commission was not cut off. There were no customers other than LUA Minneapolis and Brickstreet where revenues were significant enough to result in commissions in excess of $150,000.

6

The evidence of the $150,000 commissions limit is confirmed by the calculation appearing on DEF 380 regarding Brickstreet Tail Claims TPA whereby the final commission calculations stops at exactly $150,000 for that particular "account" while the plaintiff continued to earn commissions on other Brickstreet programs.

In an email from Nora Conway to CISGI's top executives, on which she copies CISGI's President and Executive Vice Presidents, she stresses the renewal of three FedEx accounts. She states "These 3 accounts equate to over $1.4m. for Cambridge". This statement reinforces the plaintiff's assertion that "accounts" are synonymous with programs not customers. (PL-751) This email serves as an example to reinforce the historical practice and universal understanding that "accounts" were commissioned as separate transactions, not grouped by customers.

In her deposition, Paula Sorgeloos testified that the sales executives would sign off on "all commissions" and confirmed that the vice president of sales would sign off on whether or not multiple lines of business with a single customer would be treated as separate accounts for commission purposes. Each quarter the commission worksheets were approved by senior executives of the company. The commission worksheets for the plaintiff clearly depicted the multiple accounts under Brickstreet. As with other sales personnel, commissions were separately calculated for each account depicted on these commission worksheets.

### Opinion 3

Based upon the preceding, in my opinion the $150,000 commission limitation was imposed on a per account basis as defined and stipulated on the commission reconciliation spreadsheets and not on a per customer basis. Thus commissions payable were, and should be calculated on a per account (or program) basis. If the $150,000 commission circuit breaker was intended to be on a per customer basis, I saw no evidence of such on any commission reconciliation worksheets.

### Issue 4 - Are There Brickstreet Commissions Payable to Plaintiff?

In order to calculate the commissions properly due and payable relative to the Brickstreet accounts I have arrived at certain conclusions regarding the facts of this case. For ease of comparison purposes I will subscribe to the order and format established by the defendant's expert, Bruce G. Dubinsky in his report dated May 13, 2009.

In performing the calculation of commissions earned by Ms. Murphy I have employed the following conclusions:

1.) According to all documents reviewed including emails and commission reconciliation spreadsheets and other data, there is no evidence to suggest that each "account" is synonymous with a "customer". In fact, everything I reviewed clearly indicates each "account" within a single customer is separately identified line of business and was

7

compensated accordingly. Thus each "account" is treated separately and subject to the $150,000 commission limitation.

2.) Annual commissions are calculated on revenue generated pursuant to the plaintiff's efforts. Plaintiff generated FCM, IME and SIU business with Brickstreet.

3.) The fact that CISGI "outsourced" the FCM and IME business to Concentra should have no bearing on the related commission compensation that should be awarded. These were separately identified accounts by CISGI, which enjoyed the profits of these programs.

4.) The fact that CISGI "outsourced" the SIU business to MJM should have no bearing on the related commission compensation that should be awarded. These were separately identified accounts by CISGI, which enjoyed the profits of these programs.

5.) The first contract year begins October 1, 2006 ending September 30, 2007. The second contract year beings October 1, 2007 and ends September 30, 2008.

6.) Annual commissions limit of $150,000 per account to be applied on contract year basis.

7.) Calculation of commissions within billing tiers (5%, 7%, 9%), shall be calculated on a contract period basis.

8.) Pursuant to CISGI's Commission Plans, the second 12 month period commissions shall be earned at a rate of 3% not to exceed $150,000 per account.

9.) For ease of comparison, I subscribed to two theories set forth in the "Notes" section of Mr. Dubinsky's commission calculation and specifically I applied the lowest tier of commission 5% on Non-Brickstreet contracts; then on those Brickstreet contracts not in dispute.

10.) IME and FCM revenues were provided by Coventry, (aka Concentra) on summary spreadsheets titled "Summary of CISGI activity at their Charleston, WV Office".

11.) SIU revenues were provided by MJM on the Spreadsheet for Billing/Revenue for Surveillance and on which Dave Faggert of MJM/G4S provided deposition testimony.

