|  |  |  |
|---|---|---|
| LISA M. MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-cv-3224 (AW) |
| | ) | |
| v. | ) | |
| | ) | |
| CAMBRIDGE INTEGRATED | ) | |
| SERVICES GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT CAMBRIDGE'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Cambridge Integrated Services Group, Inc., ("Cambridge"), by counsel, hereby submits its Opposition to Plaintiff Lisa Murphy's ("Plaintiff") Motion for Partial Summary Judgment and supporting Memorandum (hereinafter referred to as the "Motion" and the "Memorandum".).

## INTRODUCTION

The undisputed evidence <u>contradicts</u> Plaintiff's claim that Cambridge owes Plaintiff an additional $35,431 in commissions on the BrickStreet All Claims Review project ("ACR"), TPA Services project ("TPA") and the WV Expansion project ("WVX"), as well as her assertion that Cambridge has admitted that it owes Plaintiff additional commissions.[1]  Additionally, at a

---

[1] Plaintiff's Amended Complaint identifies seven BrickStreet "deals" for which she is seeking commissions. Plaintiff's Motion addresses <u>only three</u> of the seven "deals" – ACR, TPA, WVX. (Plf. Mem. p. 3). Cambridge filed its own Partial Motion for Summary Judgment on October 27, 2009 in which it moved for summary judgment as to the four other projects, and as to all of Plaintiff's claims on the ACR, TPA and WVX projects except for statutory claims regarding accounting adjustments in the amount of $3,404 with respect to first year revenues relating to the TPA projects and $8,195 relating to the WVX project, which, and her claim for additional commissions on the ACR project.

minimum, issues of material fact exist that prevent summary judgment on her contention that two of Cambridge's asserted defenses, relating to Cambridge's right to interpret the commission plans and to Plaintiff's termination for cause, provide no basis for Cambridge's refusal to pay Plaintiff the commissions she is seeking.

The vast majority of Plaintiff's statements of alleged fact are contradicted by the undisputed facts and derive no support from the record:

- Plaintiff asserts that she originated and sold the BrickStreet business. However, the evidence is undisputed that Plaintiff did not identify, initiate or pursue the West Virginia business until after the opportunity was qualified by others at Cambridge and, therefore, she did not produce the business under the plain meaning of the Commission Plans;

- Plaintiff alludes to Cambridge accounting records allegedly showing seven separate BrickStreet accounts, but she fails to disclose that _she_ entered the seven "account" names into Cambridge's sales tracking system which then supplies the names to Cambridge's finance department;

- Plaintiff argues that Cambridge has admitted it owes Plaintiff an additional $35,413 in commissions on the ACR, TPA, and WVX projects. To the contrary, Cambridge has continuously denied any obligation to pay any additional commissions on these accounts;

- Plaintiff contends that Cambridge's accounting documents show Plaintiff is entitled to more commissions than she was paid. However, she fails to point to a single record citation or document to support her assertion. Cambridge denies that its records show Plaintiff was entitled to any commissions beyond what she was paid;

- Plaintiff argues that Cambridge's expert, Bruce Dubinsky, concluded that Plaintiff was entitled to an additional $35,413 in commissions on the ACR, TPA, and WVX projects. Plaintiff has misstated Mr. Dubinsky's report, and Cambridge expressly denies that Mr. Dubinsky concluded that Plaintiff was due any additional commissions;

- Plaintiff asserts that Kevin Turner, Cambridge's corporate designee, admitted there have been no interpretations of the Commission Plans, including no interpretations contrary to Plaintiff's interpretations. Not only did Mr. Turner _not_ make these admissions, but Plaintiff has wholly omitted Mr. Turner's testimony to the contrary. Mr. Turner testified regarding several instances in which he interpreted the Commission Plans, including discussions with Plaintiff in the Fall of 2007; and

- Plaintiff maintains that the record proves and Cambridge has admitted that Plaintiff was terminated as part of a workforce reduction and not for cause. Plaintiff has again misstated the record. Mr. Turner was clear in his testimony that Plaintiff's material

failure to perform her job duties was the reason she was included in the workforce reduction. Moreover, Plaintiff conveniently fails to disclose to the Court that just months before her termination she had been given a written performance warning that clearly notified her that failure to improve her performance could lead to her termination

## STATEMENT OF UNDISPUTED FACTS[2]

**A.      Plaintiff's Role in the BrickStreet Account and Cambridge's Decision to Credit Plaintiff and to Treat the BrickStreet Account as Three Accounts for Purposes of Calculating Commissions**

The record establishes that Plaintiff did not "originate" the BrickStreet account as she suggests in her Memorandum.  (Plf. Mem. p. 4, ¶ 1).[3] The relationship between BrickStreet and Cambridge began with Kevin Turner, Cambridge's then Senior Vice President of Operations, who first identified the potential business opportunity with BrickStreet.  (Root Dep. p. 11-15, 100-01[4]; Turner Dep. p. 6[5]).  Soon thereafter, Vance Root, who was Cambridge's Senior Vice President of Business Development at the time, became involved.  (Root Dep. p. at 11-15, 100-02, 105; O'Brien Dep. p. 18-19).  Mr. Turner and Mr. Root attended the initial meetings with BrickStreet.  (Root Dep. p. at 103).  It was not until it became clear that BrickStreet was interested in working with Cambridge that Mr. Root, Plaintiff's manager, brought Plaintiff into the opportunity.  (*Id.* at p. 104).  Thereafter, Plaintiff was one of several Cambridge employees

---

[2] The first four pages of Plaintiff's Memorandum, her "Summary of the Facts", consists of factual argument that is devoid of any citation to the record.  Plaintiff's "summary" may not properly be considered on a motion for summary judgment and should be disregarded.  Nevertheless, because many of the "facts" alleged by Plaintiff are misstatements, Cambridge addresses them in its recitation of the facts so as to provide a complete and accurate summary of the facts and testimony provided in this case.

