# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | | |
|---|---|---|
| **LISA M. MUPRHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-cv-3224 (AW)** |
| | ) | |
| **CAMBRIDGE INTEGRATED** | ) | |
| **SERVICES GROUP, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff, Lisa M. Murphy ("Murphy"), by counsel, hereby files this Opposition to

Defendant, Cambridge Integrated Services Group, Inc.'s ("Cambridge") Motion for

Partial Summary Judgment (the "Motion") and states as follows:

## I.      STATEMENT OF THE CASE

Cambridge seeks partial summary judgment asserting that Murphy is not entitled

to commissions on: (a) Independent Medical Examinations ("IME"); (b) Field Claim

Services ("FCM"); (c) Surveillance and Investigations Unit ("SIU"); and (d) Subrogation

("SUB").  Cambridge claims that the facts are undisputed that the Commission Plans

(attached hereto as Exhibits A (2006 Plan) and B (2007 Plan) provide that services

provided to its customers by a subcontractor or third party are not subject to the payment

of commissions to the sales professional.  Despite Cambridge's bald faced assertion, no

such language is contained in the Commission Plans.  In fact, the Commission Plans

specifically provide that sales professionals are entitled to commissions for "*all business

produced*" for "*field claims services.*"  *See* Commission Plans at page 1 under Overview

1

and Eligibility.  It is undisputed that IME, FCM, SIU and SUB are all part of "*field claims services*" offered and provided by Cambridge to its customers.

Cambridge also asserts that "*revenues on the contract,*" as stated in the Commission Plans, relates only to "*revenues*" fully payable to Cambridge where subcontractors or joint venture partners are not providing said services.  *See* Commission Plans at page 2 under Voluntary and Involuntary.  Compellingly, no such language in the Commission Plans makes this distinction.  Rather, the Commission Plans state explicitly that commissions are to be paid "*for all new business produced by the participant . . . on revenue invoiced for the first twelve (12) months contract period*."  *See* Commission Plans at page 2 under Structure.

Whether IME, FCM, SIU and SUB were "*separate accounts,*" resulting in commissions due to Murphy is the hotly disputed seminal issue of fact in this case.  As noted in Murphy's Motion for Partial Summary Judgment, Cambridge routinely produced commission calculation reports ("Cambridge Commission Calculation Reports"), which identified either seven (7) or eight (8) separate, commissionable accounts for Murphy, including IME, FCM, SIU and SUB.  In fact, Murphy has identified twenty-seven (27) separate Cambridge Commission Calculation Reports showing separate "*accounts*."  In addition, Murphy testified that Vance Root instructed her to treat each line of business or services between Cambridge and BrickStreet Mutual Insurance Company ("BrickStreet") as a "*separate account*" for commission purposes.  Further, the only current Cambridge employee to testify in deposition was Pam Morrow, who testified that she was aware that the BrickStreet business was established as "*separate accounts*" for accounting purposes based on discussions between all sales professionals and the Vice President of Sales in

weekly management meetings or conference calls.  The Cambridge Commission Calculation Reports relevant to the issues in this case were all prepared by Paula Sorgeloos, a former employee, who was employed in Cambridge's finance and accounting department.  Sorgeloos testified that she prepared all of the Commission Calculation Reports and circulated those reports to Cambridge management before disseminating the same to sales professionals such as Murphy.  Sorgeloos testified that her first notice that commissions would not be paid to Murphy on the IME account was just days before Murphy's termination in May 2008, and long after Cambridge's business with BrickStreet concluded on December 31, 2007.

Cambridge asserts that no second year commissions are due because the business with BrickStreet in West Virginia was a "*run-off*" contract.  The alleged basis for this assertion arises out of the Special Account provision on page 2 of the Commission Plans that indicates that "*commissions will be paid on run-off accounts for the first twelve (12) months only*."  A run-off account is not defined in the Commission Plan — just as "*all business*" and "*revenues on the contract*" are not defined.  However, the definition of "*all business*" is unambiguous because it is subject to common understanding.  What is and what is not a run-off account is a matter of dispute in this proceeding.  Specifically, Cambridge argues by Affidavit that a run-off account is one where no new claims will be sent to Cambridge by the customer.  However, the affiant, Kevin Turner, in deposition, explained a run-off account in language that was arguably indecipherable.  Meanwhile, Cambridge's expert witness, Bruce Dubinsky, identifies a run-off account as being a "*liability*" where an insurance company establishes a "*reserve*."  Murphy testified that a run-off account is one where claims are handled by the administrator to completion for a

fixed fee. It is undisputed that Cambridge's contract with BrickStreet was for a limited period of time and that BrickStreet had the right to terminate the contract — which it did effective December 31, 2007. Cambridge was not obligated to handle the claims as a run-off because Cambridge was not obligated to handle the claims to completion after December 31, 2007.

Cambridge also asserts that summary judgment can be granted in relation to the percentage of commissions due based on the calculations of revenue for IME, FCM, SIU and SUB and for second year commissions on the WVX deal — which is clearly a contested issue of fact.

Cambridge claims that summary judgment can be granted against Murphy on the issue of treble damages pursuant to the Maryland Wage Payment and Collection Act, notwithstanding clear authority to the contrary in *Aronson & Co. v. Fetridge*, 181 Md.App. 650, 957 A.2d 125 (Md.App. 2008) and *Admiral Morg., Inc. v. Cooper*, 357 Md. 533, 745 A.2d 1026 that such a determination is a jury question.

