**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| LISA M. MURPHY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. AW-08-3224 |
| | * | |
| CAMBRIDGE INTEGRATED | * | |
| SERVICES GROUP, INC., | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM OPINION</u>

Plaintiff Lisa Murphy ("Murphy") brought this action against Defendant Cambridge Integrated Services Group, Inc. ("Cambridge") for breach of contract and violation of the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-507, related to Defendant's alleged failure to pay her commissions. Currently pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. No. 81) and Defendant's Motion for Partial Summary Judgment (Doc. No. 84) pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Also pending are Defendant's Objections and Request to Modify Order (Doc. No. 90) and Plaintiff's Request for Dismissal of Defendant's Objections (Doc. No. 91). The Court has reviewed the parties' filings with respect to the instant motions, and no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the court will GRANT in part and DENY in part Defendant's Motion for Partial Summary Judgment, DENY Plaintiff's Motion for Partial Summary Judgment, and MODIFY Defendant's Objections and Request to Modify Order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of a dispute over commissions allegedly earned by Plaintiff Murphy and withheld by Defendant Cambridge, a property and casualty claims and risk management services company. Plaintiff was employed by Defendant in a sales/business development capacity from July 2002 until May 2008, at which point her employment was terminated as part of a reduction in force. While employed with Defendant, Plaintiff was paid a base salary in addition to commissions under the terms set forth each year in Business Development Commission Plans (the "Commission Plans") that were issued by Defendant and applicable to all Cambridge employees.

The unpaid commissions at issue in this case fall under the terms of the 2006 and 2007 Commission Plans, which state that commissions are to be earned on "all new business produced by the participant" based on "revenue invoiced for the first [twelve] months [of the new client's] contract period," and, if applicable, at a three percent commission rate "on all revenue invoiced for the [new client's] second twelve-month contract period." (Doc. No. 84, Ex. C at 2.) Under the 2006 and 2007 Commission Plans, employees eligible for commissions were to earn five percent of the first million dollars invoiced, seven percent of the second million dollars invoiced, and nine percent of amounts invoiced in excess of three million dollars. The Commission Plans also contained a $150,000 cap on annual commissions per account. Commissions were not to be earned on accounts that generated less than $50,000 in annual revenue, and were only earned on first-year revenue generated by "run-off" accounts. According to Defendants, the phrase "run-off" refers to "managing or paying down liabilities on existing or 'tail' claims, and not writing new business." (Doc. No. 84-2 at 20.)

The commissions at issue in this case were based on revenue generated by Defendant's

sale of claims management services to West Virginia's Office of the Insurance Commissioner (the "WVOIC") through its private workers' compensation carrier, BrickStreet. Kevin Turner, then the Senior Vice President of Operations, and Vance Root, then the Senior Vice President of Business Development, brought Plaintiff on to manage the account after an initial meeting with BrickStreet's claims director. Plaintiff was involved in a number of different projects Cambridge managed for BrickStreet, from late 2005 until May 2008, and much of the disagreement in this case hinges on whether these projects should be considered separate accounts for commissions purposes. Seven of these projects are addressed at least in part in the parties' motions for partial summary judgment:[1]

1) The Tail Claims TPA (third-party administration) project: on October 1, 2006, BrickStreet entered into an agreement with Cambridge under which BrickStreet subcontracted to Cambridge certain of its TPA rights, duties and obligations with respect to approximately 42,000 open workers' compensation claims. Cambridge issued invoices on this "run-off" account from October 2006 to February 2008.[2]

2) The All Claims Review project: Cambridge agreed to perform a "targeted claim review" in which Cambridge agreed to review and categorize a limited number of workers' compensation claims and to assign Cambridge personnel to administer those claims. Cambridge issued invoices related to the All Claims Review project from December 2006 to March 2007.

3) The West Virginia Expansion project ("the WV Expansion project"): In April 2007,

---

[1] Plaintiff has identified the seven listed projects as separate accounts for which she believes she is entitled to commissions. Defendant argues that it considers all of the BrickStreet projects one account, but concedes that it paid Plaintiff commissions on the Tail Claims TPA project, WV Expansion project, and All Claims Review project as if they were separate accounts.

[2] Within the context of the workers' compensation insurance industry, "run-off" refers to "managing or paying down liabilities on existing or 'tail' claims, and not writing new business." (Doc. No. 84-2 at 20.)

3

Cambridge and BrickStreet amended their prior agreement and Cambridge agreed to perform targeted claim review services in addition to those in the All Claims Review.

4) Independent Medical Examination Services ("IME services"): In November 2006, Cambridge contracted with a third-party vendor, Coventry Health Care ("Coventry"), to provide IME services to claimants in West Virginia.

5) Field Case Management services ("FCM services"): Coventry also provided FCM services to claimants in West Virginia.

