IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | * | |
| LISA M. MURPHY, | * | |
| Plaintiff, | * | |
| | * | |
| | * | |
| v. | * | Civil Action No. 08-cv-03224-AW |
| | * | |
| CAMBRIDGE INTEGRATED SERVICES | * | |
| GROUP, INC., | * | |
| Defendant. | * | |

********************************************************************************

**Memorandum Opinion**

Pending before the Court is Plaintiff's motion to alter or amend award of partial summary judgment in favor of Defendant. Doc. No. 95. The Court has reviewed the Parties' filings and finds that no hearing is necessary. *See* D. MD. LOC. R. 105.6 (2010). For the reasons that follow, the motion will be granted in part and denied in part.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are adapted from the Court's Memorandum Opinion resolving the Parties' respective motions for partial summary judgment, Doc. No. 93, with some omissions because there are now fewer issues before the Court. This case arises out of a dispute over commissions allegedly earned by Plaintiff Murphy and withheld by Defendant Cambridge Integrated Services Group ("Cambridge"), a property and casualty claims and risk management services company. Plaintiff was employed by Defendant in a sales/business development capacity from July 2002 until May 2008, at which point her employment was terminated as part of a reduction in force. While employed with Defendant, Plaintiff was paid a base salary in

addition to commissions under the terms set forth each year in Business Development Commission Plans (the "Commission Plans") that were issued by Defendant and applicable to all Cambridge employees.

The unpaid commissions at issue in this case fall under the terms of the 2006 and 2007 Commission Plans, which state that commissions are to be earned on "all new business produced by the participant" based on "revenue invoiced for the first [twelve] months [of the new client's] contract period," and, if applicable, at a three percent commission rate "on all revenue invoiced for the [new client's] second twelve-month contract period." Doc. No. 84, Ex. C at 2. Under the 2006 and 2007 Commission Plans, employees eligible for commissions were to earn five percent of the first million dollars invoiced, seven percent of the second million dollars invoiced, and nine percent of amounts invoiced in excess of three million dollars. The Commission Plans also contained a $150,000 cap on annual commissions per account. Commissions could not be earned on accounts that generated less than $50,000 in annual revenue, and were only earned on first-year revenue generated by so-called "run-off" accounts.

The commissions at issue in this case were based on revenue generated by Defendant's sale of claims management services to West Virginia's Office of the Insurance Commissioner ("WVOIC") through its private workers' compensation carrier, BrickStreet. Kevin Turner, then the Senior Vice President of Operations, and Vance Root, then the Senior Vice President of Business Development, brought Plaintiff on to manage the account after an initial meeting with BrickStreet's claims director. Plaintiff was involved in a number of different projects that Cambridge managed for BrickStreet, from late 2005 until May 2008. These projects are:

1) The Tail Claims TPA (third-party administration) project: on October 1, 2006, BrickStreet entered into an agreement with Cambridge under which BrickStreet

subcontracted to Cambridge certain of its TPA rights, duties and obligations with respect to approximately 42,000 open workers' compensation claims. Cambridge issued invoices on this account from October 2006 to February 2008.

2) The All Claims Review project: Cambridge agreed to perform a "targeted claim review" in which Cambridge agreed to review and categorize a limited number of workers' compensation claims and to assign Cambridge personnel to administer those claims. Cambridge issued invoices related to the All Claims Review project from December 2006 to March 2007.

3) The West Virginia Expansion project ("the WV Expansion project"): In April 2007, Cambridge and BrickStreet amended their prior agreement and Cambridge agreed to perform targeted claim review services in addition to those in the All Claims Review.

4) Independent Medical Examination Services ("IME services"): In November 2006, Cambridge contracted with a third-party vendor, Coventry Health Care ("Coventry"), to provide IME services to claimants in West Virginia.

5) Field Case Management services ("FCM services"): Coventry also provided FCM services to claimants in West Virginia.

6) Surveillance and Investigative services ("SIU services"): in November 2006, Cambridge contracted with another third-party vendor, MJM, to provide investigative services to its customers. Under the MJM-Cambridge contract, MJM was to pay Cambridge a "management oversight fee" for the services Cambridge provides. MJM provided field investigative and surveillance services until December 31, 2007.

7) Subrogation services: Subrogation refers to an insurance company seeking reimbursement from the person or entity legally responsible for an accident after the

insurer has paid out money on behalf of its insured. Cambridge did not issue any invoices relating to subrogation services performed for BrickStreet and no revenue was received by Cambridge relating to subrogation.

