IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| LISA M. MURPHY, <br> Plaintiff, | |
| v. | Civil Action No. 08-cv-03224-AW |
| CAMBRIDGE INTEGRATED SERVICES <br> GROUP, INC., <br> Defendant. | |

## MEMORANDUM OPINION

Plaintiff Lisa Murphy brought this action against Defendant Cambridge Integrated Services Group, Inc. for breach of contract and violation of the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. § 3-507, related to Defendant's alleged failure to pay her commissions. On July 27, 2010, the Court granted partial summary judgment in favor of Defendant, *see* Doc. No. 93. Plaintiff then moved for reconsideration of the Court's decision, *see* Doc. No. 95. On January 5, 2011, the Court granted in part and denied in part Plaintiff's motion for reconsideration, *See* Doc. No. 102. Currently pending before the Court are Plaintiff's motion to alter or amend the Court's January 5, 2011 Order, *see* Doc. No. 103, and Defendant's motion for permission to file a sur-reply, *see* Doc. No. 110. The Court has reviewed the Parties' filings with respect to the instant motions, and no hearing is deemed necessary. *See* D. MD. LOC. R. 105.6 (2010). For the reasons stated more fully below, the Court will DENY Plaintiff's second motion for reconsideration and DENY Defendant's sur-reply as unnecessary.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are adapted from the Court's Memorandum Opinion resolving Plaintiff's motion to alter or amend award of partial summary judgment in favor of Defendant, Doc. No. 102. This case arises out of a dispute over commissions allegedly earned by Plaintiff Murphy and withheld by Defendant Cambridge Integrated Services Group ("Cambridge"), a property and casualty claims and risk management services company. Plaintiff was employed by Defendant in a sales/business development capacity from July 2002 until May 2008, at which point her employment was terminated as part of a reduction in force. While employed with Defendant, Plaintiff was paid a base salary in addition to commissions under the terms set forth each year in Business Development Commission Plans (the "Commission Plans") that were issued by Defendant and applicable to all Cambridge employees.

The unpaid commissions at issue in this case fall under the terms of the 2006 and 2007 Commission Plans, which state that commissions are to be earned on "all new business produced by the participant" based on "revenue invoiced for the first [twelve] months [of the new client's] contract period," and, if applicable, at a three percent commission rate "on all revenue invoiced for the [new client's] second twelve-month contract period." Doc. No. 84, Ex. C at 2. Under the 2006 and 2007 Commission Plans, employees eligible for commissions were to earn five percent of the first million dollars invoiced, seven percent of the second million dollars invoiced, and nine percent of amounts invoiced in excess of three million dollars. The Commission Plans also contained a $150,000 cap on annual commissions per account. Commissions could not be earned on accounts that generated less than $50,000 in annual revenue, and were only earned on first-year revenue generated by so-called "run-off" accounts.

The commissions at issue in this case were based on revenue generated by Defendant's sale of claims management services to West Virginia's Office of the Insurance Commissioner

("WVOIC") through its private workers' compensation carrier, BrickStreet. Kevin Turner, then the Senior Vice President of Operations, and Vance Root, then the Senior Vice President of Business Development, brought Plaintiff on to manage the account after an initial meeting with BrickStreet's claims director. Plaintiff was involved in a number of different projects that Cambridge managed for BrickStreet, from late 2005 until May 2008. These projects are:

1) The Tail Claims TPA (third-party administration) project: on October 1, 2006, BrickStreet entered into an agreement with Cambridge under which BrickStreet subcontracted to Cambridge certain of its TPA rights, duties and obligations with respect to approximately 42,000 open workers' compensation claims. Cambridge issued invoices on this account from October 2006 to February 2008.

2) The All Claims Review project: Cambridge agreed to perform a "targeted claim review" in which Cambridge agreed to review and categorize a limited number of workers' compensation claims and to assign Cambridge personnel to administer those claims. Cambridge issued invoices related to the All Claims Review project from December 2006 to March 2007.

3) The West Virginia Expansion project ("the WV Expansion project"): In April 2007, Cambridge and BrickStreet amended their prior agreement and Cambridge agreed to perform targeted claim review services in addition to those in the All Claims Review.

4) Independent Medical Examination Services ("IME services"): In November 2006, Cambridge contracted with a third-party vendor, Coventry Health Care ("Coventry"), to provide IME services to claimants in West Virginia.

5) Field Case Management services ("FCM services"): Coventry also provided FCM services to claimants in West Virginia.

6) Surveillance and Investigative services ("SIU services"): in November 2006, Cambridge contracted with another third-party vendor, MJM, to provide investigative services to its customers. Under the MJM-Cambridge contract, MJM was to pay Cambridge a "management oversight fee" for the services Cambridge provides. MJM provided field investigative and surveillance services until December 31, 2007.

7) Subrogation services: Subrogation refers to an insurance company seeking reimbursement from the person or entity legally responsible for an accident after the insurer has paid out money on behalf of its insured. Cambridge did not issue any invoices relating to subrogation services performed for BrickStreet and no revenue was received by Cambridge relating to subrogation.

Plaintiff was paid $291,062 in 2007 and 2008 in total commissions attributable to the work Cambridge performed for BrickStreet. During 2007, she received $32,313 attributable to the All Claims Review Project, $146,596 attributable to the first twelve months of the Tail Claims TPA project,[1] and $112,153 attributable to the WV Expansion project. In May of 2008, Plaintiff's employment was terminated as part of a reduction in force at Cambridge.

## II. STANDARD OF REVIEW

Plaintiff seeks reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure. "While the Rule itself provides no standard for when a district court may grant such a motion, courts interpreting Rule 59(e) have recognized three grounds for amending an earlier judgment: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice."

---

[1] Plaintiff received $3,404 less than the annual commission cap of $150,000 because of a reconciliation or "true-up." Doc. No. 84 at 1 n.1.

*Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). Plaintiff's motion is based on the third rationale for reconsideration: manifest error. To justify reconsideration on the basis of manifest error, the prior decision cannot be "'just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (quoting *Bellsouth Telesensor v. Info. Sys. & Networks Corp.*, Nos. 92-2355, 92-2437, 1995 WL 520978 at * 5 n.6 (4th Cir. Sept. 5, 1995)).

**III. ANALYSIS**

The Court granted in part and denied in part Plaintiff's August 23, 2010 motion to alter or amend the Court's award of partial summary judgment in favor of Defendant, *see* Doc. No. 102, and Plaintiff's present motion asks the Court to reconsider two of the decisions the Court affirmed in that opinion: (1) that no commissionable revenue was invoiced on the IME, FCM, and SIU accounts, and (2) that TPA is a run-off account. The Court maintains the correctness of its prior holdings on these two matters.

**A. The Commission-Eligibility of the Revenue Invoiced on the Accounts**

Plaintiff asks the Court to once more reconsider its holding that "invoices by Coventry and MJM for the IME, FCM, SIU, and subrogation projects are [not] commission-eligible." Doc. No. 102 at 7. Commissions are based on "revenue invoiced," Doc. No. 84, Ex. C at 2, and the Parties' summary judgment positions differed regarding the meaning of this phrase. The Court rejected Plaintiff's view that the phrase "revenue invoiced" includes "even revenue invoiced by third-party contractors," because such an interpretation would "require Cambridge to pay employees commissions on accounts for which it did not receive any revenue at all." *See* Doc. No. 102 at 7; *see also* Doc. No. 93 at 15.

5

In the Court's resolution of Plaintiff's first motion for reconsideration, the Court found that Plaintiff failed to directly challenge the Court's interpretation of the phrase "revenue invoiced." Plaintiff now seeks to challenge this interpretation, but her argument is untimely, as the 28-day period for bringing a Rule 59(e) motion has passed. *See* F.R.C.P. 59.

Moreover, the Court has already decided this issue, *see* Doc. No. 102 at 8; *see also* Doc. No. 93 at 15, and Plaintiff's motion does not point to newly discovered evidence or an intervening change in law that would justify altering or amending the Court's judgment. The Court's decision, that "revenue invoiced" includes only revenue invoiced by Cambridge, Plaintiff's employer, was not a clear error of law and did not work a manifest injustice. *See Hutchinson v. Staton*, 994 F.2d 1076, 1082 (4th Cir.1993) ("[M]ere disagreement does not support a Rule 59(e) motion.").

Furthermore, even if the Court elected to consider Plaintiff's contention that "revenue invoiced" "unambiguously means all revenue invoiced," Doc. No. 103 at 6, the Court finds no basis to alter its decision that invoices by Cambridge's subcontractors, for which Cambridge does not receive compensation, are not commission-eligible. Plaintiff argues that the Court must have improperly relied on extrinsic evidence in interpreting the phrase "revenue invoiced." Doc. No. 103 at 7. However, the Court expressly noted that in interpreting "revenue invoiced" it did not consider extrinsic evidence such as whether Cambridge retained the exclusive right to interpret the contract. *See* Doc. No. 93 at 15. Moreover, the Court rejected Plaintiff's interpretation of "revenue invoiced" because it found that interpreting the phrase as Plaintiff suggests, to include revenue invoiced by third parties, would require Cambridge to pay employees commissions on accounts for which it did not receive any revenue at all. *See* Doc. No

102 at 7; *see also* Doc. No. 95 at 15. Plaintiff failed to contest these underlying facts upon which the Court's decision turns. Thus, the Court declines to reconsider its decision.

Plaintiff has failed to demonstrate any other basis for manifest error. The Court finds that the testimony of Paula Sorgeloos ("Sorgeloos"), taken in its entirety, fails to support Plaintiff's contention that Cambridge ever considered revenue invoiced by others to be commission-eligible. Plaintiff contends that Sorgeloos' testimony confirms that Cambridge's position on this issue changed sometime after the publication of the 2006 and 2007 Commission Plans, because Sorgeloos had not been previously advised that revenue produced as a result of the use of subcontractors was not subject to commissions. However, the Court finds that Sorgeloos' testimony does not in fact suggest any change in policy but only that Sorgeloos did not become aware of Cambridge's policy until shortly before Plaintiff's termination. Doc. 85 Ex. 5 p. 7-8.

Similarly, the testimony of Pam Morrow fails to support Plaintiff's contention that Cambridge ever considered revenue invoiced by others to be commission-eligible. Plaintiff argues that Pam Morrow ("Morrow")'s deposition "confirmed expressly that she was paid commissions for the work of [subcontractors IME, SIU, and FCM]." Doc. 103 at 11. While this is technically correct, Morrow's testimony reveals that she has "never been paid separate commissions for ancillary services such as IME or FCM," and that she was only paid commissions for those services based on the revenue Cambridge invoiced for services sold under a particular client contract. Doc. 89 Ex. 20 at 3. The testimony of Morrow, taken as a whole, fails to support Plaintiff's contention that Cambridge paid separate commissions on ancillary services, on revenue Cambridge did not invoice.

Finally, Plaintiff argues that because Sorgeloos prepared commission reports that include separate entries for the IME, FCM, and SIU accounts, the Court should infer that the work of

7

these subcontractors was subject to commissions. Although the Court agrees with Plaintiff's argument that IME, FCM and SIU accounts are separate accounts, the Court is not persuaded by Plaintiff's further inference that the accounts are commissionable because they constitute separate entries in the commission reports. Moreover, the commission reports do not in fact show commissions due to Plaintiff for the IME, FCM, SIU, and subrogation services provided by the third-party vendors. *See* Doc. 82 Ex. 2-7. Thus, the Court declines to reconsider its January 5, 2011 holding affirming its prior decision that "revenue invoiced" refers only to revenue invoiced by Cambridge, and revenue invoiced by third-party vendors for the IME, FCM, SIU, and subrogation services they perform are not commission-eligible. *See* Doc. No. 102 at 8; *see also* Doc. No. 93 at 15.

### B. The TPA as a "Run-Off Account"

In its summary judgment opinion, the Court held that it need not definitively interpret the meaning of the phrase "run-off account" because both Parties understood that the Tail Claims TPA project was a run-off account, and therefore no dispute existed on the matter. The Court affirmed its decision in its January 5, 2011 Opinion. Plaintiff again challenges the Court's holding that the TPA project constitutes a "run-off account," arguing that the Court "improperly weighed evidence, drew inferences and determined credibility." Doc. No. 103 at 15. The Court remains convinced that there is no genuine dispute that the TPA is a run-off program and therefore declines to reconsider that part of its holding. Moreover, Plaintiff again fails to offer any new evidence or show intervening change of law that supports her case. Instead, Plaintiff restates arguments upon which the Court has already decided in support of her contention that the Court committed a clear error of law. *See* Doc. No. 103 Ex. 1 at 2, 15-16 *see also* Doc. No.

8

95 Ex. 1 at 15. A Rule 59(e) motion is "not a license to reargue the merits. *See Royal Insurance Co. of America v. Miles & Stockbridge, P.C.*, 142 F. Supp. 2d 676, 677 n.1 (D. Md. 2001) (citing *RGI, Inc. v. Unified Indus., Inc.,* 963 F.2d 658 (4th Cir. 1992)).

Even if the Court elected to again reconsider Plaintiff's contention that the term "run-off account" is ambiguous, the Court finds no basis to alter its decision. Plaintiff argues that the Court impermissibly gave weight to an "internal business memorandum" in resolving the issue. *See* Doc. No. 103 Ex. 2 at 2. As the Court stated in its January 5, 2011 Opinion, the Court relied on the business memoranda because it was drafted by Plaintiff herself and provides a description of the TPA account as "a workers' compensation run-off program." *See* Doc. No. 93 at 12-13; *see also* Doc. No. 102 at 8. The Court sees no clear error of law in its prior decision to consider Plaintiff's own words in determining whether the term "run-off account" applied to the TPA project. Thus, the Court maintains the correctness of its prior holding on this matter.

The Court accordingly declines to consider Plaintiff's argument, raised for the first time in her second motion for reconsideration, that the Court should have analyzed the Cambridge-BrickStreet contract in lieu of the internal memoranda in determining whether Cambridge's contract with BrickStreet constituted a "run-off account." Doc. No. 103 Ex. 2 at 2. This argument is not timely. *See* F.R.C.P. 59. Moreover, the Court is not persuaded that the Cambridge-BrickStreet contract illustrates Plaintiff's understanding of the term "run-off account" better than the internal business memoranda in which Plaintiff herself describes the TPA project using that term.

**IV.     CONCLUSION**

For the foregoing reasons, the Court will deny Plaintiff's motion to alter or amend the Court's January 5, 2011 Order. Doc. No. 103. Based on this holding, the Court will deny Defendant's motion for permission to file a sur-reply as unnecessary. Doc. No. 110. A separate Order will follow.

<u>August 15, 2011</u>　　　　　　　　　　　　　　　　　　　　　　<u>　　　　　/s/　　　　　</u>
　　　Date　　　　　　　　　　　　　　　　　　　　　　　　　　　Alexander Williams, Jr.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge