**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | |
|---|---|
| **LISA M. MURPHY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 08-cv-3224 (AW)** |
| ) | |
| **CAMBRIDGE INTEGRATED** ) | |
| **SERVICES GROUP, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION *IN LIMINE***

Defendant Cambridge Integrated Services Group, Inc., ("Cambridge" or "Defendant"), by counsel, submits this Memorandum in support of its Motion *In Limine*. Defendant moves the Court for an order prohibiting the Plaintiff Lisa Murphy ("Plaintiff" or "Ms. Murphy"), and her attorneys, witnesses, and other representatives (collectively "Plaintiff's Representatives") from mentioning or bringing evidence before the jury, either directly or indirectly, upon voir dire, opening statements, examination of witnesses, introduction of exhibits, closing argument, or objections to evidence, any of the following:

- evidence concerning her claims that were dismissed by the Court on summary judgment;

- evidence that her "wage" claim exceeds $6,212, which is the maximum amount in dispute applying the Court's rulings;

- evidence concerning her claim for treble damages under the Maryland Wage Payment and Collection Law, because the amounts in dispute are not wages within the meaning of the statute; and

- documents that have not been properly identified in Plaintiff's list of expected exhibits.

1

I.      PROCEDURAL AND FACTUAL BACKGROUND

During the time period relevant to this case, Cambridge was an independently owned property and casualty claims and risk management services company.  Ms. Murphy was employed by Cambridge in a sales and business development capacity from July 2002 until May 2008 when her employment was terminated.

Ms. Murphy was brought in by Cambridge management to work on the projects at issue in this case after several management employees had identified and procured the opportunity to sell Cambridge claims management and managed care services to the State of West Virginia's Office of the Insurance Commissioner in 2006 and 2007 through its private workers' compensation carrier, BrickStreet Mutual Insurance Company ("BrickStreet").  Plaintiff was credited with the BrickStreet "sale" even though the management team really generated the business.

Plaintiff's Amended Complaint alleges that Cambridge:  a)  violated the Maryland Wage Payment and Collection Law ("MWPCL") by refusing to pay her all of the commissions she claims she earned on seven "deals" between Cambridge and BrickStreet, under Cambridge's commission plans (Count I), and b) breached Cambridge's 2006 and 2007 commission plans (Count II).  The seven "deals" or projects which Plaintiff identified include:  1) Brickstreet All Claims Review (the "All Claims Review Project"); 2) Brickstreet: Tail Claims TPA Services (the "Tail Claims TPA Project"); 3) Brickstreet: West Virginia expansion work (the "WV Expansion Project"); 4) Brickstreet Insurance: Field Case Management ("FCM"); 5) Brickstreet Insurance: Independent Medical Examinations ("IME"); 6) Brickstreet: Subrogation/Recovery of Overpayment "Subrogation/Recovery"); and 7) Brickstreet: SIU (Surveillance Investigation).

By Order dated July 27, 2010, the Court granted summary judgment to Cambridge on Plaintiff's MWPCL claim (Count I) and breach of contract claim (Count II) relating to four of the seven projects, and determined that Plaintiff is not entitled to commission on these projects: FCM, IME, Subrogation/Recovery and SIU.  *See* July 27, 2010 Order, Dkt. No. 94; *see e.g.* July 27, 2010 Memorandum Opinion, Dkt. No. 93.  In reaching its ruling, the Court held that only revenue invoiced by Cambridge was eligible for commissions.  *See* July 27, 2012  Memorandum Opinion, Dkt. No. 93 at pp. 14-15.

The Court also granted Cambridge's Motion for Partial Summary Judgment regarding the amount of commissions Plaintiff was paid on the All Claims Review, Tail Claims TPA, and WV Expansion projects, holding` that it is undisputed that Plaintiff was paid $32,313 in commissions for the All Claims Review project, $146,596 for the Tails Claims TPA project, and $112,153 for the WV Expansion project, for a total of $291,062 in commissions paid on these three projects. *See* July 27, 2012 Memorandum Opinion, Dkt. No. 93 at pp. 10-11.  The Court rejected Plaintiff's cross motion for summary judgment and in doing so, noted that Plaintiff claimed that she was owed an additional $35,413 on her claims as to these three projects based solely upon her expert witnesses' calculation, and that such calculations are inadmissible. *Id.* at 21.  She now claims that she is owed $39,720.  *See* Dkt No. 23, pp. 1.

Ms. Murphy's remaining claims involve three projects:

1.  The Tail Claims TPA Project: Effective October 1, 2006, BrickStreet entered into an agreement with Cambridge ("BrickStreet-Cambridge Agreement") under which BrickStreet subcontracted to Cambridge certain of its third-party administrative ("TPA") rights, duties and obligations with respect to approximately 42,000 open workers' compensation claims.  Plaintiff claims she was owed $25,000, but the Court found that she was paid more than that:  $32,313.

2. The "All Claims Review Project": In addition to performing TPA duties, the BrickStreet-Cambridge Agreement required Cambridge to perform a "targeted claim review" in which Cambridge agreed to review and categorize a limited number of workers' compensation claims and to assign experienced Cambridge personnel to administer those claims. Plaintiff claims that she was due $150,000. She was paid that amount, less a $3,404 "true-up" or accounting adjustment.

3. The West Virginia Expansion Project: In January of 2007, the parties began negotiating an expansion of the project which was finalized in April 2007, at which time Cambridge and BrickStreet agreed that Cambridge would perform additional targeted claim review services involving a second segment of claims. Plaintiff now claims $155,782, apparently premised upon an incorrect application of the 9% commission rate, contrary to the Court's holding. She was paid $112, 153.

## II.   LAW AND ARGUMENT

"Evidence which is not relevant is not admissible." FED. R. EVID. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED R. EVID. 401. Even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED R. EVID. 403.

### A.      Evidence Pertaining to Claims That Have Been Dismissed is Irrelevant and Highly Prejudicial.

Plaintiff has indicated that she may attempt to introduce evidence, including "Twenty-seven Cambridge Commission Reports"[1] and an unspecified number of unidentified "Cambridge Accounting Records", that contain information pertaining to the FCM, IME, Subrogation, and Surveillance projects. *See* Dkt No. 23, p. 9.

These documents and any other oral or written evidence pertaining to Plaintiff's prior claims for commissions on these projects, including, but not limited to, billing amounts, revenue sums, and commission calculations, are not relevant to Plaintiff's remaining claims and can only be offered for improper, prejudicial purposes.[2] FED. R. EVID. 402 and 403. Any attempt by Plaintiff's Representatives to reference or present evidence, including financial data, pertaining to the FCM, IME, Brickstreet: Subrogation/Recovery of Overpayment, and Brickstreet: SIU projects would serve no conceivable purpose other than to mislead and confuse the jury in contravention of Rule 403 of the Federal Rules of Evidence. Plaintiff's Representatives should not be allowed to mislead the jury by suggesting that she has claims for commissions beyond Plaintiff's claims on the three BrickStreet projects at issue in this case. Moreover, such evidence could well cause the jury to erroneously think that Cambridge billed and received greater revenue relative to its relationship with BrickStreet than it actually did and to mistakenly believe that Plaintiff, in turn, earned more commissions than she was paid. That would certainly be unfair and prejudicial to Defendant.

---

[1] Plaintiff's pretrial exhibit list does not identify, by bates number of otherwise, the specific commission sheets she expects to offer. Cambridge presumes for purposes of this Motion that the entry on Plaintiff's list is intended to refer to the twenty-seven commission reports she attached as Exhibits F through DD of her Motion for Partial Summary Judgment. *See* Dkt. Nos. 81, 82.

[2] For example, the twenty-seven Commission Reports reference (without any explanation or context) the purported "Annual Size" and "Billings" of FCM, IME, Brickstreet: Subrogation/Recovery of Overpayment; and Brickstreet: SIU projects.

## B.      Plaintiff Should be Precluded from Offering Evidence that Her Claimed Damages Exceed $6,212.

In the Joint Pretrial Order, Plaintiff represents that she is seeking damages in the amount of $39,720.  *See* Dkt No. 23, pp. 1.  Specifically, she claims she earned $25,000 on the ACR project, $150,000 on the Tail Claims TPA project, and $155,782 on the WV Expansion.  *See id.*

There is no dispute that Plaintiff was paid $32,313 for the ACR project (Dkt. No. 93, p, 11), and, hence, was *overpaid* on the project by $7,313.  There also is no dispute that Plaintiff's was paid $146,596 for the Tail Claims TPA project, and, as such, the maximum amount in dispute on this project is $3,404.

Plaintiff's representation that she earned $155,782 on the WV Expansion contravenes the clear terms of the commission plans as well as the Court's summary judgment ruling.  Plaintiff's commission plans provide the following schedule for calculating commissions: 5% earned on first million dollars invoiced; 7% earned on second million dollars involved; and 9% earned on amounts invoiced in excess of three million dollars.  *See* July 27, 2012 Memorandum Opinion, Dkt. No. 93, p. 13.

In ruling on Cambridge's Motion for Partial Summary Judgment, the Court found that only billing amounts over and above three million dollars are subject to the 9% commission rate. *See id.*  Cambridge billed a total of $2,032,483 on the WV Expansion project.[3]  *See id.*  When the commission tiers are correctly applied to the revenue invoiced, it is mathematically impossible for Plaintiff to have earned $155,782 on the WV Expansion project.[4]  At most, Plaintiff could

---

[3] Cambridge's billing records at the time of Plaintiff's termination showed that Plaintiff had been paid all commissions due based upon total billings at that time of $1,887,907.

[4] It is unclear what formula Plaintiff utilized in calculating the 155,782 in commissions she believes she earned on the WV Expansion project; however, the only mathematical explanation is that she erroneously applied the 9% commission to all or some portion of the WV Expansion billings.  Plaintiff's damages calculation is further flawed insofar as she ignores the $150,000 commission cap set forth in the Commission Plans.  *See* Dkt. No. 93, p. 2.

have earned $122,274 (($1M * 5% = $50,000) + ($1,032,483 * 7% = $72,274)) in commissions on this project. She was paid $112,153, after a true-up of approximately $8,200.

When Plaintiff's calculations are revised to comply with the Court's holding, the maximum commissions she could claim to have earned on the three projects in dispute is $297,274 ($25,000 + $150,000 + $122,274). Plaintiff was paid a total of $291,062 in commissions attributable to these three projects. *See* July 27, 2012 Memorandum Opinion, Dkt. No. 93, p. 10-12. Therefore, the maximum amount of commissions she could potentially recover is $6,212.[5] Plaintiff's $39,720 damages calculation is apparently based largely upon her former expert's inadmissible calculations and is clearly erroneous. Permitting her to represent to the jury that she is owed more than $6,212 would have no purpose other than to confuse and mislead the jury and would be unduly prejudicial to Cambridge.[6] Accordingly, this Court should exclude any reference or evidence related to alleged damages that are greater than $6,212.

### C.    Plaintiff Should Be Precluded from Offering Evidence Concerning her Claim For Treble Damages.

Cambridge asks the Court for an order prohibiting Plaintiff's Representatives, including Plaintiff, from offering any testimony, evidence or argument referring to her claim for treble damages under the MWPCL because she is not entitled to such damages as a matter of law.[7]

---

[5] Cambridge offers these calculations merely as a proof of Plaintiff's erroneous damages calculation and in no way concedes that Plaintiff is owed any additional commissions on the three projects.

[6] In her Motion for Partial Summary Judgment, Plaintiff argued that there is no dispute of fact that she is still owed $35,413 in commissions relating to the All Claims Review, Tail Claims TPA project, and WV Expansion projects. *See* Dkt. No. 81-2, p. 14-15. In making this argument, Plaintiff has waived any claim for additional commissions beyond $35,413 on the Tail Claims TPA project, All Claims Review project, or WV Expansion project, and this serves and additional grounds for precluding her from offering evidence of her asserted entitlement to additional damages.

[7] Plaintiff similarly is not entitled to attorney's fees under the MWPCL as a matter of law. However, because entitlement to attorney's fees is a matter to be decided by the Court, not the jury, this Motion is limited to a request to preclude evidence offered to the jury. Notwithstanding, Cambridge's arguments herein equally apply to Plaintiff's claim for attorney's fees and she should automatically be precluded from referencing or offering evidence to the jury pertaining to her claim for attorney's fees before the jury.

The MWPCL limits the availability of treble damages and attorneys fees to violations of § 3-502 or § 3-505.  *See* Md. Code Ann. Lab. & Empl. § 3-507.1; *Glunt v. GES Exposition Servs.*, 123 F. Supp. 2d 847, 873 (D. Md. 2000).  Section 3-502 deals with the timing of payment, and Section 3-505 deals with payment on cessation of employment.  *See* Md. Code Ann. Lab. & Empl. §§ 3-502, 505.  In other words, the MWPCL "does not concern the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment."  *Friolo v. Frankel*, 373 Md. 501, 513, 819 A.2d 354 (2003); *see also McLauglin v. Murphy*, 372 F.Supp.2d 465, 474 (D.Md. 2004).

In this case, Plaintiff does not allege that Cambridge failed to pay her regularly or that it failed to pay her upon her termination.  Rather, Plaintiff's claim turns entirely upon the question of whether the commissions she seeks were due at all and what, if any amount was due.  This Court has held that claims for <u>entitlement</u> to wages are not covered by the MWPCL because they relate to the amount of wages owed, rather than the timing of payment.  *McLaughlin*, 372 F.Supp.2d 465; *Williams v. Maryland Office Relocators, LLC*, 485 F.Supp.2d 616 (D. Md. 2007); *Tucker v. System Specialist Furniture Installations, Inc.,* 2007 U.S. Dist. LEXIS 71434, (D. Md. Sept. 26, 2007); *Fisher v. Rite Aid Corporation*, 2010 U.S. Dist. LEXIS 56383 (D. Md. June 8, 2010); *Calle v. Chul Sun Kang Or*, 2012 U.D. Dist. LEXIS 5742 (D. Md. Jan. 18, 2012); *Haslup v. Johns Hopkins Hosp.*, 2011 U.S. Dist. LEXIS 91489 (D. Md. Aug. 8, 2011); *see e.g. Reed v. Code 3 Sec. and Prot. Servs., Inc.*, 2009 U.S. Dist. LEXIS 118637 (D. Md. Dec. 18, 2009).

In denying a claim for unpaid wages, Judge Blake reasoned as follows:

> The MWPCL limits the availability of treble damages, however, to violations of § 3-502 or § 3-505.  Section 3-502 deals with the timing of payment, and Section 3-505 deals with payment on cessation of employment.  In contrast, McLaughlin's minimum wage and overtime claims are based on his

> entitlement to the wages themselves. He does not allege that Freedmont failed to pay him regularly, but that it failed to pay him enough; and he does not allege that Freedmont failed to pay him minimum wage and overtime due him upon his termination, but that it failed to pay him these wages at all.

*McLaughlin*, 372 F. Supp. 2d at 474-75.

Like *McLaughlin*, the dispute in this case centers on whether Plaintiff is <u>entitled</u> to additional commissions on the business Cambridge sold to BrickStreet, not on whether Cambridge withheld wages that she would have been entitled to had she not been terminated. The limited availability of treble damages under the MWPCL to violations related to the timing of wage payments and the payment of wages on cessation of employment makes such a theory and its damages unavailable to Plaintiffs as a matter of law, and she therefore should be barred from offering evidence or comment regarding her claim under the MWPCL for enhanced damages.

Defendant notes that many of the cases involving this issue, *supra*, arise primarily in the context of claims also covered by the Maryland Wage & Hour Law, Md. Code Ann. Lab. & Empl. § 3-501, *et seq.* However, the seminal case, *McLaughlin,* involved post-termination claims for commissions on loans which the Court found were not supported by the language of the plaintiff's commission contract. So here, the commission plans on which Ms. Murphy bases her claims for additional commissions, contain an express annual cap of $150,000 per account. Plaintiff's MWPCL claim rests on her allegation that the three projects "were treated from the beginning as separate accounts." *See* Dkt. No. 123, p. 2. Plaintiff's claim ignores the plain meaning of the language in the commission plans: the express annual cap of $150,000 per account, as well as the provision giving Cambridge the sole right of interpretation and application of the commission plans. As the Court noted previously, there is "substantial evidence in record that [Cambridge's treatment of the projects as separate for commission

purposes] was an exception to Cambridge's usual interpretation of the commission plans, in which the phrase 'account' meant a single 'client' or 'customer' relative to which a Cambridge employee's commissions would be capped at $150,000."  Dkt. No. 93, p. 21.  Thus, applying *McLaughlin,* any additional amount which Plaintiff may be claiming is not premised upon her commission plan and cannot qualify as wages within the meaning of the Act.

> **D.** **Plaintiff Should be Precluded From Proffering Documents that Have Not Been Properly Identified in Her List of Expected Exhibits.**

Plaintiff's pretrial exhibit list indicates that she may attempt to introduce evidence, including "Twenty-seven Cambridge Commission Reports," an unspecified number of unidentified "Cambridge Accounting Records," and "Rule 30(b)(6) designee Kevin Turner's spreadsheet on the issue of revenue."  *See* Dkt. No. 123, p. 9.  However, Plaintiff does not identify with any specificity the "Cambridge Commission Reports" or "Cambridge Accounting Records" she expects to use as exhibits, and the exhibits from Mr. Turner's 30(b)(6) deposition do not include a spreadsheet.   Cambridge has produced commission-related records pertaining to several former Cambridge sales representative as well as hundreds of documents that could be categorized as "accounting records."   Accordingly, Cambridge is presently unable to determine which records Plaintiff is referencing or whether those records contain evidence that would be relevant to and subject to this Motion.

Beginning January 15, 2013, counsel for Cambridge has asked Plaintiff's counsel to identify the specific records referenced on Plaintiff's exhibit list by document bates number or another means that will allow Cambridge to easily identify and locate the referenced records. Last week, Plaintiff's counsel agreed to do so; but, despite the deadline for filing motions *in limine*, the requested information has not been provided.

Plaintiff's exhibit list is clearly inadequate and her failure to provide Cambridge with more specific and/or accurate information regarding the documents she expects to offer as exhibits at trial has prevented Cambridge from examining all of Plaintiff's potential exhibits and determining whether any of the documents are objectionable and the proper subject of this Motion *in Limine*.  As such, Cambridge asks that Plaintiff be precluded from offering the referenced documents (whatever they may be) and that the documents be stricken from Plaintiff's list of documents and exhibits.

## III.    CONCLUSION

WHEREFORE, Defendant respectfully requests that the Court enter an Order *in limine* precluding Plaintiff from introducing both verbal and documentary evidence regarding 1) her prior claims for commissions on the FCM, IME, Brickstreet: Subrogation/Recovery of Overpayment; and Brickstreet: SIU projects; 2) evidence that her claimed compensatory damages exceed $6,212; 3) evidence concerning her claim for treble damages under the Maryland Wage Payment and Collection Law; and 4) documents that have not been properly identified in her list of expected exhibits.

Dated:  January 28, 2013                     LITTLER MENDELSON, P.C.

By: __s/ Thomas J. Flaherty_____
Thomas J. Flaherty (Fed. Bar No. 16582)
tflaherty@littler.com
Lindsey H. McGinnis (admitted *Pro Hac Vice*)
lmcginnis@littler.com
1650 Tysons Blvd., Suite 700
McLean, Virginia  22102
703.442.8425  Telephone
703.442.8428  Facsimile

*Counsel for Defendant*

11

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2013 a copy of the foregoing Memorandum was served via the Court's electronic filing system upon:

> James P. Campbell, Esq.
> Danell P. Dean, Esq.
> Campbell Flannery, P.C.
> One Village Plaza
> 1602 Village Market Boulevard
> Suite 220
> Leesburg, Virginia 20175

__s/ Lindsey H. McGinnis_____
Lindsey H. McGinnis