Conclusion

Based upon the preceding and pursuant to the calculations of Exhibit 5, I have concluded that there are commissions due and payable by CISGI to the plaintiff Lisa Murphy totaling **$298,047** for the period October 1, 2006 – February 4, 2008.

8

## Other

My opinions were acquired by employing my nearly thirty years of experience primarily as finance and accounting manager and director of two large private corporations and as the Senior Partner and principal of a certified public accounting firm. As my resume indicates I held various positions in corporate organizations before embarking to create my CPA firm. I have performed numerous internal audit assignments in the corporate environment and have represented and assisted many clients with legal and accounting matters in my role as their CPA. My firm provides services for approximately 250 businesses in numerous industries. I have reviewed the documents as depicted on page one of my report to arrive at my opinions and conclusions. I reserve the right to modify my opinions should additional information become available during this litigation.

I am being compensated for my services at a rate of $300 per hour plus any direct expenses incurred. My fee is not contingent upon the results of this matter. A biography is attached to this report.

Respectfully submitted,

*Joseph M. Martorelli, CPA* (signature)

Joseph M. Martorelli, CPA

Exhibit 1

MURPHY VS. CAMBRIDGE
Brickstreet Invoice Summary
10/01/06 thru 02/04/08

| Invoice Date | Invoice # | Amount of Invoice | Customer Name | Date of Services | Page Reference | Targeted Claims Review | TPA Incl. True Ups | WV Expansion TCR | IT Services | Insurance Training | Claims Audit & Training | Total | Non-Commissioned Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/3/2006 | IN00007633 | 55,773.33 | Brick Street Mutual Ins. | FEB THRU OCT 08 | DEF00221 | | | | | | 55,773.34 | | |
| 10/18/2006 | IN00007775 | 93,542.79 | Brick Street Mutual Ins. | OCT AND NOV 06 | DEF00095 | | | | | | | | 46,876.79 c. |
| 10/27/2006 | IN00007775 | 93,542.79 | Brick Street Mutual Ins. | OCT AND NOV 06 | DEF00096 | | | | | | | | 46,666.00 d. |
| 10/27/2006 | IN00007820 | 53,887.00 | Brick Street Mutual Ins. | | DEF00222 | | | | | 53,887.00 | | | |
| 12/6/2006 | IN00008165 | 383,586.41 | Brick Street Mutual Ins. | 12/06 | DEF00096 | | 383,586.41 | | | | | | |
| 12/15/2006 | IN00008259 | 125,000.00 | Brick Street Mutual Ins. | 12/06 | DEF00097 | 125,000.00 | | | | | | | |
| 1/5/2007 | IN00008373 | 383,586.41 | Brick Street Mutual Ins. | 01/07 | DEF00098 | | 383,586.41 | | | | | | |
| 1/6/2007 | IN00008401 | 125,000.00 | Brick Street Mutual Ins. | 01/07 | DEF00099 | 125,000.00 | | | | | | | |
| 1/27/2007 | CM00000382 | (631.14) | Brick Street Mutual Ins. | 12/06 | DEF00173 | | (631.14) | | | | | | |
| 2/2/2007 | IN00008614 | 383,586.41 | Brick Street Mutual Ins. | 02/07 | DEF00100 | | 383,586.41 | | | | | | |
| 2/5/2007 | IN00008662 | 125,000.00 | Brick Street Mutual Ins. | 02/07 | DEF00101 | 125,000.00 | | | | | | | |
| 2/9/2007 | CM00000955 | (3,326.70) | Brick Street Mutual Ins. | 01/07 | DEF00177 | | (3,326.70) | | | | | | |
| 2/23/2007 | IN00008879 | 53,887.00 | Brick Street Mutual Ins. | | DEF00223 | | | | | 53,887.00 | | | |
| 3/2/2007 | IN00008968 | 383,586.41 | Brick Street Mutual Ins. | 03/07 | DEF00102 | | 383,586.41 | | | | | | |
| 3/6/2007 | IN00009021 | 125,000.00 | Brick Street Mutual Ins. | 03/07 | DEF00103 | 125,000.00 | | | | | | | |
| 3/26/2007 | CM00001037 | (7,941.21) | Brick Street Mutual Ins. | 02/07 | DEF00181 | | (7,941.21) | | | | | | |
| 4/3/2007 | IN00009269 | 383,586.41 | Brick Street Mutual Ins. | 04/07 | DEF00104 | | 383,586.41 | | | | | | |
| 4/20/2007 | IN00009536 | 11,099.53 | Brick Street Mutual Ins. | 03/07 | DEF00105 | | 11,099.53 | | | | | | |
| 5/2/2007 | IN00009697 | 383,586.41 | Brick Street Mutual Ins. | 05/07 | DEF00113 | | 383,586.41 | | | | | | |
| 5/11/2007 | IN00009847 | 53,887.00 | Brick Street Mutual Ins. | | DEF00207 | | | | | 53,887.00 | | | |
| 5/15/2007 | CM00001084 | (20,549.65) | Brick Street Mutual Ins. | 04/07 | DEF00193 | | (20,549.65) | | | | | | |
| 6/5/2007 | IN00010046 | 383,586.41 | Brick Street Mutual Ins. | 06/07 | DEF00114 | | 383,586.41 | | | | | | |
| 6/25/2007 | IN00010277 | 180,072.00 | Brick Street Mutual Ins. | 04/07 | DEF00115 | | | 180,072.00 | | | | | |
| 6/25/2007 | IN00010278 | 237,595.00 | Brick Street Mutual Ins. | 05/07 | DEF00094 | | | 237,595.00 | | | | | |
| 6/25/2007 | IN00010279 | 312,595.00 | Brick Street Mutual Ins. | 06/07 | DEF00119 | | | 312,595.00 | | | | | |
| 6/27/2007 | CM00001357 | (9,619.49) | Brick Street Mutual Ins. | 05/07 | DEF00199 | | (9,619.00) | | | | | | |
| 7/3/2007 | IN00010377 | 383,586.33 | Brick Street Mutual Ins. | 07/07 | DEF00120 | | 383,586.33 | | | | | | |
| 7/10/2007 | IN00010559 | 260,104.00 | Brick Street Mutual Ins. | 07/07 | DEF00121 | | | 260,104.00 | | | | | |
| 7/30/2007 | IN00010698 | 2,716.00 | Brick Street Mutual Ins. | 06/07 | DEF00122 | | 2,716.00 | | | | | | |
| 8/2/2007 | IN00010741 | 383,586.33 | Brick Street Mutual Ins. | 08/07 | DEF00126 | | 383,586.33 | | | | | | |
| 8/7/2007 | IN00010816 | 260,104.00 | Brick Street Mutual Ins. | 08/07 | DEF00127 | | | 260,104.00 | | | | | |
| 8/28/2007 | IN00011044 | 10,994.35 | Brick Street Mutual Ins. | 07/07 | DEF00128 | | 10,994.35 | | | | | | |
| 8/28/2007 | IN00011045 | 30.00 | Brick Street Mutual Ins. | APRIL THRU JUNE 07 | DEF00132 | | 30.00 | | | | | | |
| 9/5/2007 | IN00011124 | 191,793.21 | Brick Street Mutual Ins. | 09/07 | DEF00134 | | 191,793.21 | | | | | | |
| 9/5/2007 | IN00011125 | 325,130.00 | Brick Street Mutual Ins. | 09/07 | DEF00135 | | | 325,130.00 | | | | | |
| 9/19/2007 | IN00011341 | 60,525.00 | Brick Street Mutual Ins. | July thru Aug 07 | DEF00136 | | 60,525.00 | | | | | | |
| 9/26/2007 | IN00011421 | 19,378.52 | Brick Street Mutual Ins. | 08/07 | DEF00138 | | 19,378.52 | | | | | | |
| | | | Totals for First Fiscal Year Ending 9/30/07 | | | 500,000.00 a. | 3,706,746.44 | 1,575,600.00 b. | - | 161,661.00 | 55,773.34 | 5,999,780.78 | 93,542.79 |
| 10/2/2007 | IN00011616 | 191,793.21 | Brick Street Mutual Ins. | 10/07 | DEF00142 | | 191,793.21 | | | | | | |
| 10/13/2007 | IN00011888 | 179,272.27 | Brick Street Mutual Ins. | 09/07 | DEF00143 | | 179,272.27 | | | | | | |
| 11/9/2007 | IN00012627 | 352,689.02 | Brick Street Mutual Ins. | 10/07 | DEF00116 | | 352,689.02 | | | | | | |
| 11/9/2007 | IN00012628 | 383,586.41 | Brick Street Mutual Ins. | 11/07 | DEF00158 | | 383,586.41 | | | | | | |
| 10/12/2007 | CM00001338 | (191,793.21) | Brick Street Mutual Ins. | 10/07 | DEF00206 | | (191,793.21) | | | | | | |
| 1/23/2008 | CM00001510 | (383,586.41) | Brick Street Mutual Ins. | 12/07 | DEF00147 | | (383,586.41) | | | | | | |
| 2/4/2008 | CM00001530 | (131,487.18) | Brick Street Mutual Ins. | 11/07 | DEF00159 | | (131,487.18) | | | | | | |
| 11/9/2007 | IN00012629 | 250,100.00 | Brick Street Mutual Ins. | 10/07 | DEF00161 | | | 250,100.00 | | | | | |
| 12/11/2007 | IN00013066 | 383,586.41 | Brick Street Mutual Ins. | 12/07 | DEF00162 | | 383,586.41 | | | | | | |
| 2/4/2008 | IN00013946 | 86,283.09 | Brick Street Mutual Ins. | 12/07 | DEF00168 | | 86,283.09 | | | | | | |
| 2/4/2008 | IN00013947 | 215,827.89 | Brick Street Mutual Ins. | 11/07 | DEF00170 | | | 215,827.89 | | | | | |
| 2/4/2008 | IN00013948 | 34,114.62 | Brick Street Mutual Ins. | | | | | | | | | | 34,114.00 e. |
| | | | Totals for First Fiscal Year Ending 9/30/08 | | | - | 870,343.61 | 465,927.89 | | | | 1,336,271.50 | 34,114.00 |
| | | | Grand Total Two Years | | | 500,000.00 | 4,577,090.05 | 2,041,527.89 | - | 161,661.00 a. | 55,773.34 a. | 7,336,052.28 | 127,656.79 |

a. - DEF 380
b. - DEF 347
c. - Consulting services
d. - IT Services
e. - Disassociated employee severance

Grand Total
$7,463,709

Coventry Health Care Workers Comp
FCM - Field Case Management
Summary of CISGI activity at their Charleston, WV office
Sept 2006 through Sept 2008

| Period of Activity | Gross Revenues | Rev-share Eligible Revenues | As reported to Cambridge at the time of Period Activity | Calculated Rev-share | α Rev-Share Actually Paid to Cambridge | ß Rev-share not paid to Cambridge and was reversed in Nov-08 |
|---|---|---|---|---|---|---|
| Sep-06 | - | - | | - | - | - |
| Oct-06 | - | - | | - | - | - |
| Nov-06 | - | - | | - | - | - |
| Dec-06 | - | - | | - | - | - |
| Jan-07 | 2,722 | 2,491 | | 265 | 265 | - |
| Feb-07 | 6,096 | 5,555 | | 591 | 591 | - |
| Mar-07 | 22,308 | 17,785 | | 1,892 | 1,892 | - |
| Apr-07 | 38,537 | 34,784 | | 4,059 | 273 | 3,786 |
| May-07 | 46,976 | 28,679 | 301,717 | 3,051 | - | 3,051 |
| Jun-07 | 41,353 | 41,079 | | 210 | 106 | 104 |
| Jul-07 | 68,207 | 43,851 | | 1,671 | 81 | 1,590 |
| Aug-07 | 64,275 | 53,336 | | 2,863 | 51 | 2,812 |
| Sep-07 | 88,478 | 74,157 | | 3,958 | 27 | 3,931 |
| Oct-07 | 71,715 | 60,545 | | 3,247 | 53 | 3,194 |
| Nov-07 | 34,394 | 31,481 | | 1,683 | 16 | 1,667 |
| Dec-07 | 1,264 | 1,166 | | 62 | - | 62 |
| Jan-08 | 630 | 348 | | 19 | - | 19 |
| Feb-08 | 291 | 179 | | 10 | - | 10 |
| Mar-08 | 94 | 94 | 94,376 | 5 | - | 5 |
| Apr-08 | 526 | 338 | | 18 | - | 18 |
| May-08 | - | - | | - | - | - |
| Jun-08 | - | - | | - | - | - |
| Jul-08 | 291 | 103 | | 6 | - | 6 |
| Aug-08 | - | - | | - | - | - |
| Sep-08 | 216 | 122 | | 7 | - | 7 |
| | 488,375 | 396,093 | | | | |

| | |
|---|---|
| α | Because we had already paid Cambridge for Rev-share on WV claimants when we discovered we should not have, we made the decision not to reverse what we had already paid out. |
| ß | In November of 2008, we discovered that Rev-share was not to be calculated on WV claimants and as a result, we reversed what we had reported to Cambridge but had not yet paid. |

Prepared by David Perkins 781-906-6173
8/3/2009

** Any adjustments made to the original document are done in blue

Coventry Health Care Workers Comp
IME - Independent Medical Exams
Summary of CISGI activity at their Charleston, WV office
Sept 2006 through Sept 2008

| Period of Activity | Gross Revenues | Rev-share Eligible Revenues | As reported to Cambridge at the time of Period Activity | Calculated Rev-share | α Rev-Share Actually Paid to Cambridge | ß Rev-share not paid to Cambridge and was reversed in Nov-08 |
|---|---|---|---|---|---|---|
| Sep-06 | - | - | | - | - | - |
| Oct-06 | - | - | | - | - | - |
| Nov-06 | 2,325 | 1,800 | | 126 | 126 | - |
| Dec-06 | 121,946 | 89,090 | | 5,208 | 5,208 | - |
| Jan-07 | 244,995 | 178,364 | | 9,408 | 9,408 | - |
| Feb-07 | 314,253 | 219,566 | | 11,634 | 11,634 | - |
| Mar-07 | 340,428 | 222,933 | | 11,676 | 11,676 | - |
| Apr-07 | 244,900 | 158,843 | 1,783,748 | 7,980 | 84 | 7,896 |
| May-07 | 313,661 | 205,428 | | 10,920 | - | 10,920 |
| Jun-07 | 214,394 | 159,464 | | 8,358 | - | 8,358 |
| Jul-07 | 353,496 | 207,135 | | 10,332 | - | 10,332 |
| Aug-07 | 326,047 | 215,000 | | 10,626 | 42 | 10,584 |
| Sep-07 | 193,343 | 126,125 | | 6,300 | - | 6,300 |
| Oct-07 | 259,226 | 174,175 | | 8,526 | 42 | 8,484 |
| Nov-07 | 211,395 | 134,800 | | 6,762 | - | 6,762 |
| Dec-07 | 153,268 | 97,625 | 452,775 | 4,788 | - | 4,788 |
| Jan-08 | 65,210 | 40,825 | | 1,932 | - | 1,932 |
| Feb-08 | 10,340 | 4,600 | | 252 | - | 252 |
| Mar-08 | 1,250 | 750 | | 42 | - | 42 |
| Apr-08 | - | - | | - | - | - |
| May-08 | - | - | | - | - | - |
| Jun-08 | - | - | | - | - | - |
| Jul-08 | - | - | | - | - | - |
| Aug-08 | - | - | | - | - | - |
| Sep-08 | - | - | | - | - | - |
| | 3,370,477 | 2,236,523 | | | | |

| | |
|---|---|
| α | Because we had already paid Cambridge for Rev-share on WV claimants when we discovered we should not have, we made the decision not to reverse what we had already paid out. |
| ß | In November of 2008, we discovered that Rev-share was not to be calculated on WV claimants and as a result, we reversed what we had reported to Cambridge but had not yet paid. |

Prepared by David Perkins 781-906-6173
8/3/2009

** Any adjustments made to the original document are done in blue

Exhibit 4

Cambridge Integrated Services
Billing/Revenue Share for 11/30/06 - 12/31/07
OIC/Brickstreet

|  | Billed | Rev Share % | Mgmt. Oversight Fee |
|---|---|---|---|
| Non-Vended | $255,445.06 | 11.50% | $ 29,376.18 |
| Vended | $ 22,148.02 | 5.50% | $ 1,218.14 |
| Totals | $277,593.08 |  | $ 30,594.32 |

Exhibit 5

**MURPHY V. CAMBRIDGE**
Commission Payable Calculation
October 1, 2006 - September 30, 2008

| Account | Gross Revenue | Year 1 October 1, 2006 - September 30, 2007 | | | | Gross Revenue | Year 2 October 1, 2007 - September 30, 2008 | | | | Brickstreet Commission Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Commission Rate | Commission Payable | Commission Limit Per Acct. | Net Commission Payable | | Commission Rate | Commission Payable | Commission Limit Per Acct. | Net Commission Payable | |
| **Non-Brickstreet Accounts** | | | | | | | | | | | |
| Rush University Medical Center | 35,181 | 5% | 1,759 | - | 1,759 | 10,883 | 3% c. | 326 | - | 326 | |
| ARMSIF: Managed Care | 5,703 | 5% | 285 | - | 285 | 4,546 | 3% c. | 136 | - | 136 | |
| City of Covina Medical Bill Review | 2,848 | 5% | 142 | - | 142 | 3,009 | 3% c. | 90 | - | 90 | N/A |
| Mercy Hospital Medical Bill Review | 2,071 | 5% | 104 | - | 104 | 2,718 | 3% c. | 82 | - | 82 | |
| Deschutes County, Oregon | 42,179 | 5% | 2,109 | - | 2,109 | - | | - | - | - | |
| | | | | | | | | | | | |
| **Brickstreet Accounts** | | | | | | | | | | | |
| Claims Audit and Training | 55,773 | 5% | 2,789 | - | 2,789 | - | 3% c. | - | - | - | 2,789 |
| Insurance Training | 161,661 | 5% | 8,083 | - | 8,083 | - | 3% c. | - | - | - | 8,083 |
| Internal Audits | - | 5% | - | - | - | - | 3% c. | - | - | - | - |
| All Claims Review | 500,000 | 5% | 25,000 | - | 25,000 | - | 3% c. | - | - | - | 25,000 |
| TPA Services (to reach $1 Million level) | 194,584 | 5% | 9,729 | - | 9,729 e. | 870,343 | 3% c. | 26,110 | - | 26,110 | 35,839 |
| TPA Services (to reach $3 Million level) | 2,000,000 | 7% | 140,000 | - | 140,000 e. | - | 3% | - | - | - | 140,000 |
| TPA Services (to over $3 Million level) | 1,512,162 | 9% | 136,095 | (135,824) | 271 e. | - | 3% c. | - | - | - | 271 |
| WV Expansion | 1,575,600 | 9% | 141,804 | - | 141,804 | 465,928 a. | 3% c. | 13,978 | - | 13,978 | 155,782 |
| Field Case Mgmnt (FCM) | 301,717 b. | 9% | 27,155 | - | 27,155 | 94,376 a. | 3% c. | 2,831 | - | 2,831 | 29,985 |
| Independent Medical Exams (IME) | 1,783,748 b. | 9% | 160,537 | (10,537) | 150,000 | 452,775 b. | 3% c. | 13,583 | - | 13,583 | 163,583 |
| Subrogation/Recovery of Overpayments | - | 9% | - | - | - | 221,207 | 3% d. | 6,636 | - | 6,636 | 6,636 |
| Special Investigations Unit (SIU) | 213,530 c. | 9% | 19,218 | - | 19,218 | 64,063 c. | 3% | 1,922 | - | 1,922 | 21,140 |
| | 8,386,757 | | 674,808 | (146,361) | 524,048 | 2,189,848 | | 65,695 | - | 65,061 | 589,109 |

TPA services separated into 3 lines as commission rates vary as Employee achieved certain sales thresholds
TPA Services (to reach $1 Million level)   194,584
TPA Services (to reach $3 Million level) 2,000,000
TPA Services (to over $3 Million level)  1,512,162
Total TPA Revenues year 1                3,706,746

Brickstreet Commissions Paid                    (291,052)

Brickstreet Commissions Payable for Both Years   298,047

a.) Sum of these commissions equal $150,000 limit per account
b.) Based on reports received from Coventry titled "Summary of CISGI activity at their Charleston WV office."
c.) Assume all second year revenues subject to 3%
d.) Subrogation commission recorded at 7% per PL-459, however due to second year used 3% to be consistent.
e.) Revenues based on spreadsheet prepared by MJM/G4S

Joseph M. Martorelli, C.P.A.
Orange & Martorelli, LLP
50 Cherry Street
Milford, CT 06460

BIOGRAPHY SUMMARY

Mr. Martorelli graduated from the University of New Haven in 1982 with a Bachelors of Science degree in Financial Accounting. He went on to work at two local CPA firms in Connecticut to fulfill his apprenticeship program. He passed the Connecticut CPA exam in 1986, and became licensed to practice.

In 1984, he was recruited by Saab-Scania of America, Inc., as the Assistant Controller of the Scania Bus and Truck Division. He was promoted to Budget Manager for the U.S. car operation in 1986, Tax Director in 1989 and then eventually to director of Finance and Administration for Saab's entire U.S. operations in 1991. During his eight years at Saab, Mr. Martorelli was responsible for accounting, taxation, internal auditing, purchasing, real estate, travel and logistics.

When Saab decided to relocate in 1992, Mr. Martorelli decided to remain in Connecticut and organize a CPA practice (Orange & Martorelli, LLP) with his long time associate Mr. David Orange (formerly a partner with Price Waterhouse). Since the inception, the practice has grown to now employ five associates which provide tax, accounting and business management consulting services to large multi national corporations, small and medium size businesses and individuals.

Some of the major accomplishments since embarking on his own include:

A.) Assisted a California company through public offering process by acting as interim CFO

B.) Prepared litigation support financial models for a large Japanese distributor which was contesting a multi-million dollar tax assessment by the IRS.

C.) Acted as interim controller for a large regional airline and assisted the company through a successful Chapter 11 reorganization and eventual sale to a major air carrier.

Other duties while at the Regional Airline included:
   1. Financial Statement Preparation
   2. Internal and Operational Audit Functions
   3. Balance Sheet and Profit and Loss Analysis

D.) Performed financial services for a large transportation consulting company and was assigned to projects for Chrysler, Yamaha, Mercedes Benz, GM, Caterpillar, etc.

E.) Provided expert witness reports and testimony regarding bankruptcy proceedings of a foreign aircraft manufacturer and related U.S. subsidiaries.

F.) Continuously provides accounting and tax services to numerous clients in many industries including trucking, aircraft, construction, telecommunications, manufacturing, etc.

G.) Provide accounting and tax services for U.S. subsidiaries of foreign multi-national corporations.

Although Mr. Martorelli has not authored publications within the preceding ten years, he is a frequent lecturer on a variety of tax and investment planning topics.

He is also a member of the following organizations:
- Member of American Institute of Certified Public Accountants
- Member Connecticut Society of Certified Public Accountants
- Associate Raymond James Financial Services
- Member Milford and New Haven Chamber of Commerce

### PRIOR TESTIMONY

I have testified as a fact witness in my capacity as a Certified Public Accountant for a number of business clients regarding divorce, accounting irregularities and professional negligence.

I have also provided expert reports and testimony on behalf of the plaintiff in the matter of Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc. v. Fairchild Dornier GmbH, Adversary Proceeding No. 02-08199-SSM, heard before the United States Bankruptcy Court for the Eastern District of Virginia.

I have prepared expert reports on behalf of the plaintiff in the matter of Dornier Aviation North America Bankruptcy Case No. 02-82003-SSM relative to United States Bankruptcy Court for the Eastern District of Virginia.

I have prepared an expert report on behalf of the plaintiff in the matter of Ramirez MD v. Health Net Case No. CV-02-0389700-S, heard before the Superior Court Judicial District of Fairfield at Bridgeport, Connecticut.

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

Type of Service:            Facsimile and First-Class, U.S. Mail

Date of Service:            September 8, 2009

Persons served and address:  Thomas J. Flaherty, Esquire
                             Lindsey H. McGinnis, Esquire
                             Littler Mendelson, P.C.
                             1650 Tysons Boulevard, Suite 700
                             McLean, Virginia  22102

Item Served:                Expert Report of Joseph M. Martarelli, CPA

_____
James P. Campbell