[3] Wes O'Brien did not testify that Cambridge or he considered Plaintiff to have "originated" the BrickStreet account as Plaintiff's asserts.  (Plf. Mem. p. 4, ¶ 1).  Mr. O'Brien testified that he understood that Vance Root, Cambridge's former head of sales, had executive relationships with certain individuals in West Virginia and at BrickStreet and was responsible for ultimately procuring the BrickStreet account.  (O'Brien Dep. p. 19-21).  (References to the transcript from the deposition of Wesley O'Brien, on August 12, 2009, will hereinafter be referred to as "O'Brien Dep. p. __", which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "A."

[4] References to the transcript from the deposition of Vance Root, on August 25, 2009, will hereinafter be referred to as "Root Dep. p. __", which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "B."

who participated in efforts to sell Cambridge claims management services to the State of West Virginia's Office of the Insurance Commissioner through its private workers' compensation carrier, BrickStreet. (Plf. Dep. p. 107-109, 112, 128[6]; Turner Dep. p. 144; Root Dep. p. 11-12, 18-19, 100-05; O'Brien Dep. p. 18-19). Despite these facts, as the assigned sales employee, Plaintiff was paid all of the commissions attributable to the BrickStreet account. (Turner Dep. p. 144).

Cambridge interpreted the phrase "account" as used in its sales commission plans to mean a single "client" or "customer", such as BrickStreet, and initially considered BrickStreet to be one customer and one account. (Turner Dep. p. 88; O'Brien Dep. p. 24-25; Root Dep. p. 61, 77-78; Sorgeloos Dep. p. 134[7]). This would mean that, under the terms of the Commission Plans, Plaintiff's annual commissions relative to BrickStreet would be capped at $150,000. (Plf. Mem. Ex. A, B). In determining how to compensate Plaintiff, however, Cambridge, exercised the right of interpretation reserved to it under the Commission Plans, and decided to compensate Plaintiff as if the BrickStreet account were three separate accounts, each of which was subject to a separate $150,000 annual cap. (Turner Dep. p. 89-91; O'Brien Dep. p. 22-24, 27).

Wes O'Brien, Cambridge's President, testified that he and Kevin Turner, Cambridge's then Executive Vice President of Sales, discussed how the BrickStreet account should be treated for commission purposes and whether Plaintiff should be paid as an exception to the Commission Plans. (O'Brien Dep. p. 22-23). As Mr. O'Brien explained, "there were three

---

[5] References to the transcript from the first day of the 30(b)(6) deposition of Kevin Turner, on June 17, 2009, will hereinafter be referred to as "Turner Dep. p. __", which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "C."

[6] References to the transcript and exhibits from the deposition of Plaintiff, Lisa Murphy, on April 17, 2009, will hereinafter be referred to as "Plf. Dep. p. __" and "Plf. Dep. Ex. __", respectively, which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibits "D" and "E."

[7] References to the transcript from the deposition of Paula Sorgeloos, on May 29, 2009, will hereinafter be referred to as "Sorgeloos Dep. p. __", which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "F."

noticeable events that made up the West Virginia account" and "the commission plan anticipated paying a [cap] at an account level." (*Id.*). Mr. O'Brien testified that BrickStreet was "one account from the commission plan standpoint" but that he told Mr. Turner he was "okay making an exception to the plan, to pay as if [BrickStreet] was three accounts." (*Id.* at p. 24). Cambridge treated the ACR, TPA, and WVX projects as separate accounts for commission calculation purposes. (O'Brien Dep. p. 23; Plf. Dep. Ex. 13 (DEF0020)). Mr. Turner confirmed that, in Mr. O'Brien's words, "this is pretty much a gift to [Plaintiff] to make it three deals because that is not our normal interpretation of the plan." (Turner Dep. p. 90-91). In accordance with the exception granted by Cambridge, during calendar 2007 and 2008, Plaintiff was paid $291,062 in total commissions attributable to the work Cambridge performed for BrickStreet. (Plf. Dep. Ex. 13 (DEF0020)).

There is no evidence in the record supporting Plaintiff's assertion that Mr. O'Brien and Mr. Turner "admit[t] in deposition that the [ACR, TPA, and WVX] existed separately within Cambridge's internal accounting system," as Plaintiff claims.[8] (Plf. Mem. p. 3). Rather, the evidence is that BrickStreet was one account, but that Plaintiff received beneficial treatment through Mr. O'Brien's decision to make an exception to the normal interpretation of the Commission Plans. (O'Brien Dep. p. 22-24, 27; Turner Dep. p. 88, 90-91; Root Dep. p. 77-78; Sorgeloos Dep. p. 134).

### B. The Opinions Rendered by Cambridge's Expert Bruce Dubinsky

On May 13, 2009, Cambridge served its Rule 26 expert disclosure, attaching the written report of its damages expert, Bruce Dubinsky. (Plf. Mem. Ex. C). Mr. Dubinsky provided essentially four opinions in his report. First, he calculated the total amount of commissions

---

[8] Again, Plaintiff does not provide a citation to admissible evidence to support her depiction of Mr. O'Brien's and Mr. Turner's testimony.

Plaintiff was paid attributable to BrickStreet (Opinion #1). (*Id.* at p. 3-4). Second, Mr. Dubinsky calculated the commissions attributable to BrickStreet if the BrickStreet account is treated as a single account under the Commission Plans and if the commission rate tiers set forth in the Plans are applied to the aggregate amount of revenue invoiced (Opinion #2a). (*Id.* at p. 4-6). Mr. Dubinsky also provided his opinion regarding the commissions earned if the BrickStreet account is treated as one account and the commission rate tiers are applied to each BrickStreet project separately (Opinion #2b). (*Id.* at p. 6-7). Finally, Mr. Dubinsky provided his opinion regarding the amount of commissions that would be attributable to the BrickStreet projects under Plaintiff's interpretation of the Commission Plans (Opinion #3). (*Id.* at p. 7-9).

Plaintiff mischaracterizes Mr. Dubinsky's report when she states he "drew [the] precise conclusion" that Plaintiff was entitled to $326,474 in commissions and is owed a remaining balance of $35,413 with respect to the ACR, TPA, and WVX projects.[9] (Plf. Mem. p. 3). Likewise, Mr. Dubinsky did not produce documentation that "shows commissions due on the ACR, TPA and WVX accounts in the amount of $35,413." (*Id.* at p. 6, ¶ 7; Plf. Mem. Ex. C). Quite the contrary, Mr. Dubinsky's report makes it clear that his Opinion #3 represents his application of Plaintiff's view of the issues and a calculation of commissions earned based on his understanding of Plaintiff's interpretation of the Commission Plans. He expressly qualified and conditioned his opinion by stating it is "[b]ased upon [his] understanding of *Murphy's interpretation* of the Commission Plans" and that in rendering his opinion he made certain

---

[9] Irrespective of the content of Mr. Dubinsky's report, it is hearsay and, therefore, cannot be considered in deciding a motion for summary judgment. *See Maryland Highways Contractors Ass'n. v. State of Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment"); *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, 526 F.Supp.2d 746, 764 (S.D. Tex. 2007) (disregarding expert report in considering plaintiff's summary judgment motion on hearsay grounds); *LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 942 (N.D.Il. 2008) (noting that an expert report is inadmissible hearsay on summary judgment; *see also Solis v. Prince George's County*, 153 F. Supp. 2d 793, 788-89) ("unsworn expert reports, which may have been prepared in compliance with Rule 26(a)(2), will not be considered by the Court for purposes of summary judgment.") (internal citation omitted).

assumptions "in applying *Murphy's interpretation* of certain provisions of the Commission Plan" to recalculate commissions. (Plf. Mem. Ex. C at p. 7) (emphasis added). Moreover, the spreadsheet repeatedly referenced in Plaintiff's Memorandum is titled "Calculation of Commissions Owed – *Plaintiff's Methodology*," making it clear Mr. Dubinsky is <u>not</u> expressing his determination of whether commissions are owed, but expressing a calculation of commissions based on Plaintiff's view of the world. (Plf. Mem. Ex. C at Exhibit 3) (emphasis added).

Plaintiff's statements regarding the opinions of her own expert, Joseph Martorelli, are irrelevant and immaterial to the Court's adjudication of her Motion and should be disregarded in any event.[10] (Plf. Mem. p. 3, 6 at ¶ 8, 9). Mr. Martorelli's report was served **<u>169</u>** days <u>after</u> the expiration of the deadline by which Plaintiff was required to make her expert disclosures under the Court's Scheduling Order and, therefore, should be stricken and totally disregarded.[11] *See Carr v. Deeds*, 453 F.3d 593, 604-05 (4th Cir. 2006) (finding district court properly excluded plaintiff's expert report because plaintiff did not timely disclose the report).

### C. Plaintiff's Commission Reports

On a quarterly basis, sales persons at Cambridge were provided commission reports detailing the amount of commissions owed. (Sorgeloos Dep. p. 15). Paula Sorgeloos, Cambridge's former Financial Operations Manager, was responsible for calculating commissions during Plaintiff's tenure with Cambridge and was responsible for preparing and distributing the quarterly commission reports for review and approval. (Sorgeloos Dep. p. 9, 14). Plaintiff asserts that many of the commission reports "identify eight (8) separate BrickStreet accounts"

---

[10] As with Mr. Dubinsky's report, Mr. Martorelli's opinions and report are hearsay and cannot be considered on a motion for summary judgment. *See Maryland Highways Contractors Ass'n*, 933 F.2d at 1251.

and several others "also identify a ninth separate BrickStreet account." (Plf. Mem. p. 6-7; *see also* Plf. Mem. p. 2). Conveniently, however, Plaintiff ignores the undisputed evidence that <u>she</u> inputted the nine separate "account" names into Cambridge's UpShot or sales tracking program, not Ms. Sorgeloos or anyone else in accounting. (Plf. Dep. p. 97, 151-52; Grodus Dep. p. 182-83[12]). Plaintiff also ignores Ms. Sorgeloos' testimony that she obtained the names appearing under the "Account-Name" columns on the commission reports <u>from the sales representatives</u>. (Sorgeloos Dep. p. 42). With respect to Plaintiff's reports in particular, Ms. Sorgeloos testified that the fact there were several BrickStreet entries on Plaintiff's commission reports did not mean that there were multiple BrickStreet "accounts." (*Id.* at p. 134).[13] In fact, Ms. Sorgeloos confirmed her view that there was only one BrickStreet account. (*Id.*).

Similarly, Plaintiff's assertion that "Cambridge's accounting records shows that Murphy was entitled to $326,475 in commissions with respect [ACR, TPA, and WVX]" has no basis in the record. (Plf. Mem. p. 3). Indeed, Plaintiff makes this allegation without providing a single citation to the record or identifying the "accounting records" she references. This is because there is no evidence or accounting document to support Plaintiff's statement.

## D. Cambridge's Interpretation of the Commission Plans

Mr. Turner <u>never</u> admitted that there has been "no interpretation of the commission plans contrary to Murphy's interpretation during her employment on the issues in dispute in this

---

[11] On September 9, 2009, Cambridge filed a motion to strike Plaintiff's expert report pursuant to Rule 37(c) of the Federal Rules of Civil Procedure on the grounds it is untimely and its contents are improper and do not meet the standards for admissibility. (Docket No. 72). Cambridge's motion remains pending before the Court.

[12] References to the transcript and exhibits from the 30(b) deposition of Michael Grodus on June 16, 2009, will hereinafter be referred to as "Grodus Dep. p. __" and "Grodus Dep. Ex. ___", respectively, which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibits "G" and "H".

[13] Ms. Sorgeloos testified there could be several reasons why projects within one account may be listed separately on a commission report. (Sorgeloos Dep. p. 21-22). For example, she explained, "if you have one account that a salesperson sold four services on one account, they may want to see how their commission is coming in. In other words, if they sold four different services to Limited Brands, although it's one account, they may want to know how much comes from claims ..., how much comes from whatever other services were sold." (*Id.*).

litigation".[14]  (Plf. Mem. p. 4).  Moreover, he did not testify that he was "unaware of any written interpretation of any portion of the Commission Plan" or that he "was unaware of any oral or verbal interpretation of the Commission Plan, other than confirming that contracts for less than $50,000 per annum would not result in the payment of commissions," as Plaintiff alleges in her Memorandum.  (Plf. Mem. p. 8, ¶ 18).  What Mr. Turner <u>did</u> say was that he had never issued a written instrument interpreting the commissions plans, but that "there have been conversations probably with each producer regarding the plan interpretation."  (Turner Dep. p. 20, 24-25).  Mr. Turner described a discussion he had with one sales representative regarding whether commissions would be paid on an account under $50,000 in revenue.  (*Id.* at p. 18).  Mr. Turner also explained a conversation during which he explained to another sales representative how he would be compensated on a claims deal in excess of three million dollars.  (*Id.* at p. 24-26).  He told the sales person that he would be paid 5% on the first million dollars invoiced, 7% on invoiced revenue between $1 million and $3 million, and 9% on anything in excess of $3 million but that the annual commissions on the account would be capped at $150,000 pursuant to the terms of the commission plan.  (*Id.* at p. 26-28).  Mr. Turner also described his discussions with Plaintiff regarding plan interpretation.  (*Id.* at p. 24-25, 133-35, 140-41).  Mr. Turner testified that in the Fall of 2007, Plaintiff raised questions regarding her entitlement to commissions associated with independent medical exam and field case management services invoiced and performed by a third-party vendor for BrickStreet, and expressed her belief that she was entitled to commissions based on the revenue invoiced by third-party vendors.  (*Id.* at p. 133-35, 140-41).  Mr. Turner explained to Plaintiff that she was not entitled to commissions based on revenue invoiced and received by another company.  (*Id.* at p. 133-35, 139-41).  Notably, Plaintiff

---

[14] Contrary to Plaintiff's representation, Mr. Turner did not "confir[m] that the Commission Plans applied to Murphy." (Plf. Mem. p. 8, ¶ 19).  Mr. Turner confirmed that Plaintiff was "eligible to be covered" by the Plans.

acknowledged and initially agreed with Mr. Turner's interpretation, but subsequently claimed to have a change of mind. (*Id.* at p. 141).

### E. Plaintiff's Termination

Under the Commission Plans, "[n]o commissions will be payable if [an] employee is terminated for 'cause.'" (Plf. Mem. Ex. A, B). The Commission Plans further state that "cause" shall mean, *inter alia*, "material failure in the performance of employment duties" and "failure to follow specific and reasonable directives of the person to whom the employee reports or such other senior officer of the company." (*Id.* ).

Plaintiff was employed by Cambridge in a sales and business development capacity from July 2002 until May 2008 when she was selected for termination as part of a workforce reduction. (Amend. Compl. at ¶ 4; Plf. Dep. p. 41, 45, 54; O'Brien Dep. p. 42; Turner Dep. Day 2 p. 7-9[15]). Plaintiff contends that Cambridge's 30(b)(6) designee admitted that "Murphy was terminated as part of a company-wide reduction in force, rather than for cause, as cause is identified by the Commission Plans." (Plf. Mem. p. 4) (emphasis added).[16] Mr. Turner testified to the exact opposite. He unequivocally testified that Plaintiff was selected for inclusion in the workforce reduction and terminated for cause as that term is defined in the Commission Plans due to her "material failure in performance of employment duties" and her failure to follow his specific and reasonable directives. (Turner Dep. Day 2, p. 8-9, 12-13, 28-29, 38-39, 77-78). Mr. Turner explained that Plaintiff's failure to perform her duties was evident from "the lack of qualified leads, the lack of written business, [and] the lack of leads" on her part as of the time the

---

(Turner Dep. p. 39).

[15] References to the transcript and exhibits from the second day of the 30(b)(6) deposition of Kevin Turner, on August 27, 2009, will hereinafter be referred to as "Turner Dep. Day 2 p. __" and "Turner Dep. Day 2 Ex.__", respectively, which are annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibits "I" and "J".

[16] Plaintiff again offers no citation to the record to support this accusation.

termination decision was made. (*Id.* at p. 28-31). Plaintiff also fails to disclose Mr. Turner's testimony regarding a written performance warning he issued to Plaintiff on November 28, 2007. (*Id.* at p. 45; Turner Dep. Day 2 Ex. 5). The warning detailed the deficiencies in Plaintiff's performance and informed her that "[i]f significant improvement is not forthcoming future disciplinary action up to and including termination, will be taken." (*Id.*).

### F. The BrickStreet Billing History

In the Fall of 2007, BrickStreet notified Cambridge that it had granted a contract to manage all open claims for West Virginia to a different third-party administrator and was canceling its contract with Cambridge. (Turner Dep. p. 45-46; Grodus Dep. p. 105). All of the services Cambridge agreed to provide under the BrickStreet-Cambridge contract were performed by December 31, 2007. (Grodus Dep. p. 105, 107-08). However, Plaintiff's assertion that "Cambridge received all revenue due and owing from BrickStreet on or before February 2008" and that "revenue for ACR, TPA and WVX was received . . . as of February 2008" is wrong. (Plf. Mem. p. 10, ¶ 27; *see also* Plf. Mem. p. 3). In reality, Cambridge <u>issued</u> its last invoice to BrickStreet in February 2008.[17] (Grodus Dep. p. 107-08; Turner Dep. Day 2 p. 19-21; Plf. Mem. Ex. KK (DEF00092-93).

## RESPONSE TO MOTION FOR SUMMARY JUDGMENT

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the pleadings, discovery materials on file, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Plaintiff, as the moving party, has the initial responsibility of identifying those portions of the record that demonstrate the

absence of general issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether summary judgment should be granted, a court may only consider evidence determined to be admissible under the Federal Rules of Evidence. *See Utility Control Corp. v. Prince William Constr.*, 558 F.2d 716, 720 (4th Cir. 1977); *Kennedy v. Joy Techs., Inc.*, 2008 U.S. App. LEXIS 5396, **16 (4th Cir. March 12, 2008). It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment. *See Orsi v. Kirkwood*, 999 F.2d 86, 94 (4th Cir. 1993); *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) (holding authentication is a "condition precedent to admissibility," and this condition is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims."); *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 138 (7th Cir. 1985). The Fourth Circuit has held that "[t]o be admissible at the summary judgment stage, 'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" *Orsi*, 999 F.2d at 94 (citing 10A Charles A. Wright et al., Federal Practice and Procedure § 2722, at 58-60 (1983 & 1993 Supp.). Plaintiff has failed to meet these standards.[18]

## II.   CAMBRIDGE HAS CONTINUOUSLY DENIED ANY OBLIGATION TO PAY PLAINTIFF ADDITIONAL COMMISSIONS

Plaintiff's contention that Cambridge has admitted that it owes Plaintiff an additional $35,413 in commissions for the ACR, TPA, and WVX projects is contrary to the record. In its Answers to Plaintiff's Original and Amended Complaints, Cambridge did not address whether the ACR, TPA, and WVX projects were considered to be one or more accounts. (Plf. Mem. p. 14, 15). However, Cambridge did repeatedly deny that Plaintiff was responsible for producing

---

[17] Exhibit KK to Plaintiff's Memorandum is not a spreadsheet detailing a history of the payments made by BrickStreet to Cambridge as Plaintiff's suggests. Rather, it is a summary of the timing and amount of invoices sent by Cambridge to BrickStreet. (Grodus Dep. p. 31-32; Turner Dep. Day 2 p. 19-21).
[18] Not one of the 37 exhibits offered by Plaintiff was properly authenticated. Therefore, none of Plaintiff's exhibits can be considered in evaluating Plaintiff's Motion. Without the proof of these documents, Plaintiff has offered no

the "deals" identified in her Complaints and that Plaintiff was entitled to any additional commissions. (Answer to Amend. Compl. at ¶ 11, 12, 16, 27, 32, 37, 50, 60).

Cambridge has continuously denied any obligation to pay any additional commissions related to the work performed for BrickStreet and there is absolutely no evidence in the record to the contrary. Plaintiff argues that the fact that Cambridge made an exception to the Commission Plans and treated the BrickStreet account as if it was three accounts – ACR, TPA, and WVX – proves that Cambridge has admitted it owes Plaintiff an additional $35,413 in commissions on these three accounts. (Plf. Mem. p. 3, 14, 15). Plaintiff has failed to provide the logical link between these two points. Moreover, Cambridge has maintained that there was one BrickStreet account, but that Plaintiff was given the benefit of a favorable interpretation by Cambridge's President as to the treatment of the account, not that she is owed anything additional. (Turner Dep. p. 88-91; O'Brien Dep. p. 22-24, 27; Root Dep. p. 77-78; Sorgeloos Dep. p. 134). Cambridge has also maintained that if it had applied the terms of the Commissions Plans in accordance with the company's normal interpretations, Plaintiff would have been paid a total of $150,000 in commissions attributable to BrickStreet. (Plf. Mem. Ex. A, B; O'Brien Dep. p. 22-23; Turner Dep. 88-89). Cambridge did not do this, however, and instead voluntarily elected to make an exception to the Commission Plans that resulted in Plaintiff being paid almost double that amount. (Turner Dep. p. 89-91; O'Brien Dep. p. 22-24, 27). Mr. O'Brien's and Mr. Turner's deposition testimony attesting to the fact the Cambridge made an exception to the Commission Plans certainly does not constitute an admission that Cambridge is obligated to pay Plaintiff an additional $35,413 in commissions. Quite the contrary, its an admission that Plaintiff was paid more than she earned and was entitled to receive.

---

evidence to support the arguments set forth in her Motion and Memorandum. In contrast, Cambridge has offered authenticated sworn deposition testimony, affidavits, and documents. As a result, Plaintiff's Motion must be denied.

Moreover, as discussed above, Mr. Dubinsky did not "calculate[e] commissions due to Murphy in the sum of $35,413 for the ACR, TPA and WVX accounts." (Plf. Mem. p. 14). As clearly articulated in Mr. Dubinsky's report, he provided a calculation of the commissions that would be derived based on "Murphy's interpretation of the Commission Plans" and "Plaintiff's Methodology" for calculating commissions. (Plf Mem. Ex. C p. 7-9 and Exhibit 3). For the same reason, Plaintiff's argument that summary judgment is appropriate because Mr. Dubinsky and Mr. Martorelli "agree on issues of material fact" is similarly misplaced.[19]

## III. PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON HER CLAIM THAT NO BONA FIDE DISPUTE EXISTED BETWEEN CAMBRIDGE AND PLAINTIFF

Plaintiff contends that Cambridge's failure to pay Plaintiff an additional $35,413 in commissions on ACR, TPA and WVX is not subject to a "good faith dispute". (Plf. Mem. p. 15). Plaintiff further erroneously argues that she is entitled to summary judgment as to whether there existed a bona fide dispute regarding these additional commissions; , she also incorrectly requests that the Court award her treble damages under the Maryland Wage Payment and Collection Act (the "Act").[20] (Plf. Mem. p. 12-14, 21). First, an award of punitive damages under the Section 3-507.1(b) of the Act[21] is discretionary, not automatic, and the determination

---

[19] Irrespective of the fact it is inadmissible hearsay, as previously discussed, Mr. Martorelli's report should be totally disregarded and stricken because it was not timely disclosed and because he is not qualified to render the opinions set forth in his report.

[20] Although Maryland courts have held that the existence of a bona fide dispute under § 3-507.1 is a question of fact for resolution by the jury as the trier of fact, this Court has held that this does not preclude a court from deciding this issue on summary judgment where there is no evidence of a bona fide dispute. *See Gresham v. Lumberman Mutual Casualty Co.*, 426 F.Supp.2d 321, 324-25 (D. Md. 2005) ("[T]he existence of a bona fide dispute under § 3-507.1 is a question of fact left for resolution by the jury, not the trial judge. However, as in any case, in order for an employee to withstand a summary judgment motion, there must be sufficient evidence adduced to permit a trier of fact to determine that the employer did not act in good faith when it refused to pay.") (internal quotations and citations omitted); *Marroquin v. Canales*, 505 F.Supp.2d 283, 296 (D. Md. 2007) ("The determination of a bona fide dispute is one that is generally left for the jury and not the judge, though summary judgment is still appropriate where sufficient evidence as to the bona fide dispute does not exist.").

[21] If "a court finds that an employer withheld the wage of an employee...and not as a result of a bona fide dispute, the court <u>may</u> award the employee an amount <u>not exceeding</u> 3 times the wage...." (emphasis added).

of the amount of any additional damages is a matter for the jury to decide. *See Admiral Mortgage, Inc. v. Cooper,* 357 Md. 533, 550-51 (Md. 2000).

Moreover, the undisputed evidence in this case demonstrates either that there is no basis at all for any claim for additional commissions, as Cambridge has asserted in its Motion for Summary Judgment, or, at a minimum, that Cambridge had a good faith basis to dispute the amount. At most, Plaintiff's Memorandum suggests that a legitimate dispute exists over Plaintiff's claim for an additional $35K in commissions on the ACR, TPA, and WVX projects. It does not meet the summary judgment standard for determining that <u>no</u> bona fide dispute exists as to this claim. In other words, it does not identify admissible, undisputed evidence establishing that there is no genuine issue of fact as to whether Cambridge "...withheld the payment of wages without even plausibly good reason for having done so, to wit, 'not as a result of a bona fide dispute.'" *Programmers' Consortium v. Clark,* 95 A. 2d 914, 922 (Md. App. 2008). Therefore, denial of Plaintiff's request for summary judgment on the issue is both proper and appropriate.[22]

Plaintiff's argument is not clearly articulated, but it appears that she is claiming that Cambridge has taken inconsistent positions on whether the BrickStreet account was one or more accounts and that this inconsistency proves that Cambridge had no basis for not paying Plaintiff an additional $35,413 in commissions. (Plf. Mem. p. 15-16). Not only is Plaintiff's argument illogical, it is again based on mischaracterization of the pleadings and record in this case. As discussed above, Cambridge's Answers are silent as to whether it considered the ACR, TPA and WVX projects to be one or multiple accounts. Regardless, there is no inconsistency in

---

[22] Cambridge denies that it has made admissions against interest as Plaintiff asserts. (Plf Mem. p. 13). As shown throughout this Opposition, Plaintiff has misstated the testimony of Mr. O'Brien and Mr. Turner and mischaracterized Mr. Dubinsky's report. The facts are that Cambridge has consistently denied it owes any additional commissions based on any of the projects identified in Plaintiff's Amended Complaint, including the ACR, TPA and WVX projects. There is also an issue as to when, <u>if ever</u>, Plaintiff claimed that she was owed $35K prior to the institution of this action, or indeed, at any time before submission of her Motion.

Cambridge's position that BrickStreet was a single account under the normal interpretation of the Commission Plan language and that it made an exception and interpreted it as if BrickStreet was three accounts. Moreover, even if Cambridge has taken inconsistent positions, which it has not, the inconsistency is not an admission, nor is it proof, that Plaintiff is entitled to additional commissions or that Cambridge acted in bad faith by not paying Plaintiff additional commissions.

Plaintiff also claims that Cambridge admitted in its Answers that Plaintiff procured and was paid commissions on the ACR, TPA, and WVX projects but denied the existence of separate BrickStreet accounts and Plaintiff's entitlement to further commissions. (Plf. Mem. p. 16). First, Cambridge has never admitted that Plaintiff "procured" or produced the ACR, TPA, or WVX projects. What Cambridge did admit is that Plaintiff "participated in efforts to secure" what Plaintiff identifies in her Complaints as the "Brickstreet All Claims Review Deal", the "Brickstreet Tail Claims Account", and the "WV Expansion." (Answer to Amend. Compl. at ¶ 12, 27, 33). Second, Cambridge did not deny the fact that it treated the BrickStreet account as if it was three accounts for purposes of calculating Plaintiff's commissions. Rather, Cambridge admitted that Plaintiff was paid commission based on revenue Cambridge received for these services. (*Id.* at ¶ 15, 30, 36).

In the end Plaintiff's bald assertions are irrelevant and do not establish that a bona fide dispute does not exist as to her claim for $35K in additional commissions. The fact that Cambridge elected to make an exception and to compensate Plaintiff as if BrickStreet was more than one account does not, as Plaintiff suggests, mean that Cambridge did not pay Plaintiff all it believed she was owed on the ACR, TPA and WVX projects or that Cambridge has now admitted it owes Plaintiff additional commissions. Plaintiff's argument to the contrary is

groundless and illogical. (Plf. Mem. p. 16). Likewise, Mr. Dubinsky's report does not support Plaintiff's argument because, as previously explained, he did <u>not</u> determine that Plaintiff <u>is</u> owed additional commissions on the ACR, TPA, or WVX projects.

In her Memorandum Plaintiff asks "what possible good faith basis could there be for [Cambridge's] failure to pay?" The answer is: there are many grounds, all of which demonstrate, at a minimum, that a bona fide dispute exists between Cambridge and Plaintiff regarding her entitlement to any additional commissions on these three projects. First, while Plaintiff alleges that she was responsible for procuring the BrickStreet business, the undisputed facts establish that Plaintiff was <u>not</u> responsible for procuring the BrickStreet account. The undisputed evidence is that Cambridge had a good faith basis to take the position, had it elected to do so, that BrickStreet was not "new business produced by the participant" within the meaning of the Commission Plans, and to deny commissions outright. That it chose to interpret the Plans in Plaintiff's favor and pay commissions to her does not change the underlying facts or give rise to a right to receive more than the amount Cambridge decided to pay. Second, the parties apparently also dispute Plaintiff's entitlement to $3,404 in commissions that were not paid on the TPA project as a result of a "true down." Third, Cambridge has moved for summary judgment based upon the plain meaning of the Commission Plan language with respect to the proper application of the commission tiers and whether the 9% rate applies only to invoiced revenue in excess of $3 million. Cambridge and Plaintiff also disagree about the reason for Plaintiff's termination and whether she was terminated for cause under the Commission Plans.

## IV. PLAINTIFF IS NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF CAMBRIDGE'S AFFIRMATIVE DEFENSES

Plaintiff also contends that she is entitled to summary judgment on two of Cambridge's affirmative defenses: 1) Cambridge possessed the sole right of interpretation of the Commission

Plans; and 2) Plaintiff was terminated for cause as defined by the Commission Plans and, accordingly, is not entitled to commissions. (Plf. Mem. p. 17-20). Plaintiff's arguments again have no basis in the evidentiary record.

### A. The Undisputed Facts Show that Cambridge Exercised Its Right of Interpretation

As Plaintiff notes, the Commission Plans explicitly state that "<u>Cambridge reserves the sole right of **interpretation** *and* **application** of this plan</u>.". (Plf. Mem. p. 17; Plf. Mem. Ex. A, B). It does <u>not</u> say, as Plaintiff's argument implicitly assumes, that Cambridge may only exercise those rights in writing. The undisputed evidence shows that Cambridge has exercised its right of interpretation and application, and in fact exercised its rights to Plaintiff's great monetary benefit. In determining which contracts are subject to commissions, Cambridge has consistently interpreted the term "contract" to refer to a contract between Cambridge and its customer. (Turner Dep. p. 112; Turner Aff. at ¶ 5). Similarly, in determining the revenue amounts upon which commissions should be calculated, Cambridge has always interpreted the phrase "revenue invoiced" to mean revenue invoiced by Cambridge such that <u>only</u> revenue invoiced by Cambridge was eligible for commissions. (Turner Dep. p. 122-125, 127-28; O'Brien Dep. p. 54-55; Sorgeloos Dep. p. 127, 130; Root Dep. p. 112-13; Turner Aff. ¶ 5[23]; Sorgeloos Aff. ¶ 3[24]). In applying the $150,000 cap or ceiling on annual commissions on any account, Cambridge has interpreted the term "account" as synonymous with a single customer or client. (Turner Dep. p. 88; O'Brien Dep. p. 25-26; Root Dep. p. 61).

---

[23] The affidavit of Kevin Turner dated October 27, 2009, will hereinafter be referred to as "Turner Aff. at ¶ ___", which, excluding its attachments which are not relevant to this Opposition, is annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "K."

[24] References to the Affidavit of Paula Sorgeloos dated October 27, 2009, will hereinafter be referred to as "Sorgeloos Aff. at ¶ ___", which is annexed to the affirmation of Lindsey H. McGinnis, Esq., sworn to on November 13, 2009 as Exhibit "L."

Thus, Plaintiff's assertion that Cambridge never exercised its right of interpretation is flatly contradicted by the evidence. (Plf. Mem. p. 4, 8, 17). Moreover, Mr. Turner testified that he had conversations with each sales person regarding plan interpretation. (Turner Dep. p. 24-25). Indeed, as noted in the Section D above, Mr. Turner described several conversations he had regarding the interpretation of provisions of the Commission Plans at issue in this case, including conversations with Plaintiff. (*Id.* at p. 18, 24-26, 133-35, 140-41). Most striking in light of Plaintiff's allegations, Plaintiff initially agreed with Mr. Turner's interpretation, then during subsequent communications claimed to have a change of mind. (*Id.* at p. 141).

The record further establishes that Cambridge exercised its right of interpretation and application when it decided to make an exception to the Commission Plans to Plaintiff's benefit. Under Cambridge's normal interpretation of the Commission Plans, the BrickStreet account was one account, and, therefore, the maximum commission Plaintiff could have earned on the services provided to BrickStreet was $150,000 in annual commissions. (Turner Dep. p. 88; O'Brien Dep. p. 24; Root Dep. p. 77-78; Sorgeloos Dep. p. 134; Plf. Mem. Ex. A, B). However, exercising its right of interpretation and application, Cambridge elected to make an exception to the Commission Plans. As a consequence of this exercise of its "right of interpretation and application", Cambridge paid Plaintiff almost double what she would have been paid had Cambridge not chosen to do so. [25]

### B. Plaintiff Is Not Entitled To Summary Judgment As To The Facts Surrounding Her Termination

Plaintiff contends that the facts do not support Cambridge's position that Plaintiff was terminated for cause under the Commission Plans. (Plf. Mem. p. 19-20). In making this

---

[25] If the court holds that only written interpretations are effective under the Plans, then Cambridge will have a basis to recoup at least $141K from Plaintiff for unjust enrichment premised upon an unauthorized oral interpretation, and her position with respect to the right of interpretation estops her from contending that it was authorized.

argument, Plaintiff ignores Mr. Turner's unambiguous testimony that Plaintiff was terminated for cause as that term is defined in the Commission Plans, and Plaintiff also fails to disclose the fact that she given a written performance warning on November 28, 2007. (Turner Dep. Day 2, p. 28-29, 38-39, 45, 77-78; Turner Dep. Day 2 Ex. 5). Plaintiff's termination may have been implemented as part of a work force reduction, but that does not mean she was not selected for inclusion in reduction due to her material failure to perform her employment duties.

Plaintiff argues that she could not have been terminated for cause under the Commission Plans because the Plans "contemplate '*notice*' being given to plan participants," and Plaintiff did not receive written notice that she was being terminated for failure to perform her duties. (Plf Mem. p. 20). Plaintiff's argument is unavailing. First, the Commission Plans do not "contemplate" much less require that notice be given to participants regarding the precise basis for termination. Second, Plaintiff was provided notice in November 2007 that if she did not significantly improve her performance, she would be subject to further discipline including termination. (Turner Dep. Day 2 p. 45; Turner Dep. Day 2 Ex. 5). Moreover, the termination documents Plaintiff received stated that performance was a factor considered in selecting the persons to be included in the workforce reduction. (*Id.*).

Finally, Plaintiff's argument that she earned the commissions before the cause for her termination arose is unsupported by the facts. Plaintiff's statement that "Cambridge received all revenue due and owing from BrickStreet in February 2008" is simply wrong. (Plf. Mem. p. 18). Cambridge issued its last invoice to BrickStreet in February 2008. (Plf. Mem. Ex. KK). The final revenue due to Cambridge was not received until some time thereafter. Moreover, Plaintiff is again disingenuous in her argument that the "cause" for her termination did not arise until long after the work was performed and the revenue received from BrickStreet. Plaintiff was placed on

a written performance improvement plan on November 28, 2007 - - over one month before Cambridge stopped performing work for BrickStreet, three months before Cambridge issued its last invoice to BrickStreet and five months before Cambridge received its final payment from BrickStreet. (Turner Dep. Day 2, p. 28-29, 38-39, 45, 77-78; Turner Dep. Day 2 Ex. 5; Grodus Dep. p. 46-48; Ex. 3 (BrickStreet001-002)). Based on these facts, and assuming *arguendo* that Plaintiff earned any additional commissions, a reasonable interpretation of the Commission Plans is that Plaintiff did not earn the commissions she is seeking prior to the cause of her termination.

## CONCLUSION

For the foregoing reasons, Defendant Cambridge respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment.


Dated: November 13, 2009               LITTLER MENDELSON, P.C.

                                       By: ___s/ Thomas J. Flaherty_____
                                           Thomas J. Flaherty (Fed. Bar No. 16582)
                                           tflaherty@littler.com
                                           Lindsey H. McGinnis (admitted *Pro Hac Vice*)
                                           lmcginnis@littler.com
                                           1650 Tysons Blvd., Suite 700
                                           McLean, Virginia  22102
                                           703.442.8425  Telephone
                                           703.442.8428  Facsimile

                                           *Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2009 a copy of the foregoing Opposition was

served via the Court's electronic filing system and U.S. Mail upon the following:

Christopher L. Rogan, Esq.
James P. Campbell, Esq.
Danell P. Dean, Esq.
Campbell Miller Zimmerman, P.C.
19 East Market Street
Leesburg, Virginia  20176


__s/ Lindsey H. McGinnis_____
Lindsey H. McGinnis