Finally, Footnote 1 of Cambridge's Motion asserts that Cambridge seeks partial summary judgment on the sums claimed by Murphy for TPA and WVX. Cambridge's assertion is an admission of liability with regard to the Maryland Wage Payment and Collection Act, as is addressed in Murphy's own Motion for Partial Summary Judgment for an award of $35,413.

**II.**   **STATEMENT OF DISPUTED FACTS WHICH MAKE**
      **PARTIAL SUMMARY JUDGMENT INAPPROPRIATE**

The following facts make Partial Summary Judgment for Cambridge

inappropriate:

**A.**   **Murphy was Employed as a Sales Professional and**
      **Was Entitled to Commissions Based on Written Commission Plans**

1.      Murphy was employed by Cambridge from July 2002 until May 2008 as a

sales professional.  *See* Murphy Deposition at page 41, lines 19-20; page 54, lines 9-11

(Exhibit C).

2.      Murphy sold products or services for workers compensation programs in

the State of West Virginia administered pursuant to a contract between the West Virginia

Office of the Insurance Commissioner ("WVOIC") and BrickStreet.  *See* Murphy

Deposition at page 57, lines 1-6 (Exhibit C).

3.      While employed at Cambridge, Murphy was paid a base salary.  In

addition to her base salary, she was entitled to earn commissions based on commission

plans adopted and published by Cambridge.  *See* Murphy Deposition at page 52, lines 4-

8; and page 53, lines 8-10 (Exhibit C).

**B.**   **Paula Sorgeloos Prepared Cambridge's**
      **Twenty-Seven (27) Separate Commission Calculation**
      **Reports Show Seven (7) or Eight (8) Separate**
      **Accounts with Respect to BrickStreet,**
      **Including IME, FCM, SIU and SUB**

4.      Paula Sorgeloos is a former employee of Cambridge.  From approximately

2002 until the termination of her employment in 2008, Sorgeloos was responsible for

calculating commissions due to sales professionals such as Murphy and prepared

Commission Calculation Reports. *See* Sorgeloos Deposition at page 14, lines 18-25 (Exhibit D).

5.      Sorgeloos testified that her responsibilities included circulating Commission Calculation Reports for review and approval to the Vice President of Sales and the Vice President of Finance before sending copies of the Commission Calculating Reports to Cambridge's sales professionals who were compensated, in part, by sales commissions. *See* Sorgeloos Deposition at page 15, lines 19-25; page 16, lines 1-25; page 17, lines 1-12 (Exhibit D).

6.      During the course of Murphy's employment, Sorgeloos prepared and provided to Murphy a large number of reports showing the amount of revenue received for each of Murphy's separate accounts and the calculation of commissions due. *See* Sorgeloos Deposition at page 15, lines 19-23 (Exhibit D).

7.      Many of the Commission Calculation Reports prepared by Sorgeloos for Cambridge and provided to Murphy following circulation to Cambridge management identify eight (8) separate BrickStreet accounts in relation to "*Producer Name: Lisa Murphy*." A copy of a document provided by Sorgeloos to Murphy during her

employment and produced as PL 184 is reproduced in part as follows:[1]

**Producer Name:  Lisa Murphy (January 2006 - March 2007)**

| Account - Name | Annual Size | Lines of Business | Policy Effective Date | |
|---|---|---|---|---|
| Rush University Medical Center Deal | $ 50,000 | medical bill review; utilization management | 1/1/2006 | |
| ARMSIF: Managed Care Deal | $ 50,000 | medical bill review, UR, TCM, etc. | 2/1/2006 | |
| City of Covina Medical Bill Review Deal | $ 10,000 | MBR/PPO/CPS | 2/1/2006 | |
| Brickstreet Insurance: Claims Audit & Training | $ 167,320 | 3 remaining phases of claims training, complete training for two additional groups; supervisor training and internal audit proposals forthcoming | 2/21/2006 | |
| Brickstreet Insurance Training | $ 161,161 | Training | 9/1/2006 | |
| Mercy Hospital Medical Bill Review Deal | $ 10,000 | Medical Bill Review | 9/1/2006 | |
| Deschutes County, OR Gates Expansion Deal | $ 50,000 | WC Claim Mangement Services | 10/1/2006 | |
| Brickstreet All Claims Review Deal | $ 500,289 | Claims Review | 11/1/2006 | |
| Brickstreet Insurance:  Field Case Management Deal | $ 100,000 | Field Case Management | 11/15/2006 | |
| Brickstreet Insurance:  IME's Deal | $ 100,000 | IME | 11/15/2006 | |
| Brickstreet: Subrogation/Recovery of Overpayments Deal | $ 100,000 | Subro/Recovery | 11/15/2006 | |
| Brickstreet: Tail Claims TPA Services Deal | $ 3,929,407 | WC Claim Mangement Services | 12/1/2006 | |
| Brickstreet: Internal Audit | $ 100,000 | Audit | 1/1/2007 | |

8.      Several of the Commission Calculation Reports prepared by Sorgeloos for

Cambridge also identify a ninth separate BrickStreet account known as *WV Expansion.*"

A copy of the portion of the report produced by Murphy as PL185 is reproduced as

follows:



**Producer Name:  Lisa Murphy (April 2007 - March 2008)**

| Account - Name | Annual Size | Lines of Business | Policy Effective Date | Billings Q1 2008 | Billings Q2 2008 |
|---|---|---|---|---|---|
| WV Expansion | $ 2,000,000 | Expansion | 4/1/2007 | 730,262 | 845,338 |

| | | 2008 1st Q Due | 2008 2nd Q Due | |
|---|---|---|---|---|
| WV Expansion | $ 2,000,000 | 36,513 | 13,487 | |
| | | | 40,292 | |
| Total | $ | 36,513 | $ 53,779 | |

[1] This spreadsheet has been cropped to fit this page, and does not reproduce additional columns to the right of the "*Policy Effective Date.*"  The Exhibits attached as Exhibits F through DD show the entirety of each report.

9. Twenty-seven (27) separate Commission Calculation Reports prepared by Sorgeloos for Cambridge were produced in discovery and are attached to this Opposition. Exhibits F through H are three (3) separate Cambridge Commission Reports, which show the calculations for commissions for ACR, TPA, WVX, IME, FCM and SUB. Exhibits I through DD are twenty four (24) separate Cambridge Commission Reports which show calculations for commission for ACR, TPA, IME, FCM and SUB.

10. For ease of review, a table of contents is provided for Exhibits F through DD (Exhibit E).

11. Cambridge's Vice President of Sales, Pam Morrow testified that there were discussions during weekly company sales meetings and conference calls regarding separate accounts in West Virginia with BrickStreet. She testified that the BrickStreet lines of business that required separate sales cycles would be considered separate accounts for commission purposes. She recalled there being multiple accounts, but did not remember how many. *See* Morrow Deposition at page 57, lines 14-23; page 59, lines 17-25; page 60, lines 1-11 (Exhibit GG).

**C.    Facts Regarding Cambridge's Failure to
        Publish Interpretations of the Commission Plans
        During Murphy's Employment**

12. Murphy's Commission Plan for the year 2006 is attached hereto as Exhibit A.

13. Murphy's Commission Plan for the year 2007 is attached hereto as Exhibit B.

14. The 2006 and 2007 Commission Plans are identical in content, except for the effective date of each plan.

15.     Cambridge's Rule 30(b)(6) designee, Kevin Turner, confirmed at deposition that (a) he was unaware of any written interpretation of any portion of the Commission Plan, including the issues joined in this litigation; and (b) was unaware of any oral or verbal interpretation of the Commission Plan, other than confirming that contracts for less than $50,000 per annum would not result in the payment of commissions.  *See* June 17, 2009 Turner Deposition at page 19, lines 23-25; page 20, lines 1-12 (Exhibit EE).

**D.     Disputed Facts Regarding the Meaning of "*Revenue*" or "*Revenue on the Contract*" in the Commission Plans**

16.     The Commission Plans do not define the word "*revenue*" as utilized in each Plan.  *See* Exhibits A and B.

17.     The Commission Plans provide for the payment of commissions "*computed on revenues on the contract*."  *See* Exhibits A and B.

18.     The Commission Plans define the "*first twelve (12) months contract period*" as being January 1, 2006 through March 31, 2007 pursuant to the 2006 Plan and the "*first twelve (12) months contract period*" as being January 1, 2007 through March 31, 2008.  *See* Exhibits A and B.

19.     Pursuant to the Commission Plans, payment for the "*first twelve (12) month contract period*" is due thirty (30) days following the end of each calendar quarter.  *See* Exhibits A and B.

20.     "*Revenue*" and "*revenues on the contract*," as identified in the Commission Plans, relate to revenue from the "*business produced*" and "*sales*" generated by the sales professional entitled to commissions.  *See* Exhibits A and B.

21.     The Commission Plans do not exclude "*revenue on the contract*" paid by the customer as a result of services provided through Cambridge's subcontractors such as Coventry Health Care, Inc. ("Coventry") for IME and FCM services or MJM/GS4 ("MJM") for SIU and SUB services.  *See* Exhibits A and B.

22.     Paula Sorgeloos testified at deposition that in April or May of 2008, just before the date of Murphy's termination, she was first instructed by management for Cambridge that revenue paid by BrickStreet for IMEs would not be the subject of commissions for Murphy.  *See* Sorgeloos Deposition at page 138, lines 3-25; page 141, lines 1-25; page 142, lines 1-7 (Exhibit D).

23.     Morrow testified at deposition that she has always marketed to customers of Cambridge field claims services, including IME, FCM, SIU and SUB services, and that she was always paid commissions with respect to those services.  *See* Morrow Deposition at page 18, lines 12-23; page 19, lines 5-25; and page 20, lines 1-3 (Exhibit C).

24.     Murphy testified that she was specifically instructed to open separate accounts for commission purposes for IME, FCM, SIU and SUB services.  *See* Murphy Deposition at page 102, lines 6-20 (Exhibit C).

25.     Murphy testified that she was never questioned or challenged on the existence of separate accounts during the time of her employment at Cambridge.  *See* Murphy Deposition at page 102, lines 18-22; page 103, lines 1-13 (Exhibit C).  In fact, Murphy testified that Kevin Turner "*never disagreed . . .*" with the interpretation that each account was to be a separate one.  *See* Murphy Deposition at page 103, lines 3-7 (Exhibit C).

26.     Morrow testified that she prepared separate Universal Notification Forms ("UNF") for separate lines of business such as IME, FCM, SIU and SUB services, and each UNF was subsequently reviewed and approved by management at Cambridge, including the Vice President of Sales and the Vice President of Finance.  She also testified that each line of business with the same customer that required a separate sales cycle was a separate account for commission purposes.  *See* Morrow Deposition at page 34, lines 17-25; page 35, lines 1-12; and page 36, lines 6-18 (Exhibit GG).

27.     Coventry's Rule 30(b)(6) designee, David Perkins, testified at deposition that Coventry invoiced Cambridge, and the revenue received from BrickStreet, was the sum of  $3,370,477 for IME services for the period beginning November 2006 and ending in March 2008.  *See* Perkins Deposition at page 45, lines 15-23 and Deposition Exhibit No. 2 (Exhibit HH).

28.     Coventry's Rule 30(b)(6) designee, David Perkins, testified at deposition that Coventry invoiced Cambridge, and the revenue received from BrickStreet, was the sum of  $488,375 for FCM services for the period beginning January 2007 through April 2008.  *See* Perkins Deposition at page 51, lines 6-13 and Deposition Exhibit No. 3 (Exhibit HH).

29.     MJM's Rule 30(b)(6) designee, Brent Faggert, testified at deposition that MJM invoiced Cambridge, and the revenue received from BrickStreet, was the sum of $277,593.08 for SIU services from November 2006 to December 31, 2007.  *See* Faggert Deposition at page 28, lines 4-7 (Exhibit II).

**E.** **Murphy Earned All Commissions Due Prior to Cambridge's Asserted "*Interpretation*" of the Commission Plans in April or May 2008**

30.     Cambridge's arrangement with BrickStreet was terminated effective December 31, 2007.  *See* June 17, 2009 Turner Deposition at page 47, lines 18-24 (Exhibit EE).

31.     Although Murphy's employment was terminated in May 2008, all of the work and services that were the subject of the separate accounts with BrickStreet and the State of West Virginia were concluded by December 31, 2007.  *See* June 17, 2009 Turner Deposition at page 47, lines 8-12 (Exhibit EE).

32.     Cambridge received all revenue due and owing from BrickStreet on or before February 2008 as reflected in Exhibit FF attached hereto, which is a spreadsheet prepared by Cambridge's Rule 30(b)(6) designee on the issue of revenue.  This exhibit demonstrates that revenue for ACR, TPA and WVX was received in the sum of $7,471,179 as of February 2008.

33.     Pursuant to the Commission Plans, all commissions due to Murphy were due and payable prior to her termination of employment.  Given the receipt of all revenue by February of 2008, all commissions from ACR, TPA, WVX, IME, FCM, SIU and SUB had been earned, and were scheduled to be paid within thirty (30) days of the end of the calendar quarter.  *See* Commission Plans at page 1 (Exhibits A and B).

34.     Murphy made demands upon Cambridge for payment of commissions prior to her termination on May 2, 2008.

35.     Pursuant to the Commission Plans, all commissions at issue in this case were earned during the first calendar quarter of 2008.  The 2007 Commission Plan asserts

that the first calendar quarter in 2008, for commission purposes, ended on February 15, 2008. According to the Commission Plan, the commissions earned for the quarter ending February 15, 2008 were due on March 15, 2008. *See* Exhibit B.

**F.    Disputed Facts Regarding Run-off**
      **Accounts and Second Year Commissions**

36.    Cambridge's expert witness, Bruce Dubinsky, defined a run-off account as being the "*liability of an insurance company for future claims that it expects to pay for which a reserve has been established.*" *See* Dubinsky Report at page 5, footnote 19.

37.    Murphy testified that a run-off account was an account where claims are going to be handled to their conclusion and that Cambridge would be the "*last one that is going to touch those claims*" and not a situation where claims are going to be handled "*for a period of time before they go publicly out for RFP to the general public of our competitors and that we may or may not retain a portion of that after the course of that year.*" *See* Murphy Deposition at page 104, lines 2-15 (Exhibit C).

*38.*    Kevin Turner, in his Affidavit, identified a run-off account as being an account as "*an industry term for managing/paying down liabilities on existing or old claims, and not writing new business.*"

39.    The agreement between BrickStreet and Cambridge does not identify the scope of work as managing run-off accounts. Further, the agreement does not identify any "*reserves*" as set forth in the definition of Dubinsky. *See* Exhibit JJ.

40.    The agreement between BrickStreet and Cambridge does not require Cambridge to handle the claims through completion or resolution, but rather provides for specific services for a finite period of time. *See* Exhibit JJ.

### III.    SUMMARY OF THE ARGUMENT

Summary judgment in favor of Cambridge on any aspect of the ACR, TPA and WVX services is inappropriate for the reasons set forth in Murphy's Motion for Partial Summary Judgment.   This is clear for two (2) reasons.  First, as noted above, Cambridge's expert witness has issued an expert report which contains an admission that Murphy is entitled to $35,413 on the ACR, TPA and WVX accounts.  In its Motion for Partial Summary Judgment, Cambridge admits liability to Murphy on the TPA and WVX accounts, but apparently disputes the amount due, notwithstanding its own expert's report.

Summary judgment on the IME, FCM, SIU and SUB accounts is likewise inappropriate as the seminal disputed issue in this case is whether or not these additional liens of business were to be considered as "*separate accounts*" as supported by the testimony of Murphy; the testimony of Morrow; the twenty-seven (27) Commission Calculation Reports attached to this Opposition as Exhibits F through DD, and the myriad of other documents that treat the BrickStreet lines of business as separate accounts.

Whether or not any of the business between Cambridge and BrickStreet constituted a "*run-off*" account is likewise a contested issue of fact.  Cambridge contends that the BrickStreet business was all a run-off account because Kevin Turner testified that no new claims would be sent to Cambridge, other than the 42,000 claims contemplated at the outset.  Cambridge's expert, Bruce Dubinsky, has defined a run-off account as a "*liability of an insurance company for future claims that it expects to pay for which a reserve has been established.*"  *See* Dubinsky Report at page 5, footnote 19.  These definitions cannot be reconciled with one another, nor with the definition that Murphy

provided at her deposition, which indicates a different understanding of what is and what is not a run-off account. The agreement between BrickStreet and Cambridge is not an agreement for the management of run-off accounts. Rather, Cambridge's obligations under the agreement are to provide specific management and claims services for a specific period of time.

The standard of review by a trial court at summary judgment is well-settled. A court must view the opposing party's "*evidence in the light most-favorable to the non-movant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable, and the court emphasizes that its analysis of the evidence that follows is made in that fashion, not as an indication of how it would actually view the evidence at trial when it would not be required to view the evidence favorable to one side.*" *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Cambridge's Motion for Summary Judgment on the issue of treble damages under the Maryland Wage Payment and Collection Act is likewise unavailing because of the holding in *Aronson & Co. v. Fetridge*, 181 Md.App. 650, 957 A.2d 125 (2008). The Court in *Aronson* noted that:

> The question of whether there existed a "bona fide dispute" under L.E. Section 3-507.1 is "not one of law to be decided summarily, but rather properly reserved for resolution by the jury." *See Medex, 372 Md. at 44, 811 A.2d 297.* The termination of discretionary damages moreover, is "quintessentially a matter for the trier of fact." *See id. citation omitted.* The jury is, therefore, tasked with the responsibility of making "the determination of a bona fide dispute and award of treble damages[.]" *See id.*

*Id.* at 676, 140.

Cambridge's Motion seeks to have this Court weigh evidence and facts that are disputed by the parties.  Therefore, Cambridge's asserted issues are not appropriate for summary judgment.

## IV.    ARGUMENT

### A.    Disputed Facts Preclude Summary Judgment With Regard to IME, FCM, SIU and SUB Claims

Whether or not IME, FCM, SIU and SUB were separate BrickStreet accounts is a hotly disputed issue of fact.  At the outset of this case, Cambridge asserted that all of the business with BrickStreet was a single-account pursuant to the terms of the Commission Plans.  Since that initial position, Cambridge has conceded separate accounts for ACR, TPA and WVX.  Murphy is entitled to have a jury weigh and consider the contested evidence on this issue.

Evidence supporting the existence of separate accounts for IME, FCM, SIU and SUB includes the following:

● The twenty-seven (27) Cambridge Commission Calculation Reports (Exhibits F through DD and Statement of Facts, Paragraphs 7-10);

● The testimony of Murphy that she was instructed to open each line of business as a separate account (Statement of Facts, Paragraph 23);

● The testimony of Cambridge's Vice President of Sales, Pam Morrow corroborating Murphy's testimony on the existence of separate accounts (Statement of Facts, Paragraph 11);

● The testimony of former employee Paula Sorgeloos that she circulated the Cambridge Commission Calculation Reports (Statement of Facts, Paragraph 5);

● The testimony of Sorgeloos that she was advised that IMEs would not be subject to commissions only at the time that Murphy was terminated from employment at Cambridge and not before (Statement of Facts, Paragraph 21);

● Email messages and other communications regarding the existence of separate accounts;

● The fact that Cambridge cannot identify a single document in writing countering Murphy's claim for seven (7) separate accounts dated prior to the time that all commissions claimed were fully earned by Murphy; and

● Cambridge's only attempt to "*interpret*" the Commission Plans came well after all of Murphy's commissions with BrickStreet were fully earned.

Cambridge's evidence opposing the existence of separate accounts is limited to the following:

● The testimony of Kevin Turner;

● The Summary Judgment Affidavit of Kevin Turner;

● The testimony of Wes O'Brien; and

● The testimony of Vance Root.

Accordingly, summary judgment cannot be granted because of the contested issues of fact.

### B. The Commission Plan Terms That Are Not Ambiguous Support Murphy's Claims

When a contract is unambiguous, courts are required to apply the plain, ordinary and usual meaning of the words contained therein. *Claggett v. Maryland Agricultural Land Preservation,* 182 Md.App. 346, 957 A.2d 1083 (Md.App. 2008). "The interpretation of a contract is a question of law" for the court. *Aronson & Co. v.*

*Fetridge*, 181 Md.App. 650, 681, 957 A.2d 125, 143 (Md.App. 2008). "Because Maryland follows the 'objective' law of contracts, the court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated." *Id*. at 681, 957 A.2d at 143-44 (citations omitted). "Where the language of the contract is unambiguous, its plain meaning will be given effect. There is no need for further construction." *Id*.

"Ambiguity arises if, to a reasonable person, the language used is susceptible of more than one meaning or is of doubtful meaning." *Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700 (2007). In determining whether a contract is susceptible of more than one meaning, "the court considers the character of the contract, its purpose, and the facts and circumstances of the parties at the time of the execution." *Phoenix Servs. Ltd. Partnership v. Johns Hopkins Hosp., 167 Md. App.* 327, 392, 892 A.2d 1185 (2006) (internal quotations and citations omitted*.)* "A contract is not ambiguous merely because the parties do not agree as to its meaning." *Maslow v. Vanguri,* 168 Md.App. 298, 319, 896 A.2d 408 (2006).

1. **_"Revenue on the Contract"_ is Not Ambiguous**

Certain provisions of the Commission Plans may, in fact, be ambiguous, and parol evidence may be required. However, the words in the Commission Plans which entitle sales professionals to commissions — "*computed on revenues on the contract up to the date of separation . . .*" — are simply not ambiguous in any respect. *See* Exhibits A and B at page 1.

The Commission Plans unambiguously grant to sales professionals commissions calculated against one metric: revenue on the contract with the customer. Cambridge's

argument that "*revenue*" relates only to revenue enjoyed by Cambridge and, without the use of subcontractors or third party vendors, is reading language into the Commission Plans that simply does not exist.

Accordingly, Cambridge's assertion that summary judgment should be granted in its favor because subcontractors provided the services and, Cambridge paid the subcontractors, is of no avail.

2.     **"*All Business Produced*" is Not Ambiguous**

The third full paragraph of the 2007 Commission Plans contains the following language:

> *This plan is effective January 1, 2007 and applies to __all business produced__ from that date forward and ends on March 31, 2008.*

(Emphasis added.)

The Commission Plans also state that the "*plan does not apply to sales outside of field claims services*." *See* Exhibit B at page 1, paragraph 4. It is undisputed that the IME, FCM, SIU and SUB services at issue in the Motion are all within field claims services.

"*All business produced*" within "*field claims services*" has plain meaning which must be given effect. Kevin Turner testified in deposition, as a Rule 30(b)(6) designee, that IME, FCM, SIU and SUB services were all within "*field claims services*." *See* June 17, 2009 Turner Deposition at page 38, lines 2-25 and page 39, lines 1-5 (Exhibit GG). Accordingly, summary judgment is inappropriate because of the plain language granting Murphy a right to commissions for "*all business produced*" for "*field claims services*."

### 3. Payment Within "*30 Days Following the Quarter End*" is Not Ambiguous

Murphy asserts in her Amended Complaint and in her Motion for Partial Summary Judgment that all the commissions due to her were earned long before her May 2008 termination. Specifically, on page 3 of the 2007 Commission Plan is a schedule for payment which states:

> *First Twelve Month Contract Period*
> *Estimated commissions will be calculated at the end of each calendar quarter by applying rates against estimated sales. 50% of the estimated commissions will be paid approximately 30 days following the quarter end (4/30/07, 7/30/07, 10/30/07, & 2/15/08). Actual earned commissions will be calculated based on actual invoices to date in August '07 and February '08. The difference between the estimated commissions paid and the actual commissions earned will be paid at that time. . . .*

*See* Exhibit B at page 3.

All revenue from BrickStreet was received by Cambridge on or before February 8, 2008 because all the work was performed prior to December 31, 2007. Accordingly, all commissions due and payable to Murphy were due within "*thirty days following the quarter end*" which, by peculiar agreement, Cambridge identified as February 15, 2008.

### C. The "*Run-off*" Account Provision of the Commission Plans is Clearly Ambiguous

As noted above, a term is ambiguous if it is "*susceptible of more than one meaning or is of doubtful meaning.*" *Cochran* at 16. The word "*run-off*" used with the word "*accounts*" on page 2 of the Commission Plans is clearly susceptible to more than one meaning or has doubtful meaning. Cambridge asserts in its Motion that Kevin Turner is the authority on what is and what is not a run-off account. In his Affidavit presented with Cambridge's Motion, Turner defined a run-off account as follows:

> *"Run-off" program or account is an industry term for managing/paying down liabilities on existing or old claims, and not writing new business.*

In his deposition, Turner defined run-off account as follows:

> *It means that there's a policy period where claims are written, and we are only supposed to handle claims in that policy period, but there could be a few claims that come in that we don't know about because they haven't been reported yet so the industry refers to that as incurred by not yet reported, IBNR.*

*See* June 17, 2009 Turner Deposition at page 60, lines 11-16 (Exhibit EE).

Turner further testified:

> *Q.      Okay, so please tell me every element of the TPA services to Brick Street that make it a run off account?*
>
> *A.      Let me start with when I was....I was in operations at the time, when sales came to me and said we have an opportunity with State of West Virginia to take over their old fund claims and they would come to me in the capacity to determine how much staff we needed, did we need twenty adjusters, did we need a hundred adjusters and so when I do that, I ask two questions. What are the pending claims and how many new claims are they going to get in. The response was, there are no new claims, there's only pending claims, this is run off.  So please calculate a first year staffing model contemplating that these claims I believe that when we first looked at it, there were forty thousand.  How many could you run off in the first year so on day one you might need a hundred adjusters and these are just hypothetical numbers, but as you close the files, and there are no new cli...files coming in, you can theoretically do with less people over time.  If it was something different than run off and they had told me it's ongoing there's going to be new claims all the time, then I would have staffed it differently. Does that help?*

*See* June 17, 2009 Turner Deposition at page 62, lines 11-25; page 63, lines 1-11 (Exhibit EE).

Cambridge's expert witness, Bruce Dubinsky, produced an expert report in this case.  Dubinsky defined a run-off account in his report as "*liability of an insurance company for future claims that it expects to pay for which a reserve has been established.*"  *See* Dubinsky Report at page 5, footnote 19.

This definition is entirely consistent with the definition of "*run-off account*" published by the All Business Dictionary. *See* allbusiness.com and answers.com. No such definition exists in any authoritative encyclopedia such as Websters or Black's Law Dictionary.

The first contract between Cambridge and BrickStreet does not identify the scope of business as being a "*run-off*" account. Cambridge was not obligated to calculate an appropriate reserve. Cambridge did not agree to act as an insurer. Cambridge did not agree to settle claims within the scope of an existing reserve. Rather, the contract between Cambridge and BrickStreet obligated BrickStreet to manage claims for a finite amount of time on a "*cost plus*" basis.

Murphy testified about her working definition of a run-off account. She testified unequivocally that (a) a run-off account is one where the claim must be handled by the administrator to completion; and (b) Cambridge knew from the outset that it would be managing the claims and providing third party administrator services for BrickStreet for a short period of time pending a competitive bidding process for a permanent contract.

Accordingly, run-off account is clearly subject to multiple definitions. Whether or not any of the seven (7) accounts at issue in this case, including the four (4) accounts at issue in Cambridge's Motion, is or is not a run-off account is a contested issue of fact. Therefore, summary judgment on this issue is inappropriate.

### D.    Cambridge's Asserted Right of Interpretation Has No Legal Merit

Without citing any authority whatsoever, Cambridge asserts that the following language in the Commission Plans grants to Cambridge the full right of interpretation, after the fact, and even during litigation:

> *Cambridge reserves the sole right of interpretation and application of this plan. Cambridge may cancel or amend the plan at any time. Written notice of the plan cancellation or amendment must be given to plan participants.*

*See* Exhibits A and B, at page 1, paragraph 3.

First, it is undisputed that Cambridge did not interpret the Commission Plans during the course of Murphy's employment, except as to a single issue unrelated to the instant disputes. Further, it is undisputed that Cambridge did not ever issue a written notice of interpretation or amendment of the Commission Plans during the course of Murphy's employment. *See* Statement of Facts, Paragraph 14.

Second, the language upon which Cambridge relies is simply illusory and unenforceable as a matter of law. In *Cheek v. United Healthcare of Mid-Atlantic, Inc.,* 378 Md. 139, 835 A.2d 656 (Md. 2003), the court held that an employer's ability to "*alter, amend, modify, or revoke the Policy at its sole and absolute discretion at any time with or without notice*" and without consent, rendered its promise to perform illusory. [2] *Cheek* at 149-50, 835 A.2d at 662-63. Such contracts lack consideration because the party with sole discretion is not bound. *See id.* ("*[w]ords of promise which by their terms make performance entirely optional with the 'promisor' whatever may happen, or whatever course of conduct in other respects he may pursue, do not constitute a promise*").

Likewise, "*the promise is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his*

---

[2] The legislature ensured that similar interpretation clauses would not be utilized in the insurance context by enacting the Unfair Claim Settlement Practice Act. See MD Insurance §27-301. Sections 10A and10B of Title 15 have the effect of prohibiting the "designing of an insurance contract so as to accord unfettered discretion to the insurer to interpret the contract's terms." *Connecticut General Life Ins. Co. v. Insurance Commissioner for the State of Maryland*, 371 Md. 455, 810 A.2d 425 (2002).

*performance. The unlimited choice in effect destroys the promise and makes it merely illusory.*" *Id*. at 149, 835 A.2d at 662 (*citing* 1 Samuel Williston, Contracts, § 4:24 (4th Ed. 1990)).

Cambridge may not, after Murphy in good faith produced sales and revenues for Cambridge pursuant to Commission Plans, utilize a provision that was unenforceable at the time of contract execution to unilaterally interpret the terms of that contract. The perils of interpretation clauses that allow unilateral rights to interpret, amend or terminate employment compensation plans is apparent when one considers that an employer may simply decide not to pay what it has promised without any justification being necessary. The application of the doctrine of promissory estoppel and the Maryland Wage Payment and Collection Law bar any such attempt to justify, through an interpretation clause, wrongfully denied wages. *See Pavel Enterprises, Inc. v. A.S. Johnson Co., Inc*., 342 Md. 143, 674 A.2d 521 (1996)(establishing the elements for detrimental reliance as: (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise).

Contract interpretation is reserved for the Court. The Court must apply Maryland's rules of construction. One such rule holds that an employment contract is construed against the party who drafted it, if an ambiguity arises. *See Anderson Adventures, LLC v. Sam & Murphy*, 176 Md.App. 164, 932 A.2d 1186 (Md.App. 2007)("*[w]here an ambiguity exists in a contract, the ambiguity is resolved against the*

*party who made it or caused it to be made, because that party had the better opportunity to understand and explain his meaning*").

**E.     It is Well-Settled that the Existence of a
        *Bona Fide* Dispute is a Jury Question**

In its Motion for Partial Summary Judgment, Cambridge argues that this Court can resolve, at summary judgment, whether or not there was a *bona fide* dispute as contemplated by the Maryland Wage Payment and Collection Act.  Cambridge argues there must be a *bona fide* dispute between the parties because Cambridge's agents gave Murphy a reason for denial of commissions when she first made demands.  This contention is a <u>clearly</u> contested issue of fact between the parties.  Murphy has testified that no one at Cambridge advised her that they disagreed with her entitlement to commissions on the seven (7) separate accounts identified in her Amended Complaint. *See* Murphy Deposition at page 103, lines 3-7 (Exhibit C).

In reality, Cambridge's justifications for failing to pay Murphy's commissions have been a bit of a moving target.  First, Cambridge asserted that all of the BrickStreet lines of business were a single account and that Murphy was overpaid — although no Counterclaim has ever been filed in this regard.  Also, Cambridge submitted an expert report of Bruce Dubinsky who recites in his report Cambridge's position that all of the BrickStreet business was a single account.  In fact, Dubinksy's Opinion No. 2 states the following:

> *Assuming all of the BrickStreet projects constitute a single account, the total commissions attributable to the disputed BrickStreet projects is $163,706.  Consequently, the Plaintiff was erroneously overpaid $127,356 in commissions.*

*See* Dubinsky Report at page 4.

Dubinsky went on to opine that if Murphy was entitled to commissions on three (3) separate accounts — ACR, TPA and WVX — Murphy is entitled to total commissions in the sum of $326,475, and was paid $291,062 resulting in the sum of $35,413 being due to Murphy. *See* Dubinsky Opinion No. 3 at page 7. Later in the litigation, during the Rule 30(b)(6) deposition of Kevin Turner, Cambridge admitted to the existence of at least three (3) separate accounts — specifically ACR, TPA and WVX.

Cambridge's conduct, with respect to all seven (7) accounts, is relevant to the issue of *bona fide* dispute, and is proper evidence to be submitted to the jury. When considering whether commissions were legitimately withheld, the jury may consider why Cambridge's twenty-seven (27) Commission Calculation Reports show seven (7) separate accounts and why the assertion that Murphy was not entitled to commissions on IMEs was not raised until long after the commissions were earned and just before her termination. It is also of significance that Murphy frequently emailed Paula Sorgeloos and management and complained that she had not been paid the commissions she was entitled to as a result of the BrickStreet lines of business. Cambridge cannot identify a single communication in writing during her employment which asserted <u>then</u> that she was not entitled to commissions — but rather they continued to string her along.

The simple fact that a justification for refusal to pay was given by the employer does not automatically confer *bona fide* dispute status upon the Cambridge. *See Admiral Morg., Inc. v. Cooper*, 357 Md. 533, 745 A.2d 1026 (holding that evidence of an employer's inconsistent positions as to why it refused to pay wages due was sufficient to award treble damages). The question of whether a *bona fide* dispute exists depends simply on whether there is sufficient evidence adduced to permit a trier of fact to

determine that the employer did not act in good faith when it refused to pay commissions. *See Admiral Mortg.* at 543, 745 A.2d 1031.   For example, in *Aronson & Co. v. Fetridge*, 181 Md.App. 650, 957 A.2d 125 (Md.App. 2008), the employee's termination compensation agreement included a non-compete clause.   The defendant employer claimed that it had a *bona fide* dispute because it had evidence that plaintiff began working with a competing firm and lured away the defendant's former clients, which provided a reasonable basis for failure to pay wages due.   The *Aronson* Court held that an award of nearly four million dollars in treble damages was appropriate because the jury considered evidence that the employer made little, if any, effort to determine whether the plaintiff employee was in violation of the covenant not to compete and that it made no inquiry until after suit was filed.   That Court held that additional evidence introduced at trial conflicted with defendant's *bona fide* dispute claims, including the fact that defendant was unaware of whether the former employee provided essentially the same services to the competing company as were the subject of the employee's position.

Authority in Maryland is compelling that the issue of "*bona fide*" dispute is one for the jury.   In both *Admiral* and *Aronson*, the Maryland Court of Appeals approved on appeal the submission of the "*bona fide*" dispute issue to the jury.   In *Admiral*, the Court focused on several issues, including what the proper standard for the jury.   Specifically, in *Admiral*, the Court found a showing of bad faith was not required, but merely whether there was a legitimate dispute regarding wages due.   *Id.* at 543.

In *Aronson*, the Court specifically held that the issue of the existence of a "*bona fide*" dispute under the Maryland Wage Payment and Collection Act is not an issue "*of*

*law to be decided summarily but rather properly reserved for resolution by the jury.*"  *Id.* at 675.

Murphy is entitled to present her disputed evidence to the jury.  She is entitled to show the jury the twenty-seven (27) separate Commission Calculation Reports; share her story that no one at Cambridge contested the existence of separate accounts prior to her termination; and to identify all the documents corroborating her evidence.  The jury will then weigh this evidence against the testimony of Kevin Turner, Vance Root and Wes O'Brien.  This is the mandate of *Admiral* and *Aronson*.  Accordingly, this issue cannot be resolved at summary judgment as asserted by Cambridge.

## V.    <u>CONCLUSION</u>

Whether IME, FCM, SIU and SUB lines of business are separate accounts is the subject of significant factual disputes between the parties.

Certain terms of the Commission Plans are unambiguous and support the denial of summary judgment because they clearly entitle Murphy to commissions on "*all business*" related to "*revenue on the contract*" with BrickStreet.  The ambiguous terms of the contract, including the meaning of "*run-off accounts*" must be resolved on a contested factual record.

As a matter of law, Cambridge's asserted right of interpretation of the Commission Plans, supplanting the role of the Court, is simply meritless.  The issue of a *bona fide* dispute must be resolved by a jury given the mandate of *Admiral* and *Aronson*.

For all the reasons set forth hereinabove, partial summary judgment must be denied.

Respectfully submitted,

_____/s/ Danell Palladine Dean_____

Danell Palladine Dean, Esquire
(Federal Bar No. 17647)
Email: ddean@cmzlaw.com
James P. Campbell, Esquire
(Admitted *Pro Hac Vice*)
Email: jcampbell@cmzlaw.com
*Campbell Miller Zimmerman, P.C.*
19 East Market Street
Leesburg, Virginia 20176
(703) 771-8344/Telephone
(703) 777-1485/Facsimile
Counsel for Lisa M. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

| | |
|---|---|
| Type of Service: | Email via the United States District Court and First-Class, U.S. Mail |
| Date of Service: | November 13, 2009 |
| Persons served and address: | Thomas J. Flaherty, Esquire<br>Lindsey H. McGinnis, Esquire<br>Littler Mendelson, P.C.<br>1650 Tysons Boulevard, Suite 700<br>McLean, Virginia 22102 |
| Item Served: | Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment |

/s/ Danell Palladine Dean
Danell Palladine Dean

S:\Civil\Clients\Murphy, Lisa\Pleadings\Cambridge's Mot for Partial SJ\Opp to Motion for Partial Summary Judgment.doc