6) Surveillance and Investigative services ("SIU services"): in November 2006, Cambridge contracted with another third-party vendor, MJM, to provide investigative services to its customers. Under the MJM-Cambridge contract, MJM was to pay Cambridge a "management oversight fee" for the services Cambridge provides. MJM provided field investigative and surveillance services until December 31, 2007.

7) Subrogation services: Subrogation refers to an insurance company seeking reimbursement from the person or entity legally responsible for an accident after the insurer has paid out money on behalf of its insured. Cambridge did not issue any invoices relating to subrogation services performed for BrickStreet and no revenue was received by Cambridge relating to subrogation.

While Cambridge contends that it normally considered all BrickStreet projects as pertaining to one client and one account for commissions purposes (such that Plaintiff's annual commissions relating to BrickStreet would be capped at $150,000), Cambridge awarded Plaintiff commissions as if the Tail Claims TPA project, All Claims Review project, and WV Expansion project were three separate accounts. Defendant alleges that it decided not to treat the IME, FMC, SIU and subrogation services as separate accounts because the services were sold as part

of the Tail Claims TPA project and were not services invoiced by Cambridge Managed Care Services. Plaintiff contends that these projects were four separate accounts for the purpose of calculating commissions. In late 2007, Plaintiff discussed her commissions with Kevin Turner, the Executive Vice President of Business Development, and initially agreed with his assessment that she was not entitled to separate commissions on the IME and FCM services invoiced by Coventry to BrickStreet. She soon changed her mind, and in October of 2007 retained counsel to represent her in disputing the classification of these accounts.

Plaintiff was paid $291,062 in 2007 and 2008 in total commissions attributable to the work Cambridge performed for BrickStreet. During 2007, she received $32,313 attributable to the All Claims Review Project, $146,596 attributable to the first twelve months of the Tail Claims TPA project,[3] and $112,153 attributable to the WV Expansion project.[4] In May of 2008 Plaintiff's employment was terminated as part of a reduction in force at Cambridge.

On December 1, 2008, Plaintiff filed suit in this Court, and amended her complaint on March 31, 2009 (Doc. No. 27), alleging that Defendant violated a contract and owed her $442,610 in unpaid commissions (Count II) and violated the Maryland Wage Payment and Collection Law (Count I). On September 22, 2009, Defendant moved to strike Plaintiff's expert report and Magistrate Judge Connelly granted in part and denied in part this motion (Doc. No. 90). Now pending before the Court are both parties' motions for partial summary judgment (Doc. Nos. 81 & 84), and Defendant's Objections and Request to Modify the Magistrate Judge's Order regarding Defendant's Motion to Strike (Doc. No. 90) and Plaintiff's motion to dismiss the objections.

---

[3] Plaintiff received $3,404 less than the annual commission cap of $150,000 because of a reconciliation or "true-up." (Doc. No. 84 at 1 n.1.)
[4] Plaintiff was not paid $8,195 due to a true-up. (*Id.*)

## II.  STANDARD OF REVIEW

Summary judgment is only appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). In a motion for summary judgment, the moving party discharges its burden by showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (internal citations omitted). However, the party who bears the burden of persuasion on a particular claim must present legally sufficient evidence to support each element of his claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III. ANALYSIS

### 1.  <u>Defendant's Objections and Request to Modify the Magistrate Judge's Order on Cambridge's Motion to Strike Expert Report</u>

The Court will first address the discovery dispute, the resolution of which "will not affect the Court's consideration of the summary judgment motions."   (Doc. No. 87 at 8).   On

September 22, 2009, Defendant moved to strike the expert report and testimony of Joseph M. Martorelli, Plaintiff's expert witness, on the grounds of untimeliness, prejudice, and unreliability. In an Order dated November 13, 2009 (Doc. No. 87) ("Discovery Order"), Judge William Connelly found that Plaintiff failed to provide substantial justification for failing to make her expert disclosures on time and that the delay resulted in prejudice to the Defendant in that Defendant could not depose Martorelli or rebut his opinions. Judge Connelly struck portions of Martorelli's expert report that addressed issues outside the following three topics: (1) revenue invoiced by Cambridge; (2) revenue received from Cambridge; and (3) the extent to which the revenue invoiced would be subject to commissions.[5] Judge Connelly also re-opened discovery until December 31, 2009, for the limited purposes of allowing Defendant to depose Martorelli and for allowing Defendant's expert to supplement his expert report.[6]

Local Rule 301.5(a) provides that the district court judge may "reconsider, modify, or set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law." D. Md. Local Rule 301.5; *see also* Fed. R. Civ. P. 72(a) ("The district judge in the case must consider timely objections [to a magistrate judge's decision on a nondispositive matter] and modify or set aside any part of the order that is clearly erroneous or is contrary to law.") "Under the clearly erroneous standard, the reviewing court is not to ask whether the finding is the best or only conclusion permissible based on the evidence. Nor is it to substitute it own conclusions for those of the magistrate judge. Rather, the court is only required to determine whether the magistrate judge's findings are reasonable and supported by the evidence." *Int'l Ass'n of Machinists & Aero. Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479, 485-86 (D. Md. 2005)

---

[5] Judge Connelly reserved the issue of expert reliability for the Court.
[6] Defendant stated that it "would prefer not to incur additional costs if its Motion [for Partial Summary Judgment] is granted," and thus neither deposed Martorelli nor rebutted his testimony. (Doc. No. 90 at 2 n.1.)

(citing *Tri-Star Airlines, Inc. v. Willis Careen Corp.*, 75 F. Supp. 2d 835, 839 (W. D. Tenn. 1999)).

Defendant now asks the Court to modify Judge Connelly's Discovery Order by either striking Martorelli's report in its entirety and prohibiting Martorelli from testifying on the grounds of untimeliness, unreliability, and prejudice; or, in the alternative, clarifying which opinions and exhibits from Martorelli's report are stricken and shifting expert and attorney's fees and costs to Plaintiff.

Plaintiff filed a Request for Dismissal of Defendant's Objections and did not contest Defendant's arguments, but rather argued that Defendant's Objections and Request to Modify were untimely filed. Under Federal Rules of Civil Procedure 6 and 72, Defendant had ten days from November 16, 2009, excluding the intermediate weekend and Thanksgiving Day, or through December 1, 2009, to file its objections to Judge Connelly's Order. Fed. R. Civ. P. 6, 72. Since Defendant timely filed its Objections and Request to Modify on December 1, 2009, the Court will deny Plaintiff's Request for Dismissal.

The Court next turns to the merits of Defendant's Objections. The Court finds that the Discovery Order was consistent with the law. Federal Rule of Civil Procedure 37(c)(1) clearly states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was *substantially justified* or is *harmless*." Fed. R. Civ. P. 37(c)(1) (emphasis added). The Court may, at its discretion, "order payment of the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(c)(1)(A). Here, Plaintiff waited 169 days after the deadline for her expert disclosures to produce her expert report. Not only did she fail to seek relief from the Court's Scheduling

Order, she offered no explanation at all to justify her failure to disclose. Her failure to make timely disclosures resulted in prejudice to Defendant because Defendant could not depose Martorelli and its expert could not supplement his report. The Court will thus overrule Defendant's Objections and consistent with the Magistrate Judge's Order, re-open discovery for 30 days from the entry of this order to allow Defendant the opportunity to depose Martorelli and for Defendant's expert to rebut Plaintiff's expert report.

The Court will also clarify Magistrate Judge Connelly's Order as requested by Defendant. The following opinions and exhibits from Martorelli's report will be stricken because they exceed the topics noted in Plaintiff's answers to Defendant's Interrogatory: Mr. Martorelli's opinions regarding the amounts invoiced by Concentra for IME and FCM services and MJM for SIU services (Opinion 1, Issue 1, Exhibit 2 through 4); Martorelli's opinions about whether revenue from IME, FCM, and SIU services are commission-eligible (Opinion 1, Issue 2); Martorelli's opinions regarding whether the $150,000 commission cap applied to an account or a customer (Opinion 3); and Martorelli's opinions about the meaning of "account" and revenue invoiced by FCM, IME, and SIU services (Issue 4 and Exhibit 5). The Court does not find imposition of attorney's fees and cost is mandatory under Rule 37(c)(1) as the Discovery Order was granted in part and denied in part.

## 2. **Defendant's Motion for Partial Summary Judgment**

Defendant moves for summary judgment on the breach of employment contract claim (Count I) and parts of the Maryland Wage Payment and Collection Law ("MWPCL") claim (Count II). The Court grants in part and denies in part Defendant's motion as to the breach of contract claim on the grounds that Plaintiff (1) has already been paid $291,062 in commissions for 2007 and 2008; (2) is not entitled to commissions on revenue invoiced by third-party vendors; (3) is not

entitled to second-year commissions on the Tail Claims TPA project; and (4) is not entitled to commissions on the IME, FCM, SIU, and subrogation projects. The Court denies summary judgment to Defendant on Plaintiff's MWPCL claim (Count I) on the ground that there is a dispute of material fact as to whether Plaintiff is owed further commissions under the WV Expansion project.

### A. Breach of Employment Contract

Defendant argues there is no dispute of material fact regarding the following issues: (i) that Plaintiff miscalculated the amount in total commissions which she was paid during 2007 and 2008 for work performed for BrickStreet; (ii) that Plaintiff is not owed any second-year commissions on the Tail Claims TPA project; (iii) that Plaintiff is not owed any further commissions for the WV Expansion project because she incorrectly applied the commission tiers set forth in the Commission Plans to the revenue received; (iv) that Plaintiff is not entitled to any commissions relating to the IME, FCM, SIU, and subrogation projects. The Court agrees that there is no dispute of material fact regarding the issues of i) calculation of commissions; ii) second-year commissions on the Tail Claims TPA project; and iv) commissions relating to the IME, FCM, SIU, and subrogation project; but the Court finds a dispute regarding iii) commissions relating to the WV Expansion project.

### i. Calculation of Total Commissions

Defendant moves for summary judgment regarding the actual amount Plaintiff was paid in total commissions during 2007 and 2008 for her work on the various BrickStreet projects. Plaintiff alleges in paragraphs 15, 30, and 36 of the Amended Complaint that she was paid $6,735 for the All Claims Review project, $96,714 for the Tail Claims TPA project, and $27,750 for the West Virginia Expansion project, totaling $131,199 and was thus, underpaid by

$251,855.78. Defendant, however, has produced business records that show Plaintiff was actually paid $32,313 for the All Claims Review project, $146,596 for the Tail Claims TPA project, and $112,153 for the WV Expansion project, totaling $291,062, and was thus not underpaid. (Doc. No. 84-2 at 17.) Plaintiff provides no documentation to support her bald allegations, and does not contest Defendant's evidentiary proof in her Opposition. In light of the summary judgment standard requiring a nonmoving party to present "evidence to show that a genuine issue of material fact exists," Plaintiff cannot survive Defendant's motion for summary judgment in the face of evidence contradicting her allegations. *Matsushita Elec. Co.*, 475 U.S. at 587. Accordingly, the Court grants Defendant's Motion for Summary Judgment regarding the actual amount Plaintiff was paid for the All Claims Review, the Tail Claims TPA, and the WV Expansion projects. (Doc. No. 27.)

### ii. Second Year Commissions on the Tail Claims TPA Project

Defendant also moves for summary judgment on Plaintiff's claim for commissions on the second-year revenue generated by the Tail Claims TPA project, which Defendant contends is a "run-off" account for which second-year commissions are never paid. Plaintiff argues that the meaning of the phrase "run-off account" in the Commission Plans is ambiguous, and thus it is unclear whether or not the Tail Claims TPA project is considered a run-off account for the purposes of calculating commissions. The Court believes that the Tail Claims TPA project was a "run-off account," and thus, Plaintiff is not entitled to second-year commissions.

Under Maryland law, "[t]he interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 544 (2003). "The purpose of contract interpretation is to determine and effectuate the intent of the parties, and the primary source for identifying this

intent is the language of the contract itself." *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005). Contracts are interpreted "as a whole," and "the terms of the agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical meaning to the words." *Turner v. Turner*, 809 A.2d 18, 49 (Md. Ct. Spec. App. 2002). Maryland follows the objective theory of contract interpretation; thus, a court must "give effect to the contract's plain meaning, without regard to what the parties to the contract thought it meant or intended it to mean." *Id.* "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person. *Sy-Lene*, 829 A.2d at 547. The test for the meaning of an unambiguous contract is "what a reasonable person in the position of the parties would have thought the contract meant." *Turner*, 809 A.2d at 49. "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *See Sy-Lene of Wash.*, 829 A.2d at 546.

According to the plain language of the Commission Plan, "[c]ommissions will be paid on run-off accounts for the first [twelve] months only." (*See* Doc. No. 84-6, Ex. C.) The Court finds that this language is unambiguous. It is simply not debatable under this language that Cambridge would only pay Plaintiff commissions for revenue invoiced during the first year of a run-off account. Whether or not the meaning of "run-off" in the Commission Plans is ambiguous, however, is immaterial because regardless of how the term is to be defined, there is no dispute of fact that both parties understood the Tail Claims TPA project to be a run-off account for which second-year commissions were never paid. Despite Plaintiff's arguments that "run-off account" is ambiguous, Plaintiff *herself* describes the Tail Claims TPA project as "a workers' compensation run off program" in an earlier business memorandum she drafted

regarding the project.  (*See* Doc. No. 84, Ex. B at 180; Doc. No. 84, Ex. C.)  Likewise, multiple Cambridge employees testified in depositions that the Tail Claims TPA project was definitely a run-off account. (*See* Doc. No. 84, Ex. E at 59-63; Doc. No. 84, Ex. G at 35.)  Plaintiff does not dispute that the language of the Commission Plans unequivocally precludes second-year commissions for run-off accounts, and Plaintiff herself at an earlier date conceded that the Tail Claims TPA project was a run-off account.   Accordingly, Defendant is entitled to summary judgment as to Plaintiff's claim for second-year commissions on the Tail Claims TPA project.

### iii.  Plaintiff's Claim to Additional Commissions on the WV Expansion Project

Defendant moves for summary judgment on the ground that Plaintiff's claim for additional commissions related to the WV Expansion project is premised on an incorrect interpretation of the commission tiers set forth in the Commission Plans. The Commission Plans provide for commissions in the amount of five percent of the first million dollars invoiced on an account, seven percent of the second million dollars invoiced, and nine percent of any amount invoiced *in excess of* three million dollars. (*See* Doc. No. 84 at 20-21 (emphasis added).) Defendant argues that the plain language indicates that only revenue amounts over and above three million dollars would be subject to the nine percent commission rate, which by necessity implies that the seven percent commission rate applies to all amounts invoiced between one million dollars and three million dollars ($1,000,001 through $3,000,000). Plaintiff presents no response.   The Court agrees with Defendant's interpretation. Defendant, however, does not explain how Plaintiff misinterpreted the commission tiers and puts forth no evidence as to the amount she alleges she is owed as a result of this misinterpretation. As such, there remains a question of fact as to whether Plaintiff was paid commissions consistent with the Court's interpretation of the commission tiers, and the Court will deny summary judgment as to

13

Plaintiff's claims for commissions related to the WV Expansion project at this time.

### iv. Plaintiff's Claim to Commissions on the IME, FCM, SIU, and Subrogation Projects

Defendant moves for summary judgment on Plaintiff's claim that Defendant breached the Commission Plans by not paying her commissions for the IME, FCM, SIU, and subrogation projects, which she argues are separate, commission-eligible accounts. Defendant contends summary judgment is warranted because: (1) the Commission Plans explicitly refer the sole right of interpretation of the Commission Plans to Cambridge, and Cambridge interprets "revenue invoiced" to refer to only revenue invoiced by Cambridge and not third-party vendors; (2) that even if the four projects were, in fact, commission-eligible, they were ancillary services that were bundled within the Tail Claims TPA project, and thus constitute one account for which commissions are capped at $150,000; and (3) that even if the Court finds that the four projects were separate, commission-eligible accounts, Plaintiff is not entitled to any commissions because none of the projects generated sufficient revenue to cross the $50,000 minimum threshold amount. The Court will discuss each argument separately.

First, Defendant maintains that only "revenue invoiced by Cambridge" was eligible for commissions. (Doc. No. 84-2 at 5; Doc. No. 84, Ex. C.). As discussed above, Coventry provided IME services to BrickStreet from November 2006 to March 2008, and FCM services from January 2007 to April 2008. MJM provided SIU services to BrickStreet from November 2006 to December 31, 2007. (Doc. No. 84-2 at 11-12.) It is not in dispute that both Coventry and MJM issued their own invoices to BrickStreet[7]. (Doc. No. 84-2 at 12-13.) It is also

---

[7] Defendant did not bill or issue invoices pertaining to the IME and FCM services provided by Coventry and the SIU services provided by MJM. Defendant also received no revenue from Coventry and MJM for the services they provided to BrickStreet.

undisputed that Cambridge invoiced no revenue relating to the subrogation services performed for BrickStreet. Plaintiff, however, argues that the revenue invoiced by third-parties for IME, FCM, SIU, and subrogation projects was commission-eligible because the phrase "revenue invoiced" refers to any revenue invoiced, even revenue invoiced by third-party contractors.

The contract provides that "Cambridge reserves the sole right of interpretation and application of this plan" and salespeople earn commissions based on "revenue invoiced." (Doc. No. 84, Ex. C.) The Court finds that this language is not ambiguous and, as such, does not need to reach the issue of whether Cambridge retained the exclusive right to interpret the contract, though it agrees with Defendant's interpretation. To interpret the phrase "revenue invoiced" to include revenue invoiced by third parties would require Cambridge to pay employees commissions on accounts for which it did not receive any revenue at all. Thus, the Court does not believe invoices by Coventry and MJM for the IME, FCM, SIU, and subrogation projects are commission-eligible.

Second, Defendant argues that even if the Court were to find that the phrase "revenue invoiced" included the revenue invoiced by Coventry and MJM, Plaintiff still would not be entitled to any commissions because those projects are ancillary services sold as part of the Tail Claims TPA project. As such, Plaintiff's commissions for all of these services would be capped at $150,000, and thus all but $3,404 would be recoverable as she has already been paid $146,596. (Doc. No. 84-2 at 23.) In contrast, Plaintiff argues that she was instructed to treat FCM, IME, SIU, and subrogation as separate, commission-eligible accounts. (Doc. No. 86 at 16.)

The Court agrees with Defendant that the FCM, IME, SIU, and subrogation services are not separate, commission-eligible accounts. There is no evidence in the record that Cambridge

15

management instructed Plaintiff to treat the accounts separately. Plaintiff points to twenty-seven of what she characterizes as "Cambridge Commission Calculation Reports" to support her contention that FCM, IME, SIU, and subrogation services are separate, commission-eligible accounts. (Doc. No. 86 at 16.) But this evidence is unavailing as Plaintiff admitted in her deposition that she prepared those reports herself, and was responsible for identifying those projects as separate accounts. (Doc. No. 88 at 3; Doc. No. 85, Ex. D at 97, 151-52.) Plaintiff cites to "email messages and other communications regarding the existence of separate accounts" but fails to produce any evidence to support her allegation that she was "specifically instructed to open separate accounts for commission purposes for IME, FCM, SIU, and subrogation services." (Doc. 86 at 10, 17.) Not only is her claim unsubstantiated, it was expressly denied by Plaintiff's former supervisor, Vance Root, in his deposition. When asked whether he directed Plaintiff to enter each of the BrickStreet accounts, including IME, FCM, SIU, and subrogation, as separate accounts, Root replied, "We had no such conversation." (Doc. No. 84, Ex. D at 109.)

In contrast, Defendant has put forth substantial evidence that Cambridge considered these projects as bundled ancillary services that were part of the Tail Claims TPA project, and not separate accounts. Another Cambridge employee, Pam Morrow, testified in deposition that she sold "ancillary services, such as IME and FCM, to customers as part of a 'bundled product' of workers' compensation claims services." (Doc. No. 84, Ex. Q at 18-19.) In addition, Morrow stated in her affidavit that "[she] sells Cambridge's claims services and the various ancillary services as a 'bundled' package. [She] ha[s] never sold ancillary services separately or apart from the bundled package [and has] never seen an invoice for the ancillary services performed for Cambridge's customers." (Doc. No. 84, Ex. R ¶¶ 2, 3, 8.) She further stated that "[she] ha[s] never been paid separate commissions for ancillary services such as IME or FCM." (*See id.*)

Because Defendant has presented overwhelming evidence that it considered these projects as part of the Tail Claims TPA project, the Court will treat the IME, FCM, SIU, and subrogation projects as a bundled package sold a part of the Tail Claims TPA project.[8] Because the Court has found that Defendant has presented sufficient evidence based on its first two arguments, the Court grants summary judgment to Defendant on Plaintiff's claims of entitlement to commissions for the IME, FCM, SIU, and subrogation projects.

### B. Violation of Maryland Wage Payment and Collection Law ("MWPCL")

Defendant moves for summary judgment on Plaintiff's claims under the Maryland Wage Payment and Collection Law ("MWPCL") (Count I): (1) the revenue invoiced for the IME, FCM, SIU, and subrogation projects; (2) the second-year revenue on the Tail Claims TPA project; and (3) all revenue for the WV Expansion project other than $8,195 Defendants allege was deducted from Plaintiff's commission payments as the result of an accounting "true-up."[9] The Court finds that a dispute of material fact exists regarding the second sum, and thus denies summary judgment on that claim, and grants summary judgment as to the first and third claims.

Section 3-505 of the MWPCL requires employers, upon the termination of an employee's employment, to pay that employee "all wages due for work that the employee performed before the date of termination of employment." Md. Code Ann., Lab. & Empl. § 3-505. Section 3-501(c) defines "wage" to include commissions where they are promised for service." *Id.* § 3-501(c). The Court has found that Plaintiff was not entitled to commissions under the terms of the

---

[8] Defendant argues that Plaintiff is not entitled to commissions for the $30,594.32 "management oversight fee" MJM paid Cambridge for the SIU project. Since the Court finds that MJM is a service bundled into the Tail Claims TPA project, for which Plaintiff has already reached the $150,000 annual commissions cap, the Court agrees with Defendant.

[9] Defendant is not moving for summary judgment as to the following MWPCL claims: (1) $3,404 for underpayment of first-year revenues in the Tail Claims TPA project; (2) $8,195 which was deducted from her commission payment as a result of an accounting reconciliation or "true-up" with respect to the WV Expansion project; and (3) additional commissions in the amount of $38,291 with respect to the All Claims Review Project.

commission plans on revenue invoiced for the IME, FCM, SIU, and subrogation projects, as well as second-year revenue on the Tail Claims TPA project, and granted summary judgment to Defendant on those breach of contract claims. As such, Plaintiff could not have been promised those commissions in exchange for her service on the BrickStreet account, and the Court will grant summary judgment to Defendant on Plaintiff's MWPCL claims regarding those commissions. However, the Court did find that a dispute of material fact exists as to Plaintiff's entitlement to additional commissions relative to the WV Expansion project and denied summary judgment to Defendant on Plaintiff's breach of contract claim as to that project. The Court will also deny summary judgment on Plaintiff's MWCPL claim relative to that project. Thus, the Court will grant in part and deny in part Defendant's motion for partial summary judgment as to Count I.

Additionally, Defendant moves for summary judgment as to Plaintiff's entitlement to treble damages and attorney's fees under the MWPCL because a bona fide dispute existed regarding Plaintiff's entitlement to: (1) the $3,404 with respect to first year revenues under the Tail Claims TPA project that were deducted from Plaintiff's commissions because of an accounting "true-up"; (2) all commissions with respect to the WV Expansion project; and (3) additional commissions with respect to the All Claims Review project. Under the MWCPL, an employee is entitled to treble damages and attorney's fees for withheld wages if the "employer withheld the wage . . . not as a result of a bona fide dispute." Md. Code Ann., Lab. & Empl. § 3-507. A bona fide dispute exists if there is a "legitimate dispute over the validity of the claim or the amount that is owing" and a dispute over "whether there [is] sufficient evidence adduced to permit a trier of fact to determine that [the employer] did not act in good faith when it refused to pay" the wages at issue. *Admiral Mort., Inc. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000). Thus,

the existence of a bona fide dispute is not an issue "of law to be decided summarily but rather properly reserved for resolution by the jury." *Aronson & Co. v. Fetridge*, 957 A.2d 125, 140 (Md. Ct. Spec. App. 2008). The Court concludes that a question of material fact exists as to whether there was a bona fide dispute between the parties about Plaintiff's entitlement to the commissions listed above. The essence of this case is whether or not Plaintiff was entitled to additional commissions under the terms of the commission plans, and Defendant argues it clearly did not have to pay Plaintiff the commissions. As such, the Court will deny summary judgment to Defendant on the issue of treble damages and attorney's fees under § 3-507.

3. **Plaintiff's Motion for Partial Summary Judgment**

Plaintiff seeks partial summary judgment on her claims in the amount of $35,413 under Counts I and II of her Amended Complaint on the basis that the Tail Claims TPA project, All Claims Review project, and WV Expansion project constitute three separate accounts from which Plaintiff was entitled to commissions, and that she is still owed $35,413 in commissions relating to these three accounts. She also argues Cambridge did not exercise its right to interpret the Commission Plans regarding which accounts were subject to commissions and which were not, or, alternatively, that she was not terminated for cause as defined by the Commission Plans and was instead let go as part of a reduction in force. Finally, Plaintiff also argues that there is no bona fide dispute regarding the $35,413 in commissions at issue and, as such, Plaintiff is entitled to treble damages in accordance with the MWCPL. In response, Defendant asserts that even though Cambridge considered the Tail Claims TPA project, All Claims Review project, and WV Expansion as three accounts, Plaintiff is not owed any more commissions than she has already received because Cambridge did exercise its right to interpret the contract. Moreover, Defendant argues that Plaintiff was fired for cause and thus not entitled to commissions at all. Defendant

also contends that, as such, a bona fide dispute did exist as to whether or not Plaintiff was owed $35,413 in additional commissions. The Court denies Plaintiff's motion for summary judgment, finding that a dispute of material fact exists as to whether Cambridge's interpretation of the Commission Plans entitles Plaintiff to additional commissions.

## A. Breach of Employment Contract

Plaintiff moves for summary judgment on her breach of employment contract claim on the basis that there is no dispute that the Tail Claims TPA project, All Claims Review project, and WV Expansion project constituted three separate accounts under the Commission Plans. Defendant agrees that Cambridge treated these three projects as three separate accounts for the purpose of calculating Plaintiff's commissions from 2006 until she left, but argues that this fact does not entitle Plaintiff to further commissions.[10] Wesley O'Brien, Defendant's former President, and Kevin Turner, formerly Defendant's Senior Vice President of Operations, both conceded in depositions that these three projects were treated "in [Plaintiff's] case as if [they] were three [accounts]" for commissions purposes. (Doc. No. 81 at 4-5.) Plaintiff received commissions based on this interpretation of the Commission Plans from either August or September of 2007 until her termination in May 2008. (*See* Doc. No. 81 at 5.) Under this favorable interpretation, Plaintiff received $291,062 in commissions - $141,062 beyond the $150,000 to which she would have been entitled if Cambridge had considered all work done for BrickStreet as one "account."

While it is without question that these three projects were treated separately for commissions purposes, this scenario gives rise to a debate as to what Defendant's purpose was in

_____

[10] It appears that Defendant changed its mind about this issue at some point after the termination of Plaintiff's employment.

treating them separately. Plaintiff alleges that Cambridge's failure to pay her the remaining $35,413 to which she contends she is entitled under Cambridge's favorable interpretation constitutes a breach of the commission plans. However, the Court finds substantial evidence in the record that this treatment was an exception to Cambridge's usual interpretation of the commission plans, in which the phrase "account" meant a single "client" or "customer" relative to which a Cambridge employee's commissions would be capped at $150,000. (*See* Doc. No. 85 at 4.) Turner testified that treating these projects as separate accounts was "pretty much a gift to [Plaintiff] to make [these three projects] three deals because that is not [Cambridge's] normal interpretation of the plan." (Doc. No. 85 at 5.)

Even though the Court finds that these three accounts were treated as separate, Plaintiff fails to cite any authority or advance any argument that the fact that this treatment entitles her to any further commissions or that Cambridge was not allowed to change the way it treated the accounts. There is no admissible evidence in the record describing what amount Plaintiff still feels she is owed under the three-account interpretation. Plaintiff claims that her expert, Joseph Martorelli ("Martorelli") and Defendant's expert, Bruce Dubinsky ("Dubinsky"), agree in their expert reports that Plaintiff would be owed $35,413 in commissions relative to these three projects, and as such, no dispute of material fact exists as to this amount. But, it is settled law in this jurisdiction that expert reports are inadmissible hearsay which may not be considered on summary judgment. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); *Solis v. Prince George's County*, 153 F. Supp. 2d 793, 788-789 (D. Md. 2001) ("[U]nsworn expert reports, which may have been prepared in compliance with Rule 26(a)(2), will not be considered by the Court for purposes of summary judgment.").

Furthermore, even if the Court were to consider Dubinsky's expert report, he merely confirmed that $35,413 is the dollar amount that Plaintiff contends is attributable to the BrickStreet projects under *her interpretation* of the commission plans. (*See* Doc. No. 85 at 6.) He took no view as to whether Plaintiff was actually *owed* $35,413, and qualified his calculations by stating that they were "[b]ased upon [his] understanding of Murphy's interpretation of the Commission Plans." (*Id.*)

In a single sentence in her opposition to Defendant's motion for partial summary judgment, Plaintiff appears to argue that the doctrine of promissory estoppel applies because she detrimentally relied on Defendant's favorable interpretation of the Commission Plans and as such is entitled to the $35,413 that would have been due to her under that interpretation. Plaintiff cites *Pavel Enterprises, Inc. v. A.S. Johnson Co.*, which outlines the four elements that must be met to establish detrimental reliance: (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. 674 A.2d 521, 532 (Md. 1996). However, Plaintiff fails to apply this test to the facts of her case, and makes no argument that Cambridge's favorable interpretation of the three projects at issue as three separate accounts under the Commission Plans induced any action or forbearance on her part, or caused a detriment that can only be avoided by the enforcement of the promise.

Plaintiff has failed to show that there is no dispute of material fact as to whether she is entitled to $35,413 in additional commissions on the Tail Claims TPA project, All Claims Review project, and WV Expansion project. As a result, it is unnecessary for the Court to address whether or not she was terminated for cause under the terms of the commission plans.

Accordingly, the Court denies summary judgment to Plaintiff on Count II.

### B.  Violation of MWPCL

Plaintiff also fails to cite any authority or facts to show that there is no dispute of material fact that Defendant's failure to pay her $35,413 after her termination constitutes a violation of the MWPCL. Section 3-505 of the MWPCL requires employers, upon the termination of an employee's employment, to pay that employee "all wages due for work that the employee performed before the date of termination of employment." Md. Code Ann., Lab. & Empl. § 3-505. Section 3-501(c) defines "wage" to include commissions where they are "promised for service." *Id.* The Maryland Court of Appeals interpreted this section of the MWPCL in *Whiting-Turner Contracting Co. v. Fitzpatrick*, a case in which the facts that resemble those of the instant action, 783 A.2d 667 (Md. 2001), and held that an employee who was offered, but never paid, a bonus and later resigned his employment was not still entitled to the bonus upon his resignation. *Id.* at 669. In reaching that conclusion, the court stated:

> Once a bonus, commission or fringe benefit has been promised as a part of the compensation for service, the employee would be entitled to its enforcement as wages. . . . Where such remuneration is not a part of the compensation package promised, it is merely a gift, a gratuity, revocable at any time before delivery.

*Id.* Defendant has testified that its treatment of the disputed projects as separate accounts for commissions purposes was an exception to the commissions plans that was merely a gift to Plaintiff. Plaintiff fails to provide any evidence to the contrary. As a result, the Court must deny summary judgment to Plaintiff on her MWPCL claim.

### IV. CONCLUSION

For the foregoing reasons, the Court will GRANT in part and DENY in part Defendant's Motion for Partial Summary Judgment, DENY Plaintiff's Cross-Motion for Partial Summary

Judgment, DENY Plaintiff's Request for Dismissal of Defendant's Objections, and MODIFY Magistrate Judge Connelly's Order. Plaintiff's claims under the MWPCL for $3,404 with respect to first year revenues under the Tail Claims TPA project, $8,195 with respect to the WV Expansion project, and additional commissions with respect to the All Claims Review project remain, as do both her breach of contract and MWPCL claims for $35,413 with respect to these three projects.[11] A separate Order will follow.

<table>
<tr><td>   July 26, 2010   </td><td>     /s/     </td></tr>
</table>

       Date                                            Alexander Williams, Jr.
                                                   United States District Judge

---

[11] The parties are directed to initiate a conference call with chambers to schedule a pre-trial conference and trial date. Although according to the Scheduling Order, the deadline for the parties to consent to proceed before a magistrate judge has long passed, should the parties so desire, the Court will still permit the parties to consent to a magistrate judge for all further proceedings by filing an appropriate consent motion to do so.