Although Cambridge contends that it normally considered all BrickStreet projects as pertaining to one client and one account for commissions purposes (such that Plaintiff's annual commissions relating to BrickStreet would be capped at $150,000), Cambridge awarded Plaintiff commissions as if the Tail Claims TPA project, All Claims Review project, and WV Expansion project were three separate accounts. By contrast, Defendant alleges that it decided not to treat the IME, FMC, SIU and subrogation services as separate accounts because the services were sold as part of the Tail Claims TPA project and were not services invoiced by Cambridge. Plaintiff contends that these projects were four separate accounts for the purpose of calculating commissions. Plaintiff was paid $291,062 in 2007 and 2008 in total commissions attributable to the work Cambridge performed for BrickStreet. During 2007, she received $32,313 attributable to the All Claims Review Project, $146,596 attributable to the first twelve months of the Tail Claims TPA project,[1] and $112,153 attributable to the WV Expansion project. In May of 2008, Plaintiff's employment was terminated as part of a reduction in force at Cambridge.

## II.   STANDARD OF REVIEW

Plaintiff seeks reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure. "While the Rule itself provides no standard for when a district court may grant such a motion, courts interpreting Rule 59(e) have recognized three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence

---

[1] Plaintiff received $3,404 less than the annual commission cap of $150,000 because of a reconciliation or "true-up." Doc. No. 84 at 1 n. 1.

4

not available at trial; or (3) to correct a clear error of law or prevent manifest injustice."

*Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). Plaintiff's motion is based on the

third rationale for reconsideration: manifest error. To justify reconsideration on the basis of

manifest error, the prior decision cannot be "'just maybe or probably wrong; it must . . . strike us

as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *TFWS, Inc. v. Franchot*,

572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*,

Nos. 92-2355, 92-2437, 1995 WL 520978 at * 5 n. 6 (4th Cir. Sept. 5, 1995)).


## III.  <u>ANALYSIS</u>

The Court granted partial summary judgment in favor of the Defendant, *see* Doc. No. 93,

and Plaintiff's present motion asks the Court to reconsider three of the decisions rendered in that

Opinion: (1) that IME, FCM, and SIU were all part of the TPA account, rather than separate

accounts, (2) that no commissionable revenue was invoiced on the IME, FCM, and SIU

accounts, and (3) that TPA is a run-off account. The Court agrees with Plaintiff that it should

reconsider its holding that IME, FCM and SIU were indisputably part of the TPA account;

instead, the Court now holds that there is a genuine dispute of fact regarding whether the

accounts are one or separate. However, the Court maintains the correctness of its prior holdings

on the other two matters.


### A.  **Separate Accounts**

The first challenge raised by Plaintiff is directed at the Court's holding that the IME,

FCM and SIU accounts were part of the TPA account. The Court held that "[t]here is no

evidence in the record that Cambridge management instructed Plaintiff to treat the accounts

separately." Doc. No. 93 at 15-16. Plaintiff opposed summary judgment by referring to 27

Commission Calculation Reports that list of her potentially commissionable accounts, each of

which includes separate entries for TPA, FCM, IME, and SIU. *See* Doc. No. 86 at 16. However,

the Court dismissed these Reports on the ground that "Plaintiff admitted in her deposition that

she prepared those reports herself." Doc. No. 93 at 16. Plaintiff claims in her briefings and in her

deposition that she was "specifically instructed to open separate accounts" for each group of

services, Doc. No. 86 at 10, 17, but the Court dismissed this claim because Plaintiff "fails to

produce any evidence to support her allegation" and because Defendant raised considerable

evidence contradicting the allegation, Doc. No. 93 at 16.

      The Court not only agrees with Plaintiff that there is a genuine dispute of fact regarding

the separate-accounts issue, but that it was manifest error for the Court to hold otherwise. The

Court only arrived at its conclusion by dismissing Plaintiff's clear deposition testimony as

though it were not competent evidence—which it is—and by mischaracterizing the way in which

the Commission Reports were prepared. Although it is true that Plaintiff had a hand in preparing

the Reports, because she filled out forms that initially designated the accounts as separate, the

Defendant concedes that it was a different Cambridge employee—Paula Sorgeloos—who drafted

the Reports. *See* Doc. No. 98 at 6-7. Furthermore, the Court did not properly credit Plaintiff's

testimony that her supervisors instructed her to list the accounts as separate. Finally, there is

evidence in the record suggesting that two Cambridge management officials reviewed and

approved the Reports. *See* Doc. No. 99 at 1-2.

      The Court recognizes now, as it did in its prior Opinion, that Defendant has put forth

weighty evidence to the contrary, indicating that the accounts were separate. However,

Defendant's evidence only shows that there is a dispute of fact on the issue; it is not so

overwhelming as to place the issue beyond controversy. In sum, the Court improperly weighed the disputed facts in holding, as a matter of law, that the accounts were not separate, and the Court will reconsider that part of its holding accordingly.

### B.   The Commission-Eligibility of the Revenue Invoiced on the Accounts

Plaintiff next asks the Court to reconsider its holding that "invoices by Coventry and MJM for the IME, FCM, SIU, and subrogation projects are [not] commission-eligible." Doc. No. 93 at 15. Commissions are based on "revenue invoiced," Doc. No. 84, Ex. C at 2, and the Parties' summary judgment positions differed regarding the meaning of this phrase. The Court rejected Plaintiff's view that the phrase "refers to any revenue invoiced, even revenue invoiced by third-party contractors," because such an interpretation would "require Cambridge to pay employees commissions on accounts for which it did not receive any revenue at all." Doc. No. 93 at 15.

Instead of challenging the Court's interpretation of the phrase, Plaintiff quibbles with the Court's wording of secondary facts. In laying out the facts relating to the IME, FCM, SIU and subrogation projects, the Court stated that "[i]t is not in dispute that both Coventry and MJM issued their own invoices to Brickstreet." *Id.* at 14. Plaintiff takes issue with the Court's statement, contending that Coventry and MJM invoiced Cambridge, not Brickstreet. *See* Doc. No. 95 at 12. This is beside the point, however, because the Court's holding rested on the fact that Cambridge did not submit its own invoices to Brickstreet (or any other entity) in connection with the IME, FCM, SIU and subrogation services. It does not matter whether the invoices were sent by Coventry and MJM to Brickstreet (as the Court misstated) or to Cambridge, as claims administrator to Brickstreet, to be paid out of Brickstreet funds (as both Parties claim). The

important fact is that Coventry and MJM, not Cambridge, are the ones who are being paid on the invoices. Thus, the invoices sent by Coventry and MJM in connection with the ancillary TPA services are not "revenue invoiced" as that phrase was interpreted in the Court's prior Opinion, Doc. No. 93 at 15, and therefore they are not commission-eligible.

### C. The TPA as a "Run-Off Account"

Finally, Plaintiff challenges the Court's holding that the TPA project is a "run-off account." The Court reasoned that it need not definitively interpret the meaning of the phrase, because both Parties understood the TPA project to be a run-off account, and therefore no dispute exists on the matter. The Court relied on several business memoranda, drafted by Plaintiff, wherein Plaintiff describes the TPA account as "a workers' compensation run off program." Doc. No. 93 at 12-13. In an attempt to explain these memoranda, Plaintiff concedes that, "[w]ithout question, from the perspective of [WVOIC], the 'old worker's compensation claims' constituted a 'run-off program'm as the WVOIC had the obligation to resolved those claims from . . . the "West Virginia Worker's Compensation Fund." Doc. No. 95 at 15. However, Plaintiff argues that TPA is not a run-off program from the perspective of Cambridge.

This argument is unpersuasive for two reasons. First, the memorandum is an internal business memorandum, written by a Cambridge employee, for the benefit of Cambridge. Plaintiff offers no explanation for why an internal Cambridge memorandum would be drafted from the perspective of WVOIC, rather than from Cambridge's own perspective. Second, the perspectival distinction drawn by Plaintiff is nonsensical. If the project is a run-off account from the perspective of WVOIC (as Plaintiff concedes), then it is also a run-off account from the perspective of Cambridge, whose job it was to satisfy the remaining claims on behalf of

WVOIC. The Court remains convinced that there is no genuine dispute that the TPA is a run-off program and therefore declines to reconsider that part of its holding.

IV.     **<u>CONCLUSION</u>**

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's motion to alter or amend award of partial summary judgment in favor of Defendant. Doc. No. 95. A separate Order will follow.

___January 5, 2011___                                            _____/s/_____
      Date                                                        Alexander Williams, Jr.
                                              United